1                    **<u>DIRECT EXAMINATION</u>**

2  BY MR. BANDAS:

3  *Q.*   Good afternoon.  Would you please state your name for the

4  record.

5  *A.*   John O'Hagan.

6  *Q.*   John, how are you feeling?

7  *A.*   I've felt better.

8  *Q.*   I understand.  Before we get started, I want to clarify a

9  couple of issues that have come up so far in the case.  Yes or

10 no, does ROWMEC owe Gyro-Trac $694,000 -- 710 dollars and 84

11 cents?

12 *A.*   No, it does not.

13 *Q.*   Does ROWMEC owe anywhere near that amount of money?

14 *A.*   No, sir.

15 *Q.*   Did ROWMEC ever even come close to going over the

16 500,000-dollar credit limit that's been talked about in this

17 case?

18 *A.*   No, sir.

19 *Q.*   And we will get into more detail about that later,

20 Mr. O'Hagan.  How are you currently employed?

21 *A.*   By ROWMEC Equipment Company.

22 *Q.*   And what is your position with ROWMEC?

23 *A.*   I'm vice president.

24 *Q.*   Are you a corporate representative for ROWMEC in this

25 lawsuit?

Exhibit A

USCA5 3634

1   A.   Yes, sir.

2   Q.   And generally speaking what kind of business is ROWMEC?

3   A.   We build right-of-way clearing equipment -- speciality

4   right-of-way clearing equipment.

5   Q.   And tell me what you mean by right-of-way clearing.

6   A.   Mainly over the years that's what we concentrated on was

7   clearing electrical oil and gas right of ways and we developed

8   equipment that worked well in those situations.

9   Q.   All right.  Is ROWMEC a family-owned business?

10   A.   Yes, sir.

11   Q.   Who all owns this business?

12   A.   My father, William Stanley O'Hagan, Sr.; my mother, Joan

13   O'Hagan; my older brother, William Stanley O'Hagan, Jr.;

14   myself; and my younger brother, Scott O'Hagan.

15   Q.   And where is the company located?

16   A.   Conroe, Texas.

17   Q.   And how long has the company been in Conroe?

18   A.   28 years.

19   Q.   How did you end up in Conroe?

20   A.   Well, I grew up in New Jersey.  I went into the Marine

21   Corps after New Jersey and then rejoined the family business

22   in Conroe.  They moved while I was in the service.

23   Q.   And just very briefly a little bit about your personal

24   background, John.  Where do you live right now?

25   A.   Conroe, Texas.

USCA5 3635

1  Q.   Again, how long have you been in Conroe?

2  A.   29 years.

3  Q.   And how far did you get in high school?

4  A.   I graduated high school.

5  Q.   And where did you got to high school?

6  A.   Allentown, New Jersey.

7  Q.   And what did you do after high school?

8  A.   I enlisted in the Marine Corps.

9  Q.   How long were you in the Marine Corps?

10  A.   I was in the Marine Corps for three years.

11  Q.   What did you do in the Marine Corps?

12  A.   I was a combat engineer.

13  Q.   And after you got out of the Marine Corps, where did you

14  go?

15  A.   My wife, my son, and I moved to Conroe, Texas to join the

16  family business.

17  Q.   And what year was that?

18  A.   1978.

19  Q.   And what was the family business then?

20  A.   Well, it was land clearing.  But it started out basically

21  as the old style of land clearing -- bulldozers, excavators,

22  piling and burning.

23  Q.   And who started the family business?

24  A.   It was my father.

25  Q.   And when was that business started?

USCA5 3636

1  A.   Actually in the '60s he actually started the business

2  himself in New Jersey.

3  Q.   And what kind of business was it when your father started

4  the business?

5  A.   Again, he did land clearing with bulldozers, excavators,

6  machines like that.

7  Q.   If you would, so we can understand how the technology has

8  developed, what was it like to clear right of ways or land

9  with bulldozers and buckets and cranes and that kind of thing?

10 A.   Actually before right-of-way clearing we did large

11 property clearing where you would pile and burn everything.

12 So, they would push up huge piles of trees with bulldozers and

13 burn it.  And that's how it was done then.

14 Q.   All right.  When your father started the business -- and

15 what's your father's name?

16 A.   Stanley O'Hagan, Sr.

17 Q.   And when your father started the business, what was the

18 name of the company then?

19 A.   F & S Excavating.

20 Q.   What kind of customers did the company have back then

21 when it was started?

22 A.   Back in New Jersey in the early days it was mostly

23 developers.

24 Q.   And how are you introduced to the family business?

25 A.   Well, other then begging him to take us with him on

USCA5 3637

1  weekends is when we started, maybe 8, 9 years old.

2  Q.   Did your dad eventually put you to work?

3  A.   Sure.  When we were a little bit older he used to take us

4  with him, again, on weekends or in the summertime to watch

5  fires while the men got some sleep, or watch pumps, whatever

6  we could do to let them get some sleep.

7  Q.   What do you mean by watching pumps and watching fires?

8  A.   Well, again back in the old days when they started these

9  huge fires, you had to keep them going.  You couldn't let them

10  go out.  They used big fans that blew diesel onto the fires at

11  night.  So, at night we would kind of just make sure nothing

12  was going wrong while some of the men would get some sleep.

13  Q.   And how old were you, Mr. O'Hagan, when your father put

14  you to work?

15  A.   9, 10, around that age.

16  Q.   And how old are you now?

17  A.   I'm 50.

18  Q.   And other than your time in the Marine Corps, have you

19  always been involved in the family business?

20  A.   Yes, sir.

21  Q.   When you first started out as a young man, how was the

22  pay, working for the company?

23  A.   Until after I got out of the Marine Corps, married and

24  moved back here to Texas, there was no pay unless you consider

25  room and board.

USCA5 3638

1  *Q.*   I got it.  And over the years what jobs have you done in

2  the land clearing business?

3  *A.*   Well, when you work for my father in his business you

4  start off at the bottom.  He wanted us to know every aspect of

5  the business.  So, we started as laborers, fuelers, grease

6  monkeys, whatever it took.

7  *Q.*   What's a fueler, for example?  What did you do as a

8  fueler?

9  *A.*   A fueler is the guy that stays at the end of the day

10  after the operators go home and make sure that the machines

11  are ready to go again the next day, whatever it took.

12  *Q.*   And what does it sometimes take?

13  *A.*   It could be anything from just fueling it up to pulling

14  the cylinder head off, whatever it took, to make sure the

15  machine was ready to go the next day.

16  *Q.*   Over the years can you really think of any job that you

17  haven't done in the land clearing business?

18  *A.*   Not much secretarial work.

19  *Q.*   I understand.  Did your father train you in this

20  business?

21  *A.*   Yes.  My father and his brothers and his employees also

22  helped.

23  *Q.*   How did they train you?

24  *A.*   Mostly on-the-job training.

25  *Q.*   What was your father's background before he got into this

USCA5 3639

1  business?

2  A.   He had an 8th grade education, basically the same thing,

3  on-the-job training, he learned as he went.

4  Q.   Is your father actively involved in the business now?

5  A.   Very little.  He's basically retired now.

6  Q.   Is it something that he's pretty much passed on to you

7  and your siblings?

8  A.   Yes.

9  Q.   Now, if you would, Mr. O'Hagan, tell me how the family

10  business got to Texas.

11  A.   In the early '70s we had -- we had the initial fuel

12  shortage and it kind of slowed everything down on the east

13  coast.  My father had come before that to Texas and saw the

14  work that was going on here back then and he thought it would

15  be a better place for us to run our heavy equipment business.

16  Q.   What was the name of the business when you first got to

17  Texas?

18  A.   O'Hagan's Tree Eater Service.

19  Q.   Where was it based?

20  A.   In Conroe, Texas.

21  Q.   And what did O'Hagan's Tree Eater Service do?

22  A.   For a short time we started off the same way with the

23  heavy equipment but we had brought some of the machines that

24  we had developed back in New Jersey that would shred brush and

25  trees with us out here and we saw what looked like a pretty

USCA5 3640

1  good niche in the pipeline and electric utility right-of-way

2  clearing.  So, we started heading in that direction.

3  Q.   And tell me -- or tell us if you would what were the

4  machines that were being developed back in New Jersey that you

5  brought to Texas with the company or that the company brought

6  to Texas?

7  A.   Back then we called them tree eaters and they were

8  drum-type machines with knives on them that would actually

9  walk up to the trees or brush, cut it off, cut it down, and

10 chip it up down so you didn't have to haul it or burn it.

11 Q.   All right.  And when the company came to Texas, what were

12 the customers that it was going after?

13 A.   We did quite a bit of work for Gulf, which later turned

14 into Chevron, Houston Power and Light, Texaco, quite a few of

15 the major oil companies here in the area.

16 Q.   In your experience are there a lot of right of ways in

17 Texas?  Are there a lot of land clearing opportunities in

18 Texas?

19 A.   Yes, and it's on a continuing basis because the stuff

20 grows back.  So, you have to cut it basically on a yearly

21 basis, usually on a rotation.

22 Q.   And since the business has been in Texas, do you believe

23 that the number of pipelines and utilities we have in Texas

24 are indicative of what the business opportunities are for your

25 type of business in Texas?

USCA5 3641

1  A.    Yes, I think so.

2  Q.    We some of it in opening.  But basically how did the

3  company evolve from being, you know, basically a service-type

4  company to developing and selling machines?

5  A.    Well, we started just doing the contracting work

6  ourselves.  But as time went on, we had more and more people.

7  As we spread out and more people saw the machine work, we had

8  more and more people ask if they could buy the machines and if

9  so where they could buy them.  So, we started developing them

10  to sell.

11  Q.    And when you say developing them, what kinds of machines

12  are you talking about?

13  A.    The tree eaters.

14  Q.    All right.  And what was the difference between your tree

15  eater and what was out there in the marketplace before you

16  developed the tree eater?

17  A.    Before that mostly it was heavy duty brush hog mowers

18  like you'd see on the back of tractors on farms.  There were

19  heavier duty versions that would take some brush and trees.

20  Q.    What do you mean by brush hog?

21  A.    These were horizontal-type cutters that had a deck under

22  them with two to four individual blades, heavy steel blades,

23  that would spin and blow things all over the place.  They were

24  very dangerous.

25  Q.    Are you basically describing a big lawnmower?

USCA5 3642

1  A.   Yes.

2  Q.   And how were those used to cut down trees and to cut down

3  right of ways?

4  A.   They would cut down similarly.  But, again, they would

5  blow debris all over the place and they left usually a sharp

6  edge on whatever they were cutting.  So, you couldn't actually

7  drive back over where they had done the work.  You would have

8  to wait several years for the stumps to rot.

9  Q.   Before you could get back through there?

10  A.   Yes.

11  Q.   So, what was it about that technology that prompted your

12  family business to start working on a new type of technology?

13  A.   Well, we had started on it in New Jersey.  They outlawed

14  burning on the East Coast back in late '60s, like '69.  So, we

15  tried to corporate more into our business instead of just

16  burning or then it was going to hauling it off to landfills.

17  We were trying to come up with a machine that would reduce the

18  amount of wood we would either have to haul off or burn.

19  Q.   And, if you would, describe what that machine looked

20  like.  What was the major technological features of it?

21  A.   It was a drum, 5, 6-foot long and it was usually 18 to 20

22  inches in diameter.  It had teeth on the face that would swing

23  out with the inertia of the drum spinning.  First we used them

24  mostly on farm tractors but then it evolved as we worked on

25  them.

USCA5 3643

205

1  *Q.*   What type of farm tractors were you are putting your

2  equipment on when your company was first developing this

3  technology?

4  *A.*   John Deere, International, basically any farm tractor.

5  The major drawback back then is they were all -- they had

6  mechanical clutches.  So, you had to ride the clutch a lot to

7  make them work.  But that's what we had at that time.

8  *Q.*   And when did ROWMEC first start putting cutter heads on

9  different types of tractors?

10 *A.*   After we moved here to Texas.

11 *Q.*   And what year was that approximately when ROWMEC first

12 started putting the drum-type cutter head on tractors?

13 *A.*   As soon as we moved here in '78 on farm tractors but then

14 it evolved a few years after that.  Some tractors started

15 coming out that had hydrostatic drive and were more geared

16 toward what we were doing.  One of the first was a New Holland

17 that first came out with the hydrostatic drive.

18 *Q.*   And was that one of the first tractors that ROWMEC

19 started putting its cutter head on?

20 *A.*   Yes.

21 *Q.*   And if you would, just so we understand as we're going

22 forward, describe how the cutter head works as it's going

23 through and clearing a right of way or clearing vegetation?

24 *A.*   Actually it will drive up to -- under brush is basically

25 like running a brush hog.  You just drive over it and it

USCA5 3644

1  destroys it.  Bigger trees, you drive up -- and you have to

2  take your time -- you easily start to cut through it.  As the

3  tree starts to lean, then you drive up on it and take it all

4  the way down, and it just chips it up so that it's smooth

5  chips on the ground.

6  Q.   And this cutter head, does it work by spinning?

7  A.   Yes.  About 2200 RPM's it spins.

8  Q.   What is it that does the actual cutting of the tree?

9  A.   The actual stirrup-shaped cutters that are hooked to the

10 outside of the rooter with a bar.  Depending on the width of

11 the cutter head, there can be anywhere from 38 teeth to 54

12 teeth, something like that.

13 Q.   All right.  And when did the company start selling some

14 of the equipment that it was manufacturing for itself?

15 A.   I think it would have been early to mid '90s is when we

16 actually started selling them.

17 Q.   When did the company come to be known as ROWMEC?

18 A.   I think it was around 1995.

19 Q.   All right.  And then when is it that the company really

20 started focusing on equipment design and manufacture?

21 A.   Between '95 and '99, because I believe we sold the

22 construction part of the company in '99 or 2000.  We were

23 starting to bump into too many of our customers at bid

24 meetings and stuff.  So, we had to make a decision to either

25 do the contracting and not the selling or the selling and not

USCA5 3645

1  the contracting.

2  Q.   If you would, explain a little bit more what you mean by

3  selling or contracting.

4  A.   Well, we had sold a pretty good amount of machines in the

5  Houston and Texas locals to where we lived.  And they were

6  starting to be more known.  So, we started running into more

7  of our customers actually at bid meetings and stuff for the

8  oil companies and electric companies.  So, then it was time to

9  make a decision to do one or the other, either go straight

10  into sales or stay with the contracting.  We chose to go into

11  the sales.

12  Q.   All right.  And so, in the mid 1990s is it fair to say

13  that ROWMEC started evolving into more of a sales and

14  equipment manufacturing business?

15  A.   Yes, sir.

16  Q.   At that time, Mr. O'Hagan, what types of machinery was

17  ROWMEC making for sale?

18  A.   We were making rubber tired mostly, all rubber tired.  We

19  used again John Deere, New Holland, some Caterpillar, some

20  Tiger Cat.  So, we were basically taking other peoples

21  tractors and modifying them and putting our cutter heads on

22  the front.

23  Q.   Were you selling them as a complete unit?

24  A.   Yes, sir.  Although we did also sell cutter heads to some

25  people just to mount on what tractors they already had.

USCA5 3646

1  Q.   When ROWMEC first started selling its cutter heads on

2  rubber track or rubber-tired-type machines?  Did ROWMEC have

3  to do anything to arrange with the manufacturers of those

4  tractors your ability to put the cutter heads on it?

5  A.   Yes.  We had to do testing with the manufacturer to make

6  sure that our attachment wouldn't harm the tractor, that it

7  was still safe.  So, we had to pass an inspection with all

8  them.

9  Q.   And were those inspections geared towards, for example,

10 warranty issues?

11 A.   Sure.  To make sure that it wouldn't over load the

12 hydraulic system or over load the cooling system of the engine

13 or the drive system so that they wouldn't end up with

14 increased warranty issues on their machines.

15 Q.   And who did that testing and certification for the

16 different companies?

17 A.   Usually they would send people out to our shop and we

18 would hook up special testing equipment on the machines and

19 then take them out and actually run them for them to get their

20 own data together.

21 Q.   All right.  Then ultimately was it the companies that had

22 to give the final seal of approval to your equipment to your

23 equipment for you to be able to sell it on their tractors?

24 A.   You always have the option just to buy it and put the

25 machine together and sell it but without their approval and

USCA5 3647

1  without their backing and without their warranty coverage.

2  *Q.*   And why was it important for you to have the warranty

3  coverage when you sold their tractor with your cutter head?

4  *A.*   It would cause you a lot of problems down the road.  If

5  they didn't give you the backing and you still put your head

6  on there and sold the tractor and then it caused the tractor

7  to start having problems, you wouldn't have any backup from

8  the manufacturer.

9  *Q.*   What companies backed you up and gave you the

10  certification to sell their tractors with your cutter head?

11  *A.*   New Holland, John Deere.  We were actually one of the

12  first companies with this type of equipment to ever be

13  approved by New Holland, John Deere, Caterpillar, Tiger Cat

14  and there's some others one, but I'm just not remembering.

15  *Q.*   And before ROWMEC put its cutter head on these tractors,

16  were you aware of any other manufacturers or any other

17  companies that were putting in drum-type cutter heads on

18  tractors for land clearing?

19  *A.*   No, sir.

20  *Q.*   In focusing your attention on the time period before the

21  dealership arrangement was started with Gyro-Trac in this case

22  in September of 2003, and focusing on the time period before

23  that, over the years how many complete machines, meaning a

24  tractor with a cutter head, a complete machine, has ROWMEC

25  sold over the years?

USCA5 3648

1  A.   Well over 150.  We have one customer in the Houston area

2  that has over 40.

3  Q.   And these are complete units, purpose-built machines that

4  you put together and you have put out in the marketplace?

5  A.   Yes.  They're not quite purpose built.  They're still

6  machines that we take a supplier's tractor, we do some

7  modification to it, and then put our cutter head on the front.

8  Q.   So, when ROWMEC started its dealership arrangement with

9  Gyro-Trac selling tractors with cutter heads as complete

10 machines, that wasn't a new business -- or -- was that a new

11 business for ROWMEC?

12 A.   Not a new industry but a new business.  Now we were -- we

13 would be able to take what's called a purpose-built machine,

14 which would be a machine that was built from the ground up as

15 a clearing machine, and be able to sell it into the

16 marketplace also being a track machine which is something we

17 hadn't done before.

18 Q.   Again, focusing your attention on the time period before

19 the dealership that's at issue in this lawsuit which is

20 September of 2003, did ROWMEC also sell just cutter heads?

21 A.   Yes.

22 Q.   All right.  For how long had ROWMEC just sold cutter

23 heads in the marketplace?

24 A.   At or before we started selling complete machines.

25 Cutter heads is what we had to offer first.

USCA5 3649

1  Q.   In addition to complete machines, how many just cutter

2  heads has ROWMEC sold over the years, again, before the

3  dealership at issue in this case?

4  A.   Not counting the ones that were added to tractors,

5  75-plus just cutter heads.

6  Q.   Now in the years that ROWMEC was selling complete

7  machines, meaning tractors with cutter heads, who were some of

8  ROWMEC's customers over the years?

9  A.   Western Geophysical, Terra Services here in Houston,

10 we've sold some to the government of Tahiti, we've sold some

11 that are working in Africa, also in Venezuela.  And I think

12 they were all for Western Geophysical, was one of the

13 companies that we sold quite a few machines to.

14 Q.   Have you gone and demonstrated your equipment outside the

15 United States?

16 A.   Yes, sir.

17 Q.   Did you ever go outside the United States or anywhere to

18 try to sell equipment without demonstrating it?

19 A.   No.

20 Q.   Do you agree with what Mr. Flournoy said to sell these

21 machines you've got to be able to show them to people?

22 A.   Yes, sir.  Definitely to new customers.

23 Q.   Where all have you demonstrated machines around the

24 world?

25 A.   Tahiti, Malaysia.  I didn't actually do the demos in

USCA5 3650

1  Africa but our machines were demoed in Africa and of course

2  all over the United States.

3  Q.   All right.  We've heard a little bit so far in this case

4  about your patents.  I'd like to call to your attention to

5  Exhibit No. 20.

6            Mr. O'Hagan, what are we looking at here as

7  Plaintiff's Exhibit No. 20?

8  A.   That's the patent document on our cutter tooth that fits

9  our cutter head.

10  Q.   And when did you get this patent and --

11            MR. BANDAS:  This area right here.

12            Does that refresh your recollection?

13  A.   Yes, sir.

14  BY MR. BANDAS:

15  Q.   When did you get this patent?

16  A.   Looks like it was awarded in 1996.

17  Q.   If you would, describe what it is -- what is the essence

18  of this invention?

19  A.   That basically covers the cutter tooth that is mounted to

20  our cutter head that actually does the cutting.

21  Q.   All right.  And then --

22            MR. BANDAS:  Mike, if you would, bring up

23  Plaintiff's Exhibit No. 21.

24  BY MR. BANDAS:

25  Q.   What is Exhibit No. 21, Mr. O'Hagan?

USCA5 3651

1  A.   That is the patent document on the cutter head that the

2  cutter tooth fits on.

3         MR. BANDAS:   If you could, I'd like to focus up

4  here.   If we could focus in there so we can get the time

5  period when this was issued.

6  BY MR. BANDAS:

7  Q.   When was this patent issued?

8  A.   November 27th of 2001.

9  Q.   Mr. O'Hagan, who is identified as the inventor on both

10 these patents?

11 A.   I am.

12 Q.   Do you have any formal education past high school?

13 A.   No, sir.

14 Q.   Do you have any engineering degrees?

15 A.   No.

16 Q.   Have you ever taken any engineering courses?

17 A.   No, sir.

18 Q.   What did you have to do to get these patents?

19 A.   When you come up with a concept, you have to have the

20 drawings done, you have to do the testing, and then you submit

21 all that into the patent office and they review it and check

22 it against other patents that are out there.

23 Q.   Is that process called the examination process?

24 A.   Yes.

25 Q.   And how long did that process take with each of these

USCA5 3652

1  patents?

2  A.   Actual application time I think it was two years on one

3  and possibly one to two on the other one.  That's just the

4  application time, from the time you submit and you get patent

5  pending.

6  Q.   Did you have to hire lawyers to get these patents?

7  A.   Lawyers and engineers to actually do the drawings that

8  would be accepted by them.

9  Q.   Has anybody in your family ever gotten a patent before?

10  A.   No, sir.

11  Q.   Mr. O'Hagan, are you proud of these two patents?

12  A.   Yes, sir.

13  Q.   How did you first hear about Gyro-Trac?

14  A.   I think it was around 1995 my brother had been at a show

15  on clearing-type equipment or it might have been a forestry

16  show and he came back from there with a brochure on a

17  Gyro-Trac tractor.

18  Q.   And what is it that you learned about the Gyro-Trac

19  tractor then?

20  A.   At the time they had a mower-type cutter head on the

21  front so we were more interested in just the tractor, not

22  their cutter head.  But we were very interested in looking at

23  it for another type of machine to put our cutter head on.  I

24  got in touch with a man I believe at the time was in North or

25  South Carolina was supposed to be the dealer for Gyro-Trac at

USCA5 3653

1  that time.  And I called him to see if he had any equipment

2  available.  He had some used pieces but actually he was losing

3  his dealership so he gave me the number of somebody else to

4  talk to in Canada which I think was Daniel at the time.

5  Q.  What is it that was interesting to ROWMEC about the

6  Gyro-Trac tractor that they were making?

7  A.  That it was a purpose built tractor for the clearing

8  industry and that it was a low ground pressure which meant it

9  would go places that a lot of our rubber tire machines

10  wouldn't go and the horsepower.  It was just a nice looking

11  tractor.

12  Q.  If you would, explain to us the difference between what

13  you just referred to as a low pressure tractor versus a rubber

14  tire tractor.

15  A.  This was a rubber track machine which had rubber tracks

16  that supported steel bolted going across.  So, it wasn't quite

17  a bulldozer-type chassis.  It was a light weight, low ground

18  pressure.  I'm trying to think of something I could tell you

19  to compare it to but I really can't.  It was light weight,

20  good for swampy areas and mountains.  It was very safe, very

21  steady.

22  Q.  Are you talking about like a track on a tank, for

23  example?

24  A.  Sort of, yeah, but even lighter than that.  It was rubber

25  with steel bolted across the three rubber strips that would

USCA5 3654

1  hold those together.

2  Q.   And what is it that makes that low ground pressure?

3  A.   It's the combination of the square inches of track on the

4  ground and the lightness of the machine itself.

5  Q.   And would that allow a land clearing machine to get into

6  a place where rubber tire tractors might sink or bog down?

7  A.   Sure.  Especially in right of way work.

8  Q.   Was that one of the big attractions to ROWMEC about the

9  Gyro-Trac machine?

10 A.   Yes.  Because one of the things that we ran into when we

11 started doing pipeline right of way out here is not only the

12 winters where you know if you are from here that it can rain

13 pretty continuous all the way through the winter but the

14 bottoms and the low areas that you go through on right of ways

15 because they cross country.  So, you cross quite a few bottoms

16 and creeks and...  We were having to do all of those by hand

17 for years.  Even if you had a good machine that would do the

18 clearing, it wouldn't go through the wet stuff.  So usually in

19 the winters, and even in some of our wet summers, we did a lot

20 of clearing of right of ways by hand instead of using our

21 equipment.

22 Q.   And before you saw or became aware of the Gyro-Trac

23 machine, had you really seen anybody else out in the

24 marketplace that had a low-ground-pressure-type machine to

25 which your company could attach a cutter head?

USCA5 3655

1  A.   No.  Because what Gyro-Trac did to make theirs stand out
2  is before that you saw snow-type equipment or machines that
3  looked similar to theirs but they were all manual
4  transmissions in them so you couldn't really use them in a
5  clearing-type application.
6  Q.   All right.  And was your company excited, frankly, when
7  you saw Gyro-Trac machines and the potential applications it
8  had with your cutter head?
9  A.   Very excited by several things.  First, the machine
10 itself, the fact it hadn't been down here.  I think there was
11 one dealer at the time and he wasn't staying.  So, they hadn't
12 really been introduced down here at all.  So, we could get in
13 on the ground floor.
14 Q.   Okay.  Before -- strike that.
15          When you first became aware of the Gyro-Trac
16 tractor and that type of track technology, which you call the
17 low ground pressure technology, were you aware of anybody else
18 anywhere in North America that was putting a drum-type cutter
19 head like yours on a track machine?
20 A.   No.
21 Q.   And to the best of your knowledge, Mr. O'Hagan, who was
22 the first person to do that in North America?
23 A.   It was ROWMEC.
24 Q.   What year was that?
25 A.   Possibly '97, 1997.

USCA5 3656

1  *Q.*   All right.  In talking about your relationship with

2  Gyro-Trac, after you became aware of the fact that they had

3  this tractor that your company wanted to use, where did things

4  go next?

5  *A.*   I contacted -- and I believe it was Daniel.  I can't

6  remember for sure -- but he had moved to South Carolina -- had

7  just moved there at the time and had a tractor down there that

8  I could come look at it.  So, I flew down there and took a

9  look at it.

10  *Q.*   More or less when did you go meet with Daniel in South

11  Carolina?

12  *A.*   I'm a little rusty on dates but I think it was around

13  1997.

14  *Q.*   And what happened at that meeting?

15  *A.*   I met Daniel.  We went out and looked at the machine.  I

16  drove it around a little bit.  It was just a tractor without a

17  cutter head on it but I was pretty impressed.

18  *Q.*   Very good.  Did he even have any type of cutter head that

19  he was trying to sell at the time?

20  *A.*   He had a little double-bladed-mower-type cutter head on

21  the front.  A little heavier than a mower, it was a brush-type

22  but mower design.

23  *Q.*   All right.  And just so we're clear which Daniel you're

24  talking about, which Daniel did you meet with?  Are you

25  talking about Daniel Gaudreault?

USCA5 3657

1  *A.*   Yes, sir.  I'm sorry.

2  *Q.*   And are you talking about the owner of Gyro-Trac?

3  *A.*   Yes.

4  *Q.*   What happened after the meeting you had with Daniel in

5  South Carolina?

6  *A.*   ROWMEC actually purchased, I think it was, three machines

7  from him.

8  *Q.*   When ROWMEC purchased those machines, what was ROWMEC'S

9  business purpose or intention in purchasing those machines?

10  *A.*   To put our cutter heads on the front and sell them.

11  *Q.*   And you were going to sell them -- ROWMEC was going to

12  sell them to customers?

13  *A.*   Yes.

14  *Q.*   What machines did ROWMEC purchase from Gyro-Trac?

15  *A.*   We bought three GT-18's.  That was the only model he had

16  at the time.

17  *Q.*   To your knowledge was Gyro-Trac or Daniel making any

18  other type of machine other than the GT-18 at the time?

19  *A.*   They might have made a carrier-type tractor which was

20  called a Mesick, I think, which was basically the low ground

21  pressure machine but it was just for hauling cargo or

22  personnel, not a clearing-type machine.

23  *Q.*   All right.  And when was it -- over what time period did

24  ROWMEC buy those track machines, the first track machines from

25  Gyro-Trac?

USCA5 3658

1   A.   It was in '97.  It was within a couple of months we had
2   purchased all three.  I can't give you exact dates.
3   Q.   Just so we're clear, was there any kind of dealer
4   relationship with Gyro-Trac at the time?
5   A.   No.
6   Q.   Was this just an arm's length transaction?  You're
7   interested in their tractor and you would like to go get their
8   equipment?
9   A.   Yes, sir.
10  Q.   Where did the business relationship go from there?
11  A.   We put cutter heads on two of the tractors, sold one
12  immediately to a customer of ours.  Between the first and the
13  third unit, we started having some pretty bad problems with
14  the tractor itself.  We ended up purchasing that tractor back
15  before we could get the third one sold.  So, we didn't have a
16  lot of good luck.
17  Q.   All right.  And what year was that?
18  A.   Between '97 and '99.  That's all I can remember.
19  Q.   And even though you had maybe some specific problems with
20  those machines, was ROWMEC still fundamentally interested in
21  using track machines with drum cutter heads?
22  A.   Yes.  We definitely kept looking for a replacement.
23  Q.   And what other companies were out there that ROWMEC
24  looked at potential suppliers for track machines?
25  A.   There were none.

USCA5 3659

1  *Q.*   None other than Gyro-Trac?

2  *A.*   Gyro-Trac.

3  *Q.*   Now, where did the business relationship go with

4  Gyro-Trac after that?  Did Gyro-Trac ever purchase cutter

5  heads from ROWMEC, for example?

6  *A.*   Yes, kind of all at the same time.  We had purchased the

7  three tractors.  I think it was right around then -- it was

8  2000 -- right around 2000, I guess, 2001 they had purchased

9  some cutter heads from us.  So, the whole thing was from '97

10 to 2000, 2001.  I'm just not good on the dates.

11 *Q.*   And, Mr. O'Hagan, when you first started during business

12 with Gyro-Trac, did you express to Daniel a vision or your

13 ideas of how the marriage of that technology could be

14 beneficial to both companies?

15 *A.*   Yes, definitely.  We thought it would be a perfect fit

16 for both companies.  At the same time, like I said, he bought

17 two to four cutter heads from us and took them and installed

18 them on tractors of his, too.

19 *Q.*   What, if anything, did he express to you about how they

20 saw the business opportunity and what importance or role your

21 cutter heads had in their business?

22 *A.*   What I got directly from Daniel and later on from Jon

23 Flournoy is that they weren't doing well with trying to sell

24 their tractors here with the mower-type cutter head.  But when

25 they installed our cutter heads on there, that's when their

USCA5 3660

1  part of the company started to take off.

2  Q.   What do you recall Daniel telling you about that, about

3  his experience of putting his tractors with your cutter heads?

4  A.   Actually what he told me, he was almost bankrupt when he

5  bought the first cutter heads from me and that's when his

6  business really started taking off.

7  Q.   How many cutter heads did you sell to Gyro-Trac?

8  A.   Four maybe five.

9  Q.   And more or less when was the last cutter head that you

10  ended up selling to Gyro-Trac?

11  A.   It was all pretty close in that time period but it was

12  just the four or five and then he never purchased any more

13  from us.

14  Q.   After you sold that last cutter head to Gyro-Trac, what

15  happened in your relationship with Gyro-Trac after that?

16  A.   He started producing his own cutter heads.

17  Q.   And when did that happen?

18       MR. KEENAN:  Objection, Your Honor.  I think we're

19  about to violate the limine.

20       MR. BANDAS:  Can we approach, Your Honor?

21     (At side bar)

22       MR. KEENAN:  The Court, as I understand it, Your

23  Honor, ruled that the only thing that was going to be

24  discussed with regard to the underlying litigation was that

25  there was a patent lawsuit filed, period, the end.  And I

USCA5 3661

1  think where he's about to go is down memory lane with how they

2  got to the point where a patent lawsuit was filed.

3          MR. BANDAS:  No.  That's not all what I'm going to

4  do.  I think it's fair to establish in very succinct manner

5  the fact there was a lawsuit, there was an allegation of a

6  patent dispute, and that there's a settlement.  We're not

7  getting into the merits of it.

8          MR. KEENAN:  No.  No.  What the Court ruled was is

9  that that very issue could not be gotten into.  And, you know,

10  that's exactly where you are going now with it.  The next

11  question you were going to ask him is:  Did you consider that

12  a violation of the patent?  And then we're going to be off to

13  the races.

14          MR. BANDAS:  That's not the next question we were

15  going to ask.  I was simply going to ask, Your Honor:  What

16  happened next?  He's going to say:  They were making their

17  own.  What did you do?  We filed a lawsuit.  What happened?

18  It was settled.  That's where we get to where we are.

19          MR. KEENAN:  Well, okay.  If that's --

20          THE COURT:  If that's what he's going to ask, that

21  sounds fine to me.

22          MR. KEENAN:  I agree.  I was not at all convinced

23  that's where we were headed.

24          THE COURT:  How much longer do you have with him?

25          MR. BANDAS:  Hours.

USCA5 3662

1          THE COURT:  All right.  I think it's a good time to

2   take our evening recess.

3       (Open court)

4          THE COURT:  All right.  Ladies and gentlemen, I

5   think we've kept you here long enough.  We're going to take

6   our evening recess.  We'll start tomorrow morning at 10:00

7   o'clock.  I'd like you to be in the jury room no later than,

8   say, 9:45 or so.  If you want to come earlier, it will be

9   open, but I'd like you here at least by 9:45.

10              Please remember the admonition that I gave to

11   you earlier about not discussing any aspect of this case with

12   anyone.  You are not to make up your mind as to any fact or

13   issue until all of the evidence has been presented and the

14   case is finally submitted to you.  So, with that admonition,

15   thank you very much for your attention and we'll see you in

16   the morning.

17          THE MARSHAL:  All rise.

18       (Proceedings concluded for the day at 5:59 p.m.)

19                        * * *

20

I certify that the foregoing is a correct transcript from the
21   record of proceedings in the above-entitled cause, to the best
of my ability.

22

23

_____          12/28/07
24   Stephanie Kay Carlisle-Neisser CSR, RPR      Date
Official Court Reporter

25

USCA5 3663

1          THE COURT:  The jury is ready.  Let's go.

2      (Jury present)

3          THE COURT:  All right.  Mr. Bandas, are you ready to

4  proceed.

10:18:16AM  5          MR. BANDAS:  We are ready to proceed with

6  Mr. O'Hagan, Your Honor.

7          THE COURT:  Mr. O'Hagan, would you please come

8  forward and have a seat back in the witness chair and remember

9  that you are still under oath.

10  (**JOHN PATRICK O'HAGAN, JR.,** Plaintiff's witness, previously

11  sworn.)

12              **DIRECT EXAMINATION (Continued)**

13  BY MR. BANDAS:

14  Q.   Mr. O'Hagan, yesterday when we left we were -- just to

10:18:36AM 15  help us maybe remember where we were -- we were talking about

16  your patents and what happened when you found out that

17  Gyro-Trac was making their own drum cutter head and cutter

18  teeth.  Do you remember that?

19  A.   Yes, sir.

10:18:48AM 20  Q.   What happened after you found that out?

21  A.   We filed suit against Gyro-Trac Canada and Gyro-Trac

22  (USA).

23  Q.   And was that a patent lawsuit?

24  A.   Yes, sir.

10:18:56AM 25  Q.   And when was that filed?

USCA5 3712

1   A.   Sometime in '03.

2   Q.   Is that when it was settled or is that when it was filed?

3   A.   It was filed before that.  It was settled in '03.

4   Q.   And I don't want to get into what happened in that

10:19:13AM  5   lawsuit except to ask you did you sign or reach a settlement

6   agreement in that case?

7   A.   Yes, sir, we did.

8   Q.   All right.

9        MR. BANDAS:  Mike, if would, would you please bring

10:19:24AM  10   up Exhibit No. 4.

11   BY MR. BANDAS:

12   Q.   Could you please identify that document, Mr. O'Hagan?

13   A.   That is the settlement agreement.

14   Q.   And what is the effective date of that settlement

10:19:46AM  15   agreement?  I think we can see it right up here.

16   A.   September 12, 2003.

17   Q.   I know you're not a lawyer, Mr. O'Hagan, but generally

18   speaking, did ROWMEC release its claims against Gyro-Trac,

19   Inc., in Canada and Gyro-Trac (USA) in South Carolina?

10:20:03AM  20   A.   Yes, sir.

21   Q.   And generally speaking, what is it that ROWMEC got in

22   this settlement?

23   A.   We got some cash and we got a dealership agreement from

24   Gyro-Trac, Inc., and Gyro-Trac (USA).

10:20:18AM  25   Q.   What was the cash for?

USCA5 3713

1   A.    $300,000 to kind of help us in the money that we had lost

2   because of the patent infringement.

3   Q.    Was that also to help start the dealership?

4   A.    Yes, sir.

10:20:30AM  5   Q.    All right.  And the other part of it was -- was that a

6   dealership?

7   A.    Yes, sir.  A dealership for Texas and the surrounding

8   states.

9   Q.    All right.  Did ROWMEC see settling that case for an

10:20:45AM  10   exclusive five-state dealership as valuable?

11   A.    Yes, sir.  That was what we were most excited about.

12   Q.    Mr. O'Hagan, why it is it that you agreed to become a

13   dealer for two companies that you had just sued?

14   A.    Well, we had hoped we could get past the original issues

10:21:03AM  15   and actually form sort of a partnership in selling this

16   equipment.

17   Q.    Did you believe in the Gyro-Trac equipment at that time?

18   A.    Yes.  Yes.

19   Q.    And do you think that the Gyro-Trac equipment had a

10:21:17AM  20   valuable place in the marketplace?

21   A.    Yes.  It had a huge potential.

22   Q.    I know we're going to talk about some problems with the

23   machines.  But as you're sitting here today, do you still

24   believe that the Gyro-Trac machine has value and merit in the

10:21:32AM  25   marketplace?

USCA5 3714

1  A.   Yes.

2  Q.   Do you wish you were still the dealer?

3  A.   Yes.

4  Q.   All right.  What I want to do with you is go over some of

10:21:41AM 5  the basic terms of the contract, Mr. O'Hagan.

6        MR. BANDAS:  If we can, Mike, let's zoom in on this

7  area up here.

8  BY MR. BANDAS:

9  Q.   Okay.  First of all, Mr. O'Hagan, who are the two

10:22:02AM 10  parties -- or who are the parties to this agreement?

11  A.   Gyro-Trac, Inc., in Canada and Gyro-Trac (USA).

12  Q.   All right.

13        MR. BANDAS:  Mike, could you please highlight....

14  BY MR. BANDAS:

10:22:31AM 15  Q.   Just so we're clear, "Gyro-Trac," when that term comes up

16  in this agreement, does it mean both Gyro-Trac, Inc., in

17  Canada and Gyro-Trac (USA) in South Carolina?

18  A.   Yes.

19  Q.   All right.  If you would, tell us what was the exclusive

10:22:47AM 20  dealership that ROWMEC got under this agreement?

21  A.   We would be the exclusive dealer for Texas and the

22  surrounding states where we would be the only dealer available

23  to buy Gyro-Trac products.

24  Q.   All right.  What states were you going to be -- or were

10:23:02AM 25  you exclusive dealers in?

USCA5 3715

1    A.    Texas, Oklahoma, New Mexico, Arkansas, and Louisiana.

2    Q.    All right.  We've heard in opening that Gyro-Trac, Inc.,

3    doesn't think they supplied you under this agreement.  Do you

4    agree with that?

10:23:17AM 5   A.    No.

6    Q.    How come?

7    A.    Because we made the agreement with both companies.  We

8    thought of them as one company.

9    Q.    Was Gyro-Trac, Inc., in Canada a supplier to you under

10:23:30AM 10   your reading of this agreement?

11   A.    Yes, sir.

12           MR. KEENAN:  Objection, Your Honor.  Calls for legal

13   interpretation.

14           THE COURT:  Sustained.

15   BY MR. BANDAS:

16   Q.    Was Gyro-Trac, Inc., one of the parties to this

17   agreement?

18   A.    Yes, sir.

19   Q.    Was Gyro-Trac (USA) one of the parties to this agreement?

10:23:47AM 20   A.    Yes, sir.

21   Q.    Were you looking at them -- how were you looking at them?

22   A.    Basically as one entity.

23   Q.    Were you looking at them as your supplier under this

24   agreement?

10:23:59AM 25   A.    Yes.

USCA5 3716

1  Q.   Now, since the settlement agreement was signed, has

2  Gyro-Trac, Inc., engaged in the manufacture, assembly, or

3  wholesale distribution of Gyro-Trac equipment covered under

4  the agreement?

10:24:15AM 5  A.   Yes, sir.

6       MR. KEENAN:  Objection, Your Honor.  Calls for

7  speculation.

8       MR. BANDAS:  He's going to testify factually to how

9  this agreement worked, Your Honor.

10:24:22AM 10      MR. KEENAN:  That wasn't the question.  The question

11  was:  Has Gyro-Trac, Inc., supplied, manufactured, et cetera,

12  and it calls for speculation.

13       THE COURT:  I agree it calls for speculation unless

14  you can prove he knows personally that they have done that.

10:24:35AM 15  So, sustained.

16       MR. BANDAS:  Okay.

17  BY MR. BANDAS:

18  Q.   Mr. O'Hagan, did you specifically bargain for Gyro-Trac,

19  Inc., in Canada being a supplier or distributing equipment to

10:24:59AM 20  you under this agreement?

21       MR. KEENAN:  Objection, Your Honor.  That runs into

22  the limine.  The terms of the contract speak for themselves.

23  What he bargained for or not is irrelevant.

24       MR. BANDAS:  Your Honor, what I thought we talked

10:25:08AM 25  about was we can talk about the factual circumstances of how

USCA5 3717

1  this contract was entered into.

2  THE COURT:  I'm going to sustain the objection.

3  MR. BANDAS:  Okay.

4  BY MR. BANDAS:

10:25:26AM 5  Q.  Mr. O'Hagan, why was it important to have Gyro-Trac,

6  Inc., in Canada and Gyro-Trac (USA) in the settlement

7  agreement?

8  MR. KEENAN:  Objection, Your Honor.  Parole

9  evidence....

10:25:43AM 10  THE COURT:  I'm going to let him answer that

11  question.

12  BY MR. BANDAS:

13  Q.  Why was that important, Mr. O'Hagan?

14  A.  Well, in the settlement it was brought to our attention

10:25:52AM 15  that if we had gone through and gotten a judgment against

16  Gyro-Trac South Carolina that they would close it down and

17  just take it back to Canada where we wouldn't be able to get

18  any of the benefit of the settlement agreement.

19  Q.  Was it important for you for both of those companies to

10:26:08AM 20  be obligated under this agreement?

21  A.  Yes.  Gyro-Trac Canada was very important to us because

22  we had been told that they were backed by the Canadian

23  government.  They were more substantial.  Gyro-Trac (USA) had

24  just started in South Carolina.

10:26:22AM 25  Q.  All right.  Now, under this dealership agreement could

USCA5 3718

1  there be any other dealers in the five-state area?

2  A.   No.

3  Q.   Mr. O'Hagan, now I want to shift your attention to how is

4  it that ROWMEC was going to make money under this settlement

10:26:41AM  5  agreement?

6  A.   We would buy equipment from Gyro-Trac at a

7  wholesale-less-10-percent-price and then sell it for a profit.

8  Q.   All right.

9        MR. BANDAS:  May I approach the Elmo, Your Honor?

10:26:53AM 10        THE COURT:  Yes.

11        MR. BANDAS:  Would it be okay, Your Honor, if I went

12  to the easel?

13        THE COURT:  Absolutely.

14  BY MR. BANDAS:

10:28:10AM 15  Q.   Can you see that?

16  A.   Yes, sir.

17  Q.   And just to cover so we have a clear distinction in this

18  case, how does ROWMEC make money under the settlement

19  agreement?

10:28:19AM 20  A.   According to the contract we were to be sold equipment

21  and products from Gyro-Trac at the best wholesale price less

22  an additional 10 percent.

23  Q.   Is that the dealership part of the agreement?

24  A.   Yes, sir.

10:28:30AM 25  Q.   And generally speaking, were there any other ways that

USCA5 3719

```
 1   ROWMEC would make money under this agreement?

 2   A.   Service and -- service of the equipment after it was

 3   done.

 4   Q.   What would be included under dealership?

 5   A.   Sales.

 6   Q.   Sales?

 7   A.   Sales.

 8   Q.   Okay.

 9   A.   Sales of consumable products after the machines were in

10   the field.

11   Q.   Replacement parts?

12   A.   Yes, sir.

13   Q.   All right.  What else?  Did you say "service" a moment

14   ago?

15   A.   Yes, sir.  I thought it was up there.  Service.

16   Q.   All right.  That's in the dealership category?

17   A.   Yes.

18   Q.   Is there another category of how ROWMEC would make money

19   under this settlement agreement?

20   A.   Commissions on equipment that Gyro-Trac sold.

21   Q.   Okay.  Those would be on Gyro-Trac sales?

22   A.   Yes, sir.

23   Q.   Is that right?

24   A.   Yes.

25   Q.   And commissions, were they limited to particular sales,
```

Timestamps:
10:28:46AM (line 5)
10:28:54AM (line 10)
10:29:11AM (line 15)
10:29:24AM (line 20)
10:29:38AM (line 25)

USCA5 3720

1  meaning whether or not it was in your territory?

2  A.   It was outside the territory, the rest of the United

3  States.

4  Q.   And just so we're clear, is ROWMEC suing the Gyro-Trac

10:29:54AM  5  companies for taking away the dealership in this case?

6  A.   Yes.

7  Q.   Is ROWMEC suing Gyro-Trac for not paying commissions in

8  this case?

9  A.   No.

10:30:03AM 10  Q.   Okay.  Very good.

11              Generally speaking, how does a heavy-equipment

12  dealership work?

13  A.   Again, we buy product at a discounted wholesale price

14  less 10 percent and we sell it for a profit.

10:30:39AM 15              MR. BANDAS:  Mike, please pull up Exhibit No. 4 and

16  focus in on paragraph 10, fourth page.  Okay.

17              If we could, let's highlight this bottom

18  section, beginning right there.

19  BY MR. BANDAS:

10:31:48AM 20  Q.   Mr. O'Hagan, what is that?  What are we looking at on the

21  screen?

22  A.   The terms and conditions of the contract.

23  Q.   And what was the price that ROWMEC was supposed to get on

24  products sold by the Gyro-Trac companies?

10:32:02AM 25  A.   Other than tractors, it was the lowest available

USCA5 3721

1   wholesale price less an additional 10 percent.

2   Q.   All right.   Now, it says there "all products other than

3   tractors."   What is a tractor?

4   A.   A tractor is just the tractor without any cutter head on

10:32:20AM   5   it.

6            MR. KEENAN:   Objection, Your Honor.   It's asking him

7   to construe the contract.

8            MR. BANDAS:   May we approach on this, Your Honor?

9            THE COURT:   All right.

10:33:50AM   10      (At side bar)

11           MR. KEENAN:   The objection is he's interpreting the

12   contract.   The Court has already ruled the contract is not

13   ambiguous.   And with regard to this, I think it is offering

14   Parole Evidence for interpretation.

10:33:50AM   15           MR. MEYER:   Judge, this is something that we

16   actually took up in the first day of the pretrial.   I actually

17   think our interpretation is the same as Mr. Keenan's which is

18   a tractor is simply a mower, the vehicular part of the

19   machine.   It excludes the cutter head.   That's exactly what we

10:33:50AM   20   talked about in pretrial.   So, I don't think they'll be an

21   objection.

22           But the word "tractor," even though I don't

23   think we have a disagreement on it, is not defined in the

24   agreement.   He's in this business.   I can't imagine that he

10:33:50AM   25   can't say what a tractor is.   It's not defined in the

USCA5 3722

1  agreement.  It's just common sense to explain what it is

2  about.

3          MR. BANDAS:  It is part of the factual underpinning

4  of what this contract is about.  You have a dealership to sale

10:33:50AM  5  cars....

6          THE COURT:  I'm going to let him say what his

7  understanding is of what a tractor is.

8      (Open court)

9  BY MR. BANDAS:

10:33:56AM 10  Q.   Mr. O'Hagan, here it says "all products other than

11  tractors offered by Gyro-Trac shall be available to ROWMEC at

12  Gyro-Trac's lowest available wholesale price less an

13  additional 10 percent."

14          What does that mean to you or to ROWMEC, "other

10:34:10AM 15  than tractors"?

16  A.   That would be all products and machines sold by

17  Gyro-Trac, complete machines.

18  Q.   How is a tractor different than a complete machine?

19  A.   That part was actually put in there by Gyro-Trac to

10:34:23AM 20  protect them, to keep ROWMEC from being able to buy tractors

21  at a discounted price --

22          MR. KEENAN:  Objection, Your Honor.  It's

23  speculation as to what Gyro-Trac put in.  He is interpreting

24  the contract again.  Same objection.

10:34:37AM 25          MR. BANDAS:  Your Honor, he's just simply explaining

USCA5 3723

1   what his understanding of the contract is.

2           THE COURT:  Overruled.

3   BY MR. BANDAS:

4   Q.   Mr. O'Hagan, please continue your answer.

10:34:46AM 5   A.   It kept us from being to -- us, meaning ROWMEC -- from

6   being able to purchase a tractor by itself at a discounted

7   rate and then putting our own cutter head on it and therefore

8   having a better price in the market than Gyro-Trac would have.

9   Q.   Does that mean simply that Gyro-Trac didn't want to sell

10:35:05AM 10   tractors by themselves at a discount where you could put your

11   own cutter head on it and under sell them?

12   A.   Yes, sir.

13   Q.   When we go here and we say "all other products" or "all

14   products other than tractors" what does "all products" mean to

10:35:22AM 15   you?

16   A.   Any complete machines that Gyro-Trac manufacturers plus

17   the replacement parts and things that go along with them.

18   Q.   Just so we're clear, what is a complete machine?

19   A.   A tractor with a cutter head.

10:35:42AM 20   Q.   Now, when you have a dealership contract, Mr. O'Hagan, is

21   it important for the suppliers, the Gyro-Trac companies in

22   this case, to have equipment for you to sell?

23   A.   Yes, sir.

24   Q.   And under this agreement does Gyro-Trac have to maintain

10:35:56AM 25   wholesale prices?

USCA5 3724

1   *A.*   Yes.

2         MR. BANDAS:  If we can, let's look at Paragraph 6,

3   please, Mike, on Page 3.

4   BY MR. BANDAS:

10:36:26AM  5   *Q.*   What I want to do with you, Mr. O'Hagan, is go through

6   and talk about some of the different things that Gyro-Trac was

7   obligated to do under this agreement.  One of the things that

8   we heard yesterday in opening was that Gyro-Trac didn't have

9   to supply a truck and trailer.

10:36:41AM 10         MR. BANDAS:  If we could, Mike, let's please

11   highlight that part.  Just right there, please.

12   BY MR. BANDAS:

13   *Q.*   Okay.  What was the purpose of having a truck and

14   trailer?

10:36:56AM 15   *A.*   To supply us with a truck and trailer to do the

16   tow-and-show to pull the machines around for demos.

17         MR. BANDAS:  And then let's go to this sentence

18   here, please, Mike.

19   BY MR. BANDAS:

10:37:25AM 20   *Q.*   If you would, Mr. O'Hagan, please read that.

21   *A.*   "The purpose of this provision is to ensure that ROWMEC

22   has at least one of each complete unit made by Gyro-Trac for

23   sale on consignment at all times."

24   *Q.*   And what is a complete unit?

10:37:38AM 25   *A.*   Tractor with a cutter head.

USCA5 3725

1    Q.    All right.  And what does consignment mean?

2    A.    That we wouldn't be charged for it until it was sold.

3    Q.    All right.  And what does it mean to have one on

4    consignment at all times?

10:37:52AM  5    A.    That we should have each of one of their models on our

6    lot at all times.

7    Q.    Does that mean that every single time Gyro-Trac makes a

8    new model ROWMEC is supposed to get one?

9    A.    Yes.

10:38:03AM  10   Q.    Is that what a consignment machine is?

11   A.    Yes.

12   Q.    Now, we've heard some talk in this case about

13   demonstrator machines.

14   A.    Yes, sir.

10:38:37AM  15   Q.    What is a demonstrator machine?

16   A.    It could be a couple of different things.  It could be a

17   new machine that's taken out to demo one time for a customer

18   that's interested in buying it and he ultimately purchases

19   that machine or it can be a machine designated just to do

10:38:53AM  20   demos and not for sale.

21   Q.    All right.  How is a demonstrator machine different than

22   a consignment machine?

23   A.    If it's the latter, then it's not designated for sale,

24   it's just there for demos.

10:39:07AM  25   Q.    Going back to the exclusive territory, is Gyro-Trac

USCA5 3726

1  allowed -- or were they allowed to come into your territory

2  and sell machines without giving you credit?

3  A.   No.

4  Q.   And again, just to get sort of an overview of the major

10:39:23AM 5  provisions in this contract --

6         MR. BANDAS:  Mike, if you would, please pull up

7  paragraph 9 on Page 4.

8  BY MR. BANDAS;

9  Q.   All right.  If you would, Mr. O'Hagan, please read that.

10:39:49AM 10  A.   "Product support.  Each party shall be responsible for

11  product it sales.  However, Gyro-Trac shall be responsible for

12  standard manufacturer's warranty on products Gyro-Trac

13  manufactures and ROWMEC shall be responsible for standard

14  manufacturer's warranty on products ROWMEC manufactures,

10:40:10AM 15  regardless of which party sells the product."

16  Q.   Under this agreement was ROWMEC ever responsible for

17  warranties on Gyro-Trac produced products?

18  A.   No, sir.

19  Q.   Why was that important to ROWMEC?

10:40:22AM 20  A.   It was very important because of the three original units

21  that we had bought from Gyro-Trac we had a misunderstanding

22  about the warranty issues on those tractors.  They felt that

23  we should be responsible for the warranty to the customer.

24  Q.   And having this provision in this agreement, was that

10:40:39AM 25  your way of making sure this was clear for all time in your

USCA5 3727

1   relationship with the Gyro-Trac suppliers?

2   A.   Yes, sir.

3   Q.   All right.  Now, after Gyro-Trac -- the Gyro-Trac

4   companies and ROWMEC signed the settlement agreement, did

10:41:04AM   5   ROWMEC and the Gyro-Trac companies start having problems?

6   A.   Yes.

7   Q.   And let's talk about warranty.  During the course of your

8   dealership with Gyro-Trac, did you have to perform warranty

9   work on the Gyro-Trac tractors?

10:41:17AM   10   A.   Yes, sir.

11   Q.   What kind of warranty work did you end up doing?

12   A.   What started out that we thought was a warranty issue

13   ended up being catastrophic failure of the undercarriage.  So,

14   it actually turned into a recall.

10:41:34AM   15   Q.   We just read paragraph 9 of the agreement.  So, how is it

16   that ROWMEC even got in the position of doing any warranty

17   work on the Gyro-Trac equipment?

18   A.   Because of the distance between Gyro-Trac Canada,

19   Gyro-Trac (USA) and our dealer area, they asked us to perform

10:41:50AM   20   warranty on customers' machines.

21   Q.   Who asked you to do that?

22   A.   Gyro-Trac Canada and Gyro-Trac (USA).

23   Q.   All right.  How come you didn't tell them, "Hey,

24   paragraph 9 says I don't have to do that"?

10:42:02AM   25   A.   We knew it was in its infancy and we were trying to be

USCA5 3728

1  cooperative and help the product become popular.

2  Q.   All right.  Now let me show you what's been marked in

3  evidence as Plaintiff's Exhibit No. 25.

4        MR. BANDAS:  Plaintiff's Exhibit No. 25.

10:42:55AM 5  BY MR. BANDAS:

6  Q.   If you would, Mr. O'Hagan, could you identify that

7  document, please?

8  A.   I can't really --

9        MR. BANDAS:  Let's first zoom in on the date.  Then

10:43:14AM 10  if you would, please zoom back out and let's zoom in on the

11  body of the letter.

12  BY MR. BANDAS:

13  Q.   If you would, Mr. O'Hagan, tell us about this document.

14  A.   That was a letter explaining that they had a warranty

10:43:29AM 15  claim form that they were going to have us fill out to do

16  warranty repairs.

17  Q.   When ROWMEC and Gyro-Trac entered into the settlement

18  agreement, was there any warranty claim forms that existed at

19  this time?

10:43:42AM 20  A.   No.  Or procedure.

21  Q.   Was this the first time they ever told you about a

22  warranty claim procedure?

23  A.   Just the form, not a procedure.

24  Q.   All right.  And did you have conversations with Gyro-Trac

10:43:53AM 25  about this form and how to use it and whether you should use

USCA5 3729

1    it?

2    A.   Yes.

3    Q.   What conversations did you have with them?

4    A.   Just that when we did a warranty repair on a customer's

10:44:05AM  5    tractor we needed to fill out that form and send it back to

6    them for consideration for credit.

7    Q.   All right.  Did ROWMEC ever agree to vary the terms of

8    the contract, paragraph 9, by telling Gyro-Trac that the only

9    way ROWMEC would be get paid is if it filled out this form?

10:44:26AM 10    Did you ever agree to that?

11    A.   No, sir.

12    Q.   Why not?

13    A.   Because it wasn't part of the contract.

14    Q.   Nevertheless, is this claim form something that ROWMEC

10:44:33AM 15    used?

16    A.   Yes.

17    Q.   During the entire dealership arrangement, from the

18    settlement agreement to the date of termination in 2006, how

19    many warranty claims did ROWMEC make?

10:44:47AM 20    A.   How many claims did we make?

21    Q.   Yes.

22    A.   I know a close dollar amount.  I'm not sure how many

23    claims that actually was.

24    Q.   Dollar amount, what was the dollar amount of warranty

10:45:03AM 25    claims that ROWMEC made?

USCA5 3730

 1   *A.*   It was around $130,000.

 2   *Q.*   All right.  And during that time period with the recalls

 3   and the problems, how many warranty claims did the Gyro-Trac

 4   companies actually pay to ROWMEC during the term of the

10:45:18AM  5   dealership?

 6   *A.*   They never paid any.  We got credit for two I think in

 7   that time.

 8   *Q.*   And what was the dollar value of that credit?

 9   *A.*   One was around $1400 and I think the other was around 6.

10:45:31AM 10   *Q.*   Okay.

11         MR. BANDAS:  May I approach the Elmo?

12         THE COURT:  Yes.

13   BY MR. BANDAS:

14   *Q.*   Mr. O'Hagan, I'm going to show you a document that's been

10:46:52AM 15   marked as part of Exhibit No. 26 in this case.  Do you

16   recognize this document?

17   *A.*   Yes, sir.

18   *Q.*   All right.  Do you have factual knowledge -- do you

19   personally -- of what this document is?

10:47:03AM 20   *A.*   Yes, sir.

21   *Q.*   What is this document?

22   *A.*   This is 12 pallets of new and pull-off parts that we

23   pulled off of tractors we were doing warranty on that we

24   shipped back to Gyro-Trac.

10:47:17AM 25   *Q.*   Okay.  And does this document add up the different

USCA5 3731

1  amounts that gives you a total of how much the dollar value

2  was of all the parts, the warranty parts, that were shipped

3  back to ROWMEC -- to Gyro-Trac?

4         THE COURT:  Mr. Keenan.

10:47:35AM  5         MR. KEENAN:  Your Honor, this is the problem we

6  talked about before -- beforehand.  This is the O'Hagan

7  binder.  This is precisely the objection that we lodged and I

8  thought the Court's ruling was pretty clear.

9         MR. BANDAS:  I did, too, Your Honor.  And he's just

10:47:49AM 10  talking factually about the same things that are factually

11  also in Ms. O'Hagan binder.  If he has any issues with it, he

12  can cross-examine the witness.

13         THE COURT:  I think he said he had factual knowledge

14  of these items described on this exhibit.  So, I'm going to

10:48:06AM 15  let him answer.  Overruled.

16  BY MR. BANDAS:

17  Q.   Again, Mr. O'Hagan, what does this document detail?

18  A.   It's a packing slip of all the parts that had gathered up

19  from the recall and from the warranty issues, some being

10:48:23AM 20  brand-new parts that we never used for anything.  When they

21  started going down, it happened so fast and so hard that

22  neither side really knew how to handle it.  We knew it was

23  important to take care of the customer first.  So, in a lot of

24  cases they were shipping us parts to replace the parts that

10:48:38AM 25  had failed.  And by the time they got to get to us, they would

USCA5 3732

1    tell us not use them because they also were parts that were

2    defective.  So, we started to get a pretty good pile of parts.

3    Q.    It identifies here 12 different pallets of parts.

4    A.    Yes, sir.

10:48:52AM  5    Q.    What is a pallet?

6    A.    A pallet generally is 48 by 48 inches square.  It's just

7    what you put things on to ship by truck.

8    Q.    Okay.  And did you ship all of those parts back to

9    Gyro-Trac?

10:49:11AM 10    A.    Yes, sir.

11    Q.    How much money did Gyro-Trac charge you for all of these

12    parts?

13    A.    It's around 130, $140,000.

14    Q.    All right.  If we could, Mr. O'Hagan, again talking from

10:49:24AM 15    Exhibit No. 26, do you personally have factual knowledge of

16    some of the warranty claims that were being made by customers

17    on their tractors?

18    A.    Yes, sir.

19    Q.    And do you personally have factual knowledge of what

10:49:40AM 20    specific pieces were being replaced on tractors?

21    A.    Yes.

22    Q.    And do you personally have factual knowledge of how

23    Gyro-Trac was billing ROWMEC for some of those replacement

24    parts?

10:49:51AM 25    A.    Yes, I do.

USCA5 3733

1   *Q.*   And again from Exhibit 26 -- let me zoom in here.  What

2   is a sprocket?

3   *A.*   A sprocket, there's four on each machine, two on each

4   side, that's actually what drives the tractor.

10:50:17AM  5   *Q.*   Okay.  And what is a wheel assembly?

6   *A.*   That is a support wheel that goes behind the shaft and

7   the sprockets that the track rides over.

8   *Q.*   All right.  And here's another one where we have an

9   example of being charged for a drive sprocket; is that right?

10:50:37AM  10   *A.*   Yes.

11   *Q.*   I'm going through these randomly.  Here's another example

12   of Gyro-Trac billing for a drive axle.  Do you see that?

13   *A.*   Yes.

14   *Q.*   Are these the types of parts that ROWMEC buys for resale

10:50:55AM  15   and profit?

16   *A.*   Yes.

17   *Q.*   Well, under the warranty claims, are these the type of

18   parts that ROWMEC buys and charges its customers for under a

19   warranty claim?

10:51:04AM  20   *A.*   No.

21   *Q.*   Now, of all of the items identified in the first document

22   I showed you totaling $139,000, did ROWMEC resale any of those

23   items to its customers for a profit?

24   *A.*   No.

10:51:17AM  25   *Q.*   What did it do with the replace -- what did it do with

USCA5 3734

1  the parts for which the return parts were replacing?

2  A.   Again, some of them were installed on customers' tractors

3  that had gone down.   A majority of the parts were parts that

4  had been shipped to us and then found out during shipping, or

10:51:38AM  5  before we got to install them, that they were also defective

6  parts and we were asked not to put them on.

7  Q.   Where does that 139,000-dollar number come from?   Is that

8  just the invoices that Gyro-Trac sent ROWMEC?

9  A.   Yes.

10:51:58AM  10  Q.   So, that represents the price that Gyro-Trac actually

11  charged ROWMEC for warranty and recall parts?

12  A.   Some, yes.

13  Q.   Okay.   And did ROWMEC return those parts to Gyro-Trac?

14  A.   Yes.

10:52:10AM  15  Q.   Did those amounts ever come off Gyro-Trac's bill?

16  A.   ROWMEC's bill?   No.

17  Q.   I'm sorry.   ROWMEC's bill.   Or Gyro-Trac's bill to

18  ROWMEC?

19  A.   No, never did.

10:52:23AM  20  Q.   When were those parts returned?

21  A.   It's on the paper right there.   10/17/05 when it was

22  shipped.

23  Q.   Let me show you what has been marked as one of the

24  defendant's exhibits in this case.   Do you recognize this

10:52:52AM  25  document?

USCA5 3735

```
 1   A.   Yes.
 2   Q.   Okay.  What is this document?
 3   A.   It's an account statement.
 4   Q.   It's an account statement.  And let's look at it.  Have
 5   you seen these before?
 6   A.   Yes.
 7   Q.   Do you have factual personal knowledge of how these work?
 8   A.   Yes.
 9   Q.   All right.  Do you see there where it says "CR"?
10   A.   Yes.
11   Q.   What does that mean?
12   A.   Credit.
13   Q.   And then, for example, there we see a little minus sign
14   with 688.80?
15   A.   Yes.
16   Q.   What does that mean?
17   A.   That would be a credit issued possibly for parts that had
18   been returned.
19   Q.   And let's go through to -- you said you returned those
20   parts in October 2005?
21   A.   Yes.
22   Q.   All right.  Do you see anywhere on Gyro-Trac's bill where
23   they gave you a credit for returning $139,000 worth of parts?
24   A.   No.
25   Q.   All right.
```

USCA5 3736

1            MR. BANDAS:  May I approach the easel next to the

2  witness?

3            THE COURT:  You may.

4  BY MR. BANDAS:

10:54:09AM 5  Q.   You understand that Gyro-Trac is contending in their

6  lawsuit against you in this case that you failed to pay

7  roughly $694,000; is that correct?

8  A.   Yes, sir.

9  Q.   All right.  And we've been through the exhibits on the

10:54:26AM 10 warranty return parts?

11 A.   Yes, sir.

12 Q.   And just to be clear, you returned $139,000 worth of

13 parts?

14 A.   Yes.

10:54:34AM 15 Q.   They never took it off your bill?

16 A.   No.

17 Q.   Do you think it should have come off your bill?

18 A.   Yes, sir.

19 Q.   Would it be okay if we put that as one example in this

10:54:45AM 20 case of where the bill was incorrect that Gyro-Trac sent you?

21 A.   Yes.

22 Q.   Okay.  Remember yesterday we were talking about -- or

23 Mr. Flournoy was testifying about the meeting that he had with

24 you in around July of 2005?

10:55:27AM 25 A.   Yes, sir.

USCA5 3737

```
 1  Q.   Is that correct?
 2  A.   Yes.
 3  Q.   And you heard him testify about some conversation about a
 4  repayment schedule?
```
10:55:32AM `5  A.   Yes.`
```
 6  Q.   All right.  And I believe he testified that you paid
 7  $100,000 at that meeting?
 8  A.   Yes.
 9  Q.   All right.  Did you in fact pay $100,000?
```
10:55:45AM `10 A.   Yes, sir.`
```
11  Q.   And again I'm going to show you what's been marked as
12  part of Exhibit No. 26.  If you would, please identify what
13  that document is.
14  A.   That is a return check, a canceled check for $100,000.
```
10:56:02AM `15 Q.   All right.  Did Gyro-Trac cash that check?`
```
16  A.   Yes.
17  Q.   Did your funds clear to go pay the $100,000?
18  A.   Yes.
19  Q.   All right.  When you got Gyro-Trac's bill and we look at
```
10:56:17AM `20 the time period for July of 2005, can you see anywhere on`
```
21  there where they give you credit for the $100,000 that you
22  paid them at the meeting?
23  A.   No, never came off the statement.
24       MR. BANDAS:  May I approach the easel, Your Honor?
```
10:56:34AM `25       THE COURT:  Yes.`

USCA5 3738

1  BY MR. BANDAS:

2  Q.   Mr. O'Hagan, do you believe that $100,000 should have

3  been credited to your account when you paid them $100,000?

4  A.   Yes, sir.

10:56:47AM 5  Q.   So, we put up here another example of how their bill is

6  wrong?

7  A.   Yes.

8  Q.   And my math isn't so good generally, but if we add that

9  up, are we now under the 500,000-dollar credit line that they

10:57:10AM 10  talked about?

11  A.   Yes, sir.

12  Q.   I want to talk to you about another example with you if I

13  can.  Are you aware that Gyro-Trac sold a GT-25 to Kris

14  Knackstead in January of 2006?

10:57:30AM 15  A.   Yes.

16  Q.   And again let me show you a document that's taken by

17  Mr. -- from Mr. Wayman's report.

18        MR. BANDAS:  It's already in evidence, Your Honor.

19  He's the forensic CPA in the case.

20  BY MR. BANDAS:

21  Q.   Do you see there where a machine was sold in January 2006

22  for $283,000 to Kris Knackstead at Eco-Solutions?

23  A.   Yes, sir.

24  Q.   January of 2006 was ROWMEC still in its dealership with

10:58:07AM 25  Gyro-Trac?

USCA5 3739

1   A.   Yes.

2   Q.   When Gyro-Trac sold this machine, did it tell ROWMEC

3   anything about it?

4   A.   No.

10:58:14AM   5   Q.   All right.  Did Gyro-Trac ever credit ROWMEC for having

6   this sale in ROWMEC's territory?

7   A.   No, they did not.

8   Q.   What was the MSRP of that machine if ROWMEC would have

9   sold it?

10:58:31AM   10   A.   269, 270,000.

11   Q.   What was ROWMEC's cost at that time at least insofar as

12   what Gyro-Trac had said?

13   A.   Depending on which sheet you used, it was 192, around

14   192.

10:58:49AM   15   Q.   So, roughly speaking, what would have been ROWMEC's

16   profit on that sale if Gyro-Trac had told ROWMEC about the

17   sale and credited ROWMEC for the sale?

18   A.   It would have been around 90,000, I think.

19   Q.   Going back to the bill and looking at the dates for

10:59:08AM   20   January of 2006 --

21        MR. BANDAS:  It's not on these.

22   BY MR. BANDAS:

23   Q.   But, Mr. O'Hagan, do you have factual knowledge as to

24   whether or not Gyro-Trac ever properly credited ROWMEC's

10:59:27AM   25   90,000-dollar portion of that sale?

USCA5 3740

1  *A.*   No, they didn't.

2  *Q.*   Do you believe that should have come off the bill?

3  *A.*   Yes, sir.

4         MR. BANDAS:  May I approach the easel, Your Honor?

10:59:37AM 5  BY MR. BANDAS:

6  *Q.*   And should we add that as another example of their bill

7  being incorrect?

8  *A.*   Yes.

9  *Q.*   Now, in addition, Mr. O'Hagan, are you generally aware of

11:00:22AM 10  other miscellaneous mistakes that Gyro-Trac made in their

11  bill?

12  *A.*   Yes.

13  *Q.*   What are those other mistakes of which you have personal,

14  factual knowledge?

11:00:32AM 15         MR. KEENAN:  This is the O'Hagan binder again.

16         THE COURT:  He says he has personal knowledge.  I'm

17  going to let him testify.  Overruled.

18  *A.*   There were overcharges, duplicate charges, charges for

19  products that we never received, even products that were

11:00:49AM 20  sometimes shipped direct to our customers that they paid for,

21  we got charged for, too.

22  BY MR. BANDAS:

23  *Q.*   Can you give me some more examples of that?

24  *A.*   It's probably right on the statement there.  But I know

11:01:02AM 25  of one for sure where Wright Tree Service paid for product

USCA5 3741

1    with a credit card and it showed up on our bill.

2    Q.   All right.  Do you remember the amount of that charge?

3    A.   No, I sure don't.

4    Q.   Was there several examples like that during the life of

11:01:16AM  5    this dealership?

6    A.   Yes.

7    Q.   All right.  And have you in your company made an effort

8    to try to calculate what are those general -- or what is the

9    total amount of those general overcharges and just flat-out

11:01:33AM  10   mistakes on the bill?

11   A.   Yes.

12   Q.   All right.  And generally speaking -- and I know you

13   didn't do the math yourself -- but you have factual knowledge

14   of who those totals are, correct?

11:01:42AM  15   A.   Right now I think it's around 70,000.  Between 70 and

16   80,000.

17              MR. BANDAS:  May I approach the easel, Your Honor?

18              THE COURT:  Yes.

19   BY MR. BANDAS:

11:01:50AM  20   Q.   Okay.  These general mistakes, do you believe, the double

21   billings and the COD's and charging you for parts that were

22   charged to your customers also, do you think that kind of

23   thing ought to come off the bill?

24   A.   Yes.

11:02:07AM  25   Q.   What did you say the number was?

USCA5 3742

1   *A.*   70 plus, 75, maybe.

2   *Q.*   What if we just put 70; is that okay?

3   *A.*   Sure.

4   *Q.*   Do you believe that $70,000 should have come off your

11:02:17AM  5   bill?

6   *A.*   Yes.

7   *Q.*   All right.  Did that ever happen?

8   *A.*   No.

9   *Q.*   And I know we're going to talk about other problems with

11:02:25AM  10   the bill.  But just right now are we pretty clear that this is

11   well under $500,000?

12   *A.*   Yes.

13   *Q.*   Now, going back to the agreement....

14          MR. BANDAS:  Mike, please pull up paragraph 6 on

11:02:50AM  15   Page 3, Exhibit No. 4.

16   BY MR. BANDAS:

17   *Q.*   Can you see there where it says "Gyro-Trac will supply"?

18   *A.*   Yes.

19   *Q.*   If you would, just read the first few lines of this

11:03:27AM  20   paragraph, please, just so we have our bearings.

21   *A.*   Starting with "Gyro-Trac"?

22   *Q.*   Yes.

23   *A.*   "Gyro-Trac will supply trucks, marketing materials, and

24   promotional materials compromising one truck, one trailer, and

11:03:41AM  25   printed marketing material generally available."

USCA5 3743

1    Q.    Keep reading.

2    A.    "In addition, Gyro-Trac agrees to sell to ROWMEC at least

3    one GT-18 tractor with a Gyro-Trac cutter head complete unit

4    on consignment.  When available, Gyro-Trac also agrees to sell

11:03:57AM  5    ROWMEC one GT-10 tractor with a Gyro-Trac cutter head on

6    consignment with appropriate security to protect Gyro-Trac's

7    interest in the tractor."

8    Q.    All right.  And then we've already read this particular

9    sentence, right?

11:04:11AM  10    A.    Yes.

11    Q.    Very good.  Now, under this agreement does -- do the

12    Gyro-Trac companies have an obligation to furnish you

13    consignment machines?

14    A.    Yes, sir.

11:04:24AM  15    Q.    When you signed this agreement, did anybody at Gyro-Trac

16    tell you that they would not have equipment available for you?

17    A.    No, they did not.

18    Q.    When you signed this agreement was it in fact your belief

19    that Gyro-Trac -- the Gyro-Trac suppliers would have equipment

11:04:43AM  20    that you could actually sell?

21    A.    Yes.

22    Q.    Was this an important part of your dealership?

23    A.    Very important.

24    Q.    Now, during the course of this dealership, did

11:04:55AM  25    Gyro-Trac -- strike that -- did ROWMEC have a hard time

USCA5 3744

1   getting consignment machines from Gyro-Trac?

2   A.   We never did.

3   Q.   Okay.  Now, when the dealership agreement was signed,

4   what specific machines was Gyro-Trac making at the time?

11:05:11AM  5   A.   At that particular time it was the GT-10 and the GT-18.

6   Q.   Let's talk about the GT-18.  Did you ever get a GT-18 on

7   consignment?

8   A.   No.

9   Q.   All right.  What did you get in terms of a GT-18?

11:05:25AM  10   A.   We got a used GT-18, what they called a demo machine.

11   Q.   When did you get that?

12   A.   September of '03 I believe or right after.

13   Q.   Within a couple of months after the --

14   A.   Yeah.  Pretty close to the signing of the contract.

11:05:41AM  15   Q.   Now, when you got that GT-18 tractor, did you have any

16   concerns about the machine when you got it?

17   A.   Yes.  Initially when we got it, Mr. Flournoy asked me to

18   look it over and make sure it had been checked over before it

19   left there.  There were quite a few things that hadn't been

11:05:59AM  20   addressed.

21   Q.   What were some of the things that hadn't been addressed?

22   A.   Bolts missing, the tracks, the undercarriage were not in

23   great shape.

24   Q.   What did you do with that machine?

11:06:07AM  25   A.   He asked us to go try it, to go do a demo with it and see

USCA5 3745

1    how we liked what they'd done, the modifications that we

2    hadn't seen before.

3    Q.   In other words, this was supposed to be a new generation

4    of the GT-18's that you had bought before?

11:06:21AM 5    A.   Yes, sir.

6    Q.   So, your understanding was this was the new and improved

7    GT-18?

8    A.   Yes.

9    Q.   Did you go out and do those demos?

11:06:29AM 10    A.   Yes.

11    Q.   When did you do your first demo?

12    A.   It would have been very, very close to right after we got

13    the machine.

14    Q.   And what happened at that demo?

11:06:37AM 15    A.   A wheel fell off.

16    Q.   By the way, when you go do a demo, is that what they call

17    a tow-and-show?

18    A.   Yes.

19    Q.   And what do you mean the wheel fell off?

11:06:47AM 20    A.   One of the idler wheels that support the track fell off.

21    Q.   Was your prospective customer watching at the time?

22    A.   Yes.

23    Q.   What did he think?

24    A.   He was not real impressed.

11:06:58AM 25    Q.   Did you call Mr. Flournoy and tell them that the wheel

USCA5 3746

1    had fallen off the GT-18?

2    A.    Yes.

3    Q.    What was his response?

4    A.    He told us to hold off on pushing the GT-18 that they had

11:07:10AM  5    a new model coming out that had addressed all those issues,

6    the track issues, the wheel issues, the fit and finish issues

7    that they had in the past.  He said just be patient, hold on,

8    the new tractor was coming.

9    Q.    So, just to be really clear, what did Mr. Flournoy tell

11:07:25AM 10    you with respect to whether or not ROWMEC ought to even go try

11    to sell the GT-18?

12    A.    They told us not to push that one, that they were going

13    to the send us an upgrade package also for the demo tractor

14    that would turn it into a demo GT-25 although it wouldn't

11:07:44AM 15    truly be one.

16    Q.    But what were his instructions to ROWMEC about whether or

17    not to even try to sell a GT-18 in the future?

18    A.    He said to wait, wait for the 25's.

19    Q.    Okay.  So, is that machine one that ROWMEC kept as a

11:07:59AM 20    demonstrator?

21    A.    Yes.

22    Q.    Did Gyro-Trac tell ROWMEC it was okay to keep it as a

23    demonstrator?

24    A.    Yes.

11:08:06AM 25    Q.    Did that GT-18 ever go out on demonstrations again?

USCA5 3747

1  A.   Yes.  After we went over it ourselves and upgraded it and

2  put the GT-25 upgrade stuff on it.

3  Q.   And what was the GT-25 upgrade stuff?

4  A.   At first it was just a different rotator to go on the

11:08:23AM 5  cutter head housing.

6  Q.   Was it anything after that?

7  A.   Well, we had asked for new tracks and stuff for it

8  because they weren't in that great a shape.  They said take it

9  the way it is was for now.  And on the next demo that we did,

11:08:39AM 10  the tracks failed.  Then they sent us new tracks.

11  Q.   And was your prospective customer watching at the time?

12  A.   Yes.

13  Q.   What did they think?

14  A.   They had been talking about three sales if the tractor

11:08:52AM 15  did what we said it would do.  Of course when the tracks

16  failed, they said they had seen enough.

17  Q.   Three sales of what?  Which machine?

18  A.   GT-25's.

19  Q.   All right.  And who was that customer?

11:09:04AM 20  A.   I don't have the name with me.  I can get it.  But I

21  don't remember it right now.

22  Q.   Did anything ever happen again after that with that

23  particular customer?

24  A.   I think they purchased some competitors' machines.

11:09:18AM 25  Q.   Just so we're clear, during the entire duration of the

USCA5 3748

1    dealership between Gyro-Trac and ROWMEC, did ROWMEC ever get a

2    consignment GT-18?

3    A.    No.

4    Q.    All right.  Let's talk about the GT-10 machine.  Did

11:09:37AM 5    ROWMEC ever ask Gyro-Trac for a consignment GT-10 as required

6    by the contract?

7    A.    Yes.

8    Q.    Did they ever send you one?

9    A.    No.

11:09:45AM 10    Q.    Did you ever get any used GT-10's?

11    A.    Yes.

12    Q.    All right.  Do you remember when you got the first one?

13    A.    March possibly.

14    Q.    Of 2004?

11:09:58AM 15    A.    Yes.

16    Q.    And what did you do with that machine?

17    A.    We demonstrated it.

18    Q.    And who did you demonstrate it for?

19    A.    To a man named Mr. Koontz.  Allied Development I believe

11:10:10AM 20    was the name of his company.

21    Q.    Did he like the demonstration?

22    A.    Yes.

23    Q.    Did he place an order for a GT-10?

24    A.    Yes.

11:10:16AM 25    Q.    Did you take a deposit?

USCA5 3749

1  A.   Yes.

2  Q.   And more or less when did you take that deposit?

3  A.   Not long after March, right in that time frame.

4  Q.   All right.  Did you put that order in with Gyro-Trac for

11:10:31AM  5  the GT-10?

6  A.   Yes.

7  Q.   Did they ever send the GT-10?

8  A.   No.

9  Q.   Ultimately what happened with the sale to Mr. Koontz?

11:10:41AM  10  A.   After about six months he asked for his money back.

11  Q.   All right.  And when was it that Gyro-Trac finally let

12  ROWMEC know that they couldn't deliver or wouldn't deliver a

13  GT-10?

14  A.   It was December of that year.

11:10:55AM  15  Q.   All right.  And generally speaking, Mr. O'Hagan, does it

16  affect your company's reputation to take a deposit on a

17  machine and sell it and not be able to deliver?

18  A.   Yes, definitely.

19  Q.   All right.  Now, the used GT-10 that ROWMEC got, what

11:11:15AM  20  happened to that machine?

21  A.   We demoed it to a couple more people and we sold it.

22  Q.   All right.  And did ROWMEC then look for at least another

23  used GT-10 machine?

24  A.   We asked for anything they had available.  We had

11:11:28AM  25  customers calling us about equipment.  We had started

USCA5 3750

1    advertising.  So, we were looking pretty bad.  We didn't have

2    anything to sell.

3    Q.    Okay.  And when did you get the second used GT-10?

4    A.    A little while after the March.

11:11:45AM 5    Q.    All right.  And what happened to that machine?

6    A.    We demonstrated it and sold it.

7    Q.    And who did you sell it to?

8    A.    Kris Knackstead.

9    Q.    All right.  Now, after that what efforts did ROWMEC make

11:11:57AM 10    to continue to try to sell GT-10's?

11    A.    After that we didn't have any more to sell.  So, we

12    didn't try to sell any more.

13    Q.    Was it clear to ROWMEC that whether you placed orders or

14    not for the GT-10, Gyro-Trac just wasn't going to deliver

11:12:17AM 15    them?

16    A.    Right.  Finally by December they had told us that they

17    weren't going to produce those any more.

18    Q.    Were you getting calls for the GT-10's?

19    A.    Yes.

11:12:25AM 20    Q.    Were you getting calls for the GT-18's?

21    A.    Yes.

22    Q.    Did you have any machines at all on consignment that you

23    could sell them?

24    A.    No.

11:12:31AM 25    Q.    Did you have any machines that Gyro-Trac could even send

1  you if you ordered them?

2  A.   No.

3  Q.   Now let's talk about the GT-13.  Did ROWMEC ever get a

4  GT-13 from Gyro-Trac?

11:12:45AM  5  A.   Yes.

6  Q.   All right.  When did ROWMEC get that machine?

7  A.   It would have been right about the time that Mr. Koontz

8  decided not to purchase his 10.

9  Q.   Before I think you said December 2004?

11:13:00AM 10  A.   Yes.

11  Q.   Okay.  So, this would have been shortly after that?

12  A.   Yes.

13  Q.   All right.  And was that a new machine?

14  A.   Yes.

11:13:08AM 15  Q.   And tell me about that machine when you got it.  What

16  happened?

17  A.   Well, we didn't even know about the 13 that it was a new

18  production model that they were coming out with.  When they

19  finally told us that they couldn't send us the GT-10, they

11:13:24AM 20  offered to send the 13 out there in its place.

21          So, they sent it out.  And even though

22  Mr. Koontz had asked for his money back, we took it out there

23  to let him look at it to show him that we did finally get a

24  tractor hoping that he would possibly change his mind and

11:13:40AM 25  purchase the GT-13.

USCA5 3752

1    *Q.*    Did he ultimately change his mind and purchase it?

2    *A.*    No.

3    *Q.*    All right.  And did you have a demonstration with that

4    GT-13 for Mr. Koontz?

11:13:52AM  5    *A.*    Yes.

6    *Q.*    How did that demonstration go?

7    *A.*    We had some track problems with it.

8    *Q.*    What track problems did you have with the GT-13?

9    *A.*    It tore the sprockets off the back.

11:14:03AM  10    *Q.*    Was Mr. Koontz impressed with that?

11    *A.*    No.

12    *Q.*    Did you call anyone at Gyro-Trac to tell them you had

13    sprocket problems with the GT-13?

14    *A.*    Yes, Mr. Flournoy.

11:14:16AM  15    *Q.*    What did he tell you to do?

16    *A.*    He told us that basically that was one of the first

17    production units coming off the line.  And if they knew they

18    had a problem -- they were going to send us the parts to

19    repair that one and to now keep that as a demonstrator

11:14:30AM  20    machine.

21    *Q.*    So, ultimately did you ever get a consignment GT-13?

22    *A.*    No.

23    *Q.*    Now -- but nevertheless you then had a demonstrator; is

24    that correct?

11:14:40AM  25    *A.*    Yes.

USCA5 3753

283

1  Q.   And having that demonstrator, was that even available for

2  sale if you had had a customer come in wanting to buy a GT-13?

3  A.   No.

4  Q.   Did you sell any GT-13's after that?

11:14:53AM  5  A.   Yes.

6  Q.   Who did you sell it to?

7  A.   We sold one to Asplundh Tree.

8  Q.   And more or less, when was that sale?

9  A.   It would have been after the December.

11:15:06AM 10  Q.   All right.  Did Asplundh's machine have problems?

11  A.   Yes.

12  Q.   And what problems did that machine have?

13  A.   In the beginning it had some electrical problems, some

14  fit and finish problems, but the biggest problems were the

11:15:18AM 15  drive sprockets on the track system.

16  Q.   Did you tell Gyro-Trac about these problems?

17  A.   Yes.

18  Q.   And how did they tell you to deal with it?

19  A.   They shipped us more sprockets and said they weren't

11:15:29AM 20  quite sure what was causing the problem yet but they shipped

21  us new sprockets to put on there to keep the customer going.

22  Q.   Did they tell you whether to step up your efforts to sell

23  the GT-13?

24  A.   Yes.  They said that they would have the problem taken

11:15:41AM 25  care of shortly.

USCA5 3754

```
 1  Q.   And did Gyro-Trac make any sales of GT-13's in your
 2  territory?
 3  A.   Yes.
 4  Q.   And who did they sell it to?
 5  A.   To Stanley Tew.
 6  Q.   And did they ever tell you before that -- before they
 7  were talking to Mr. Tew that they were in your territory?
 8  A.   No.
 9  Q.   How did you find out about it?
10  A.   After they made the sale, they called us to see if we
11  would take delivery of the machine, do the service on it, and
12  deliver it to the customer.
13  Q.   What was ROWMEC's response?
14  A.   Yes.
15  Q.   And did ROWMEC in fact do that?
16  A.   Yes.
17  Q.   Now, did ROWMEC have any input on the sales price of that
18  machine?
19  A.   No.  The deal was already done before we knew about it.
20  Q.   Did ROWMEC have any input at all on any of the terms?
21  A.   No.
22  Q.   What company did?
23  A.   Gyro-Trac (USA) and Gyro-Trac Canada.
24  Q.   All right.  Now, ultimately though, like we talked about
25  earlier on the GT-25 machine that was sold in January, for
```

Timestamps: 11:15:51AM (line 5), 11:16:04AM (line 10), 11:16:13AM (line 15), 11:16:23AM (line 20), 11:16:36AM (line 25)

USCA5 3755

1   this GT-13, did Gyro-Trac give you credit on your bill for

2   this particular sale?

3   A.   Yes.

4   Q.   And when we say credit, does that mean your profit

11:16:51AM  5   margin?

6   A.   Yeah.

7   Q.   Okay.  And did they do that because it was in your

8   territory?

9   A.   Yes, sir.

11:16:59AM  10   Q.   Okay.  But they didn't do that with the GT-25 that we

11   talked about earlier in January 2006; is that right?

12   A.   No.

13   Q.   Okay.  Now I want to talk to you about the GT-25's --

14          THE COURT:  Mr. Bandas, this might be a good chance

11:17:14AM  15   for us to take a mid-morning break before you move into the

16   next topic.

17          Ladies and gentlemen, we have a couple of

18   matters to take up with the lawyers while you're out.  Let's

19   take a 30-minute break and be back here at a quarter till,

11:17:27AM  20   please.

21       (Jury out)

22          THE COURT:  Let's take about ten minutes and talk

23   about the issue that we were dealing with this morning, the

24   supplier issue.

11:18:06AM  25          MS. WEBB:  Yes, Your Honor.

USCA5 3756

1      MS. SHACKELFORD:  Because Gyro-Trac has admitted in

2  its pleadings and in the pretrial order that the agreement

3  created a dealership on the part of ROWMEC, we believe that

4  that brings the contract into Chapter 19 because of their

11:18:34AM  5  judicial admissions and we simply want to preclude them now

6  after they have judicially admitted this from bringing in

7  evidence contrary to their judicial admissions.  Those

8  admissions are binding and contrary evidence should not be

9  accepted on that issue.

11:18:50AM  10      And the Fifth Circuit has numbers of cases --

11  I'm sure you're familiar with most of them -- that do say that

12  judicial admissions are binding and that you cannot create a

13  fact issue by controverting your judicial admissions.

14      Now, we could waive that by failing to mention

11:19:09AM  15  when they bring in contrary evidence and that's what we're

16  trying to avoid.

17      THE COURT:  All right.  Ms. Webb.

18      MS. WEBB:  With respect to the pretrial order, that

19  might be more appropriately addressed by Mr. LeBlanc.

11:19:18AM  20      MR. LeBLANC:  Your Honor, that goes back to what

21  Mr. Keenan was saying earlier.  Yes, they're parties to the

22  contract.  Yes, that is the contract that established the

23  dealership arrangement.  Absent this contract, there wouldn't

24  have been any obligation to sell to them at dealer prices,

11:19:33AM  25  whatever those might have been.  But that doesn't -- I mean,

USCA5 3757

1  that doesn't apply -- I mean, that's a separate inquiry for

2  the Court.  And if the evidence shows that there was never a

3  direct transaction about equipment between Gyro-Trac, Inc.,

4  and ROWMEC, then that's certainly relevant to the Court's

11:19:55AM 5  determination whether it's a supplier.  I mean, supplier in

6  the statute has a very specific --

7          THE COURT:  Supplier is defined in the statute.

8          MR. LeBLANC:  Yes, Your Honor.

9          THE COURT:  "Supplier means a person engaged in the

11:20:07AM 10  manufacture, assembly, or wholesale distribution of

11  equipment...."  Supplier means a person engaged in the

12  wholesale, distribution of equipment.

13          Now, under this contract haven't both Gyro-Trac

14  companies agreed to supply wholesale equipment to ROWMEC?

11:20:34AM 15          MR. LeBLANC:  Well, Your Honor, the contract

16  language notwithstanding the evidence is still that Gyro-Trac,

17  Inc., didn't actually supply any equipment and has never

18  supplied equipment inside the United States.  I think that's

19  relevant to the inquiry.  And there's an issue of --

11:20:54AM 20          THE COURT:  Everybody is standing up now.

21          MR. KEENAN:  May I speak to it just real quickly,

22  Your Honor?

23          THE COURT:  Yes.

24          MR. KEENAN:  The fact of the matter is, there is no

11:21:05AM 25  judicial admission where we say we are bound by this statute.

USCA5 3758

1   Either the statute applies or not.  That's a question of law

2   for the Court.  But what I would respectfully suggest is, is

3   even absent this contract, the Court would have to make an

4   inquiry whether or not the parties meet the definition of a

11:21:21AM 5   supplier or a dealer under that statute.  And I don't think

6   you can ignore -- with all due respect to their argument --

7   ignore what the facts are in determining whether or not we

8   meet the definition for that --

9           THE COURT:  When you sign an agreement that says you

11:21:37AM 10   are going to supply wholesale equipment to ROWMEC, doesn't

11   that bring you within the statutory definition?

12           MR. KEENAN:  If we didn't supply it, we may have

13   breached the contract, but if we didn't supply anything, we

14   don't meet the definition under the statute.  It's that

11:21:52AM 15   simple, I think.

16           MR. BANDAS:  May I respond, Your Honor?

17           THE COURT:  Sure.

18           MR. BANDAS:  I think what we're hearing is if you

19   ignore the fact that we signed a contract committing to be a

11:21:59AM 20   supplier that fits the statutory definition and you just

21   ignore those facts, then we ought to have a fact issue on

22   whether or not they actually sent any.  That doesn't really

23   seem very logical, Your Honor.  I think that when you sign a

24   contract and you write your name down and you don't

11:22:15AM 25   differentiate your obligations between USA and Inc. and

USCA5 3759

1  they're both on the hook, if they want to move product through

2  one entity or the other, that's their own internal

3  convenience.  We don't really care as long as we get our

4  product.  We signed a contract with two companies that

11:22:29AM  5  obligated themselves identically in the identical way to do

6  it.  And I don't think they can say, "Let's erase the

7  contract.  Let's pretend like it never happened.  Let's go

8  back in time and we will just get out of this contract by

9  moving everything through USA and playing games."  I don't

11:22:46AM 10  think they can do that, Judge.

11        MR. KEENAN:  They are two separate causes of action,

12  Your Honor.  We absolutely are bound jointly and severally on

13  the breach of contract claim.  If the jury finds a breach of

14  contract, I agree.  But with regard to the statute, you cannot

11:23:00AM 15  overlay that contractual obligation and say that that meets

16  the definition.  You've got to do a factual inquiry and see

17  have we performed the acts that the statute requires.  If we

18  have, then they got us.  If we haven't, then they don't.

19        MS. WEBB:  I think it's also critical that whether

11:23:19AM 20  Gyro-Trac, Inc., may in fact supply somebody else -- on the

21  facts of this case, they didn't.  But you can't go out and say

22  Caterpiller is a dealer with respect to ROWMEC.  Because

23  regardless of the contract, what did they do?  And in this

24  case Gyro-Trac, Inc., didn't do anything with respect to the

11:23:38AM 25  statute --

USCA5 3760

1          MR. BANDAS:  I think I have an answer, Judge.  If I

2     understand their argument correctly, let's assume for a second

3     that neither company supplied anything at all under this

4     contract, would their defense then be, "Well, USA didn't

11:23:52AM 5     supply it.  We never moved a tractor.  And Canada never

6     supplied it.  So neither company can possibly fit the

7     statutory definition of Chapter 19."

8          MR. KEENAN:  No --

9          MR. BANDAS:  If -- I know everybody wants to say

11:24:06AM 10     something.  I want to get my thought out.

11          The point is, Your Honor, we have a contract

12     that says in black and white, "These are who the suppliers

13     are.  This is what they're obligated to do."  Now, I think if

14     the Court looks at that, I don't think there's any argument

11:24:22AM 15     that that fits within the definition of Chapter 19.  I think

16     what you're hearing the defense say is, "Let's just ignore the

17     contract and let's look at invoices and -- where things were

18     actually shipped from."  I would just suggest, Your Honor,

19     that what they did after a contract doesn't define who they

11:24:41AM 20     are under the contract.

21          MR. KEENAN:  Your Honor, I think Mr. Bandas may have

22     just made the point for us.  If we do not perform under the

23     contract, we have breached the contract.  But even if there

24     wasn't a contract, we would only be bound by this statute --

11:24:58AM 25     let me back up.  If we hadn't performed at all under the

USCA5 3761

1  contract and never sold anything, never put ourselves in the

2  situation where we were favoring one dealer over another, et

3  cetera, then the statute would not apply.  We would have

4  clearly breached the contract but we would have not have

11:25:12AM  5  engaged in conduct that meets the definitions under the

6  statute.

7          So, yes, in answer to his question, if neither

8  one of us had performed under the contract, we would have

9  breached the contract, but that statute would absolutely not

11:25:24AM  10  apply.

11          THE COURT:  To either one?

12          MR. KEENAN:  Either one.  Because if you take a look

13  at that statute, what you're talking about is specific

14  violations that occurred during the course of the dealership

11:25:32AM  15  relationship.  If we would have never sold product, then

16  clearly we've got a problem with the breach of contract but

17  the statute wouldn't apply.  And here one of the parties falls

18  under that.  One of the parties simply did not perform at all

19  in a dealership relationship.  The other party did.  The other

11:25:52AM  20  party is clearly bound by the statute.

21          THE COURT:  Is there any case law on this?

22          MS. SHACKELFORD:  Not a single case.  As best we can

23  tell, the statute was born in Texas and has no history

24  elsewhere either.  I think we've all looked.  The problem with

11:26:06AM  25  Mr. Keenan's argument is that it ignores the fact that one of

USCA5 3762

1    the statutory causes of action is that you cannot terminate a

2    dealership without cause.  They have both judicially admitted

3    that the contract creates a dealership between Gyro-Trac,

4    Inc., Gyro-Trac (USA), and ROWMEC.  So, there's a judicial

11:26:30AM  5    admission that the dealership exists with ROWMEC and that

6    brings both entities under the contract whether they're

7    suppliers or not because they are part of a dealership

8    agreement.  And there are several different places.

9           Now, I believe that both are suppliers because

11:26:48AM 10    under the contract both are obligated to supply.  What they

11    did for their internal convenience is something else.  But

12    they are both part of the dealership agreement.  And under

13    Chapter 19 they are subject to liability for breaching the

14    dealership agreement without cause -- for terminating it

11:27:07AM 15    without cause.  So, there are two issues under the statute,

16    one is the dealership, and the other is some of the other

17    provisions that talk about suppliers.

18           THE COURT:  All right.  Here's what I'd like to see:

19    By the end of the day I would like to see a one-page brief

11:27:22AM 20    from both sides on this issue.  Since there's not any case

21    law, it shouldn't take you more than one page to layout

22    exactly what your positions are.  I think I understand it.

23    And let me read those and let me go and read this statute a

24    little bit more closely.  But let's do that by the end of the

11:27:38AM 25    day.

USCA5 3763

1          I know this affects the jury charge; so, we

2  need to get this decided.

3          MS. SHACKELFORD:  That's one of the reasons we

4  wanted to bring it to up today.

11:27:47AM 5          Your Honor, I didn't know you were going to

6  rule on asking us for a one-page thing and I have a four-page

7  thing that is already prepared.

8          THE COURT:  All right.  Ms. Webb, you can have four

9  pages, if you need them.

11:27:59AM 10          Okay.  Just give me something by the end of day

11  that I can read tonight.

12          MR. BANDAS:  Electronically or present it to Rhonda?

13          THE COURT:  It would best if you could give it to

14  Rhonda this afternoon and I can take it home this evening.

11:28:13AM 15  You can file it electronically as well.  I can pull it up off

16  the Internet as well.

17          Anything else we need to talk about?

18          MR. BANDAS:  One issue.  What I thought we had

19  agreed upon at the pretrial conference was to the extent we

11:28:27AM 20  showed demonstrative exhibits to the jury that we would copy

21  each other with those demonstrative exhibits.  We looked at

22  the defendant's opening and they had a lot of pictures and

23  graphs and that kind of thing and we think they're

24  demonstrative and we would like to get a copy of that.

11:28:41AM 25          THE COURT:  I think that's fair.  Any demonstrative

USCA5 3764

1     exhibits that you use, make a copy for the other side.

2               MR. LeBLANC:  Okay.

3               MR. BANDAS:  Thank you, Your Honor.

4          (Short break)

11:51:04AM 5     (Jury present)

6               THE COURT:  All right.  Mr. Bandas, are you ready to

7     proceed?

8               MR. BANDAS:  Yes, I am, Your Honor.  Thank you.

9     BY MR. BANDAS:

11:51:05AM 10   Q.   Mr. O'Hagan, I want to talk to you now about the GT-25

11    tractors, okay?  When did ROWMEC first learn that Gyro-Trac

12    was going to make a GT-25?

13    A.   Not long after the settlement, after we had the initial

14    problems with the GT-18, when Jon Flournoy told me to hold off

11:51:29AM 15   they had a new tractor come out.

16    Q.   How did you find out that Gyro-Trac was actually

17    producing GT-25's and had them ready for sale?

18    A.   They had sold one in our area.

19    Q.   What do you mean "your area"?

11:51:40AM 20   A.   In our five-state dealer area.

21    Q.   All right.  And what was the customer that bought it?

22    A.   Alan Davis.

23    Q.   And did you have anything to do with that sale?

24    A.   No.

11:51:51AM 25   Q.   When was that sale?  Do you remember?

USCA5 3765

1    *A.*   No, sir.

2    *Q.*   All right.  At that point in time had Gyro-Trac ever sent

3    a GT-25 to ROWMEC on consignment?

4    *A.*   No, sir.

11:52:11AM   5    *Q.*   And when you found out about the Alan Davis sale, what

6    did you do?

7    *A.*   I called and complained to Jon Flournoy.

8    *Q.*   And tell us what was your complaint.  What did you tell

9    him?

11:52:26AM   10   *A.*   Well, we had converted the GT-18 demo machine to be for

11   all intents and purposes a GT-25 so that we could demo it.  We

12   were doing some demos.  They were telling us the 25 wasn't

13   ready yet.  So, we didn't get any.  But they sold one in our

14   area.

11:52:41AM   15   *Q.*   And before that time did you -- you being ROWMEC -- have

16   any idea that the GT-25's were even in production and ready to

17   sell?

18   *A.*   No.

19   *Q.*   What did Mr. Flournoy do with your complaint?

11:52:54AM   20   *A.*   I believe that's about the time that they sent us some

21   GT-25's because we had sold one to Wright's Tree Service.

22   *Q.*   Was that around March or April of 2005?

23   *A.*   Yes, sir.

24   *Q.*   Now, what is it that you did with the machines that you

11:53:08AM   25   got?

USCA5 3766

1    A.   We sold them.

2    Q.   And which ones did you sell?

3    A.   We sold the first two I believe -- the first one to

4    Johnny Johnson and then the next two to Wright's Tree Service.

11:53:22AM  5    Q.   How long did it take you between getting a GT-25 and

6    being able to sell it?

7    A.   Basically the same month that we got them we already had

8    one sold and two more right after that.

9    Q.   So, if you had the tractors, were you able to sell them?

11:53:41AM 10    A.   Yes, sir.

11    Q.   And who bought your first GT-25?

12    A.   I believe it was Johnny Johnson.

13    Q.   And where is Johnny Johnson out of?

14    A.   Lufkin, Texas.

11:53:49AM 15    Q.   He's the gentleman we heard from yesterday?

16    A.   Yes, sir.

17    Q.   And who bought your next GT-25?

18    A.   I'm pretty sure it was Wright's Tree Service.

19    Q.   And what is Wright's Tree Service?

11:53:57AM 20    A.   Wright's Tree Service is a company that does basically

21    right-of-way tree clearing all over the country.

22    Q.   All right.  And how big of a company is that, to your

23    knowledge?

24    A.   In the electric utility right-of-way clearing, they're

11:54:13AM 25    probably up there around the third largest.

USCA5 3767

1   Q.   How many machines did Wright's Tree Service buy from you?

2   A.   They bought three total.

3   Q.   And what kind of machines?

4   A.   All GT-25's.

11:54:22AM  5   Q.   All right.  And generally speaking what was ROWMEC's

6   profit margin on those GT-25's?

7   A.   80, $90,000.

8   Q.   For each sale?

9   A.   Yes, sir.

11:54:32AM  10   Q.   So, was that a valuable business for ROWMEC?

11   A.   Yes.

12   Q.   Now, after those original GT-25's were sold, did ROWMEC

13   get any more consignment GT-25's from Gyro-Trac?

14   A.   We finally ended up getting two but -- in about a

11:54:51AM  15   four-month period we sold the GT-25's that we sold.  But

16   immediately after we sold the first ones is when the warranty

17   issues and the recall issues started again.  So, we finally

18   got two machines that weren't already committed to sales but

19   we ended up having to use those to lend out to customers that

11:55:08AM  20   had purchased GT-25's that were failing in the field.

21   Q.   All right.  And, so, did that take that out of inventory

22   in terms of making sales?

23   A.   Yes.

24   Q.   Nevertheless, were you then able to sell those two

11:55:20AM  25   GT-25's as used machines?

USCA5 3768

A.   Yes.  Those two tractors, after we got the other tractor
straightened out and they came back, we were able to clean
those up and sell those to Wright's Tree Service as used
tractors.

11:55:32AM  5  Q.   And you first started -- strike that.

Was March, April 2005 really the first time
that Gyro-Trac sent consignment machines to ROWMEC of any
kind?

A.   Yeah, unless you split hairs.  The first tractor was
11:55:50AM 10  already sold; so, it wasn't a consignment machine.  It was
already committed to Johnny Johnson.  So, for a very short
time we might have had one or two consignment machines.

Q.   When you "split hairs," are you talking about a GT-25 in
the March, April 2005 time period?

11:56:05AM 15  A.   Yes.

Q.   All right.  Before those GT-25's and looking at the time
period before that beginning with when the settlement
agreement was signed, had Gyro-Trac ever sent ROWMEC one
single consignment machine?

11:56:20AM 20  A.   No, sir.

Q.   When ROWMEC first got consignment machines of the GT-25
in April or March of 2005, how many sales did you make after
that?

A.   I think it was five total of GT-25.

11:56:35AM 25  Q.   All right.  Was ROWMEC able to sell more GT-25's after

USCA5 3769

1   that before the dealership was terminated?

2   A.   We definitely backed off a hair because of the warranty

3   issues and the recall issues.   We were having so much trouble

4   keeping up to the ones that we had already sold, keeping them

11:57:02AM 5   running and keeping the customers happy, we were waiting to

6   see what the final outcome was going to be on the recall.

7   Q.   Why was that important to ROWMEC?

8   A.   Always the customer's first.   And what was happening to

9   us is that the tractors were failing so often that we were

11:57:20AM 10   having trouble keeping those machines running that we had

11   already sold.

12   Q.   And did you have conversations with anybody at Gyro-Trac

13   about this?

14   A.   Yes.

11:57:28AM 15   Q.   And who did you talk to?

16   A.   Jon Flournoy, Odette, might have talked to Daniel but I'm

17   not sure.

18   Q.   All right.   And what did Mr. Flournoy say?

19   A.   He said they were working on it, again be patient, it

11:57:43AM 20   will be taken care of.

21   Q.   Did you and Mr. Flournoy have any disagreements about

22   whether or not to push sales during this time period?

23   A.   Yes.

24   Q.   Tell me about those disagreements.

11:57:53AM 25   A.   He felt that we should keep on selling the way that we

USCA5 3770

1   were and I had a problem until we knew that the problems were

2   taken care of continuing to push those tractors in the market

3   and ending up with more problems that we couldn't keep up

4   with.

11:58:07AM  5   Q.   All right.  Now, towards the end of your relationship

6   with Gyro-Trac were some of those problems getting worked out

7   with the GT-25?

8   A.   I really don't know.  Because by the time they had taken

9   the dealership from us, I lost all contact.  So, we didn't

11:58:27AM  10  know what was going on with them.

11  Q.   All right.  And did you nevertheless -- I know you are in

12  a lawsuit with them -- but did you nevertheless believe that

13  the Gyro-Trac had the ability to go out and improve these

14  machines?

11:58:37AM  15  A.   Oh, yes, definitely.  We knew there would be a learning

16  curve to put these new products on the market and that there

17  could possibly be some issues with the machines.  We really

18  felt we could work through it.  They were beautiful machines.

19  When they ran, I still don't believe there's another machine

11:58:57AM  20  on the market that will do the job that one of these tractors

21  will do.

22  Q.   I just want to be clear.  Does ROWMEC still wish it had

23  this dealership?

24  A.   Yes.

11:59:04AM  25  Q.   Now, let me ask you about pricing on the products that

USCA5 3771

1  you were getting from Gyro-Trac.  Did you ever have pricing

2  issues with the Gyro-Trac companies?

3  *A.*   Yes.

4  *Q.*   What pricing issues did you have?

11:59:20AM  5  *A.*   First, that we never did get our contractual lowest

6  wholesale minus 10 percent price.

7  *Q.*   All right.  And did Gyro-Trac ever tell you that they

8  had -- that they even had wholesale prices?

9  *A.*   No.

11:59:38AM  10  *Q.*   All right.  Did they send you price sheets from time to

11  time?

12  *A.*   Yes.

13  *Q.*   Did they tell you whether or not they were wholesale

14  prices?

11:59:46AM  15  *A.*   No.

16  *Q.*   Did they tell you whether or not they were best available

17  wholesale prices?

18  *A.*   No.

19  *Q.*   Did they tell you whether or not they were best available

11:59:52AM  20  wholesale prices less 10 percent?

21  *A.*   No.

22  *Q.*   Did you ever -- did you always get the same price, for

23  example, on a GT-25?

24  *A.*   No.

12:00:01PM  25  *Q.*   What were some of the different prices you got on the

USCA5 3772

1  GT-25?

2  *A.*   I think it went anywhere from 192 to 216 to 232 in there

3  some where.

4  *Q.*   Did anyone ever tell you why the prices went up or down?

12:00:17PM  5  *A.*   No.

6  *Q.*   Did anybody ever tell you that whatever the price was

7  their best available wholesale price less 10 percent.

8  *A.*   They just told us that was our price.

9  *Q.*   Did they ever tell you what they were charging other

12:00:31PM  10  retail customers?

11  *A.*   No.

12  *Q.*   All right.  Through this period of time, Mr. O'Hagan, to

13  your knowledge did Gyro-Trac have any other dealers other than

14  ROWMEC?

12:00:42PM  15  *A.*   No.

16  *Q.*   All right.  For you to determine whether or not ROWMEC

17  was getting best available wholesale price less 10 percent,

18  would you have to know something about what Gyro-Trac was

19  charging other customers?

12:01:02PM  20  *A.*   Yes.

21  *Q.*   And was that information that Gyro-Trac shared with you

22  before the dealership was terminated?

23  *A.*   No.

24  *Q.*   And was that something they shared with you before this

12:01:12PM  25  lawsuit was filed?

USCA5 3773

1  A.   No.

2  Q.   Since then have you learned whether or not Gyro-Trac was

3  charging other people less money retail for the same tractors

4  they were selling to you wholesale?

12:01:27PM 5  A.   Yes.

6  Q.   Can you give us some examples of that?

7  A.   I just know there was a list of like 11 machines that

8  were sold before we ever received a machine and the pricing

9  was substantially lower than what we were being charged.

12:01:39PM 10  Q.   There were some prices substantially lower after you

11  bought your GT-25's; is that right?

12  A.   Yes.

13  Q.   There were some lower before some of your GT-25

14  purchases?

12:01:52PM 15  A.   Yes.

16  Q.   Would you describe that as prices as just kind of all

17  over the board?

18  A.   Yes.

19  Q.   Now, is pricing one of the issues that ROWMEC is

12:01:59PM 20  complaining about with respect to the bill?

21  A.   Yes.

22  Q.   And did you personally go through and look at the

23  different prices that had been charged to other customers?

24  A.   Yes.

12:02:15PM 25  Q.   All right.  Now, did anybody in your company do that work

USCA5 3774

1    more closely than you did?

2    A.    Yes.   My sister-in-law Karen.

3    Q.    And who is Karen?

4    A.    My sister-in-law.

12:02:25PM 5    Q.    Karen O'Hagan?

6    A.    Karen O'Hagan.

7    Q.    And what is Ms. Karen O'Hagan's role in the business?

8    A.    Actually, we asked her to come back and work for the

9    company just to help us get to the bottom of the bill and find

12:02:41PM 10    out where the mistakes were and why it was so far off.

11    Q.    And how long did it take her to do that?

12    A.    A year.

13    Q.    Was she able to do that with just the information that

14    Gyro-Trac had supplied before this lawsuit was filed?

12:02:54PM 15    A.    No.   No.

16    Q.    Was she able to get enough information afterwards to

17    finish her analysis of the bill?

18    A.    To work on it some more, yes.   Through discovery there's

19    been more information that she could use to get the bill

12:03:09PM 20    closer to what it should be.

21    Q.    To your factual knowledge, did she make an attempt to

22    figure out whether or not there WAS overcharges in machines?

23             MR. KEENAN:   Same objection.

24             THE COURT:   Overruled.

12:03:27PM 25    A.    Yes.

USCA5 3775

305

1   BY MR. BANDAS:

2   *Q.*   And do you know generally what number she came up with?

3   *A.*   I think it was 200 -- it was over 250,000.

4   *Q.*   And to your factual knowledge, what does that number

12:03:44PM  5   represent?

6   *A.*   The amount of money we were overcharged for the tractors

7   that we purchased.

8           MR. BANDAS:  May I approach the easel, Your Honor?

9           THE COURT:  Yes.

12:04:00PM 10   BY MR. BANDAS:

11  *Q.*   Now, Mr. O'Hagan, do you remember earlier when we talked

12  about the different items that you thought should come off the

13  bill?

14  *A.*   Yes.

12:04:06PM 15  *Q.*   This issue with respect to overcharges that Ms. O'Hagan,

16  your sister-in-law, did, is that something that you think

17  could have affected the bill as well?

18  *A.*   Yes.

19  *Q.*   Even if we don't take that off this bill, right here, do

12:04:22PM 20  we still have the bill well under the 500,000-dollar credit

21  line?

22  *A.*   Yes.

23  *Q.*   And whether or not -- you said the overcharges were

24  approximately $250,000?

12:04:37PM 25  *A.*   Between 250 and 280, I believe.

USCA5 3776

1   Q.   To your knowledge, whether or not that's a good number or

2   high or low for overcharges, does that just depend on looking

3   at the different sales prices and figuring out what is an

4   appropriate wholesale price less 10 percent?

12:04:55PM  5   A.   Yes.

6   Q.   As you're sitting here today, has anybody ever told you

7   what's the right wholesale price less 10 percent?

8   A.   No.

9   Q.   Has anybody ever told Ms. O'Hagan what is the right

12:05:07PM 10   wholesale price less 10 percent?

11   A.   No.

12   Q.   So, whether it should be 250 or a little higher or a

13   little lower, is it nevertheless ROWMEC's position that there

14   ought to be some accommodation in this bill for pricing

12:05:19PM 15   issues?

16   A.   Yes.

17   Q.   All right.  Now, similarly on cutter teeth and other

18   parts and equipment, do you have factual knowledge about

19   whether or not there were potentially overcharges on parts and

12:05:40PM 20   teeth?

21   A.   Yes.  That's initially what made us start looking at the

22   bill thinking that it was wrong.

23   Q.   And who was it mainly that did that work?

24   A.   Patty Curran, myself, and my son all had something to do

12:05:52PM 25   with what the billing was.

USCA5 3777

1  *Q.*   And then later did your sister-in-law, Karen O'Hagan,

2  become involved?

3  *A.*   Yes.

4  *Q.*   And to your knowledge did she come up with some

12:06:00PM  5  calculations about what the overcharges were just on parts and

6  teeth and that type of thing?

7  *A.*   Yes.

8  *Q.*   And more or less what was that number?

9  *A.*   I think it was 75, 78,000, something like that.

12:06:13PM 10        MR. BANDAS:  May I approach, Your Honor?

11        THE COURT:  You may.

12  BY MR. BANDAS:

13  *Q.*   And, again, whether or not Gyro-Trac had an actual best

14  available wholesale price less 10 percent on cutter teeth and

12:06:34PM 15  parts, to your knowledge was that ever communicated to ROWMEC?

16  *A.*   No.

17  *Q.*   Okay.  So, whether that number is exactly right, it ought

18  to be higher or lower, can ROWMEC even say?

19  *A.*   No.

12:06:45PM 20  *Q.*   But nevertheless, do you believe that the overpricing on

21  the teeth and the parts should at least have been considered

22  in some form in looking at the bill?

23  *A.*   Yes.

24  *Q.*   Okay.  Just so we have a summary, is it ROWMEC's position

12:06:59PM 25  that these things for sure ought to come off the bill?

USCA5 3778

1   A.   Yes.

2   Q.   Is it ROWMEC's position that these things here, the

3   overcharges and the pricing issues, at least merit

4   consideration in looking at this bill?

12:07:10PM 5   A.   Yes.

6   Q.   Okay.  To clarify some things, Mr. O'Hagan, were the

7   billing issues something that just sprung up out of the blue

8   at the end of the dealership term between ROWMEC and the

9   Gyro-Trac companies?

12:07:37PM 10   A.   No.  It started almost immediately.

11   Q.   It started almost immediately?

12   A.   Yes.

13   Q.   Give me some examples of what would come up.

14   A.   We knew from the start that we weren't getting the proper

12:07:48PM 15   discount on cutter teeth and parts as soon as we started

16   buying them.

17   Q.   Did ROWMEC sit idly by and not tell anybody about it?

18   A.   No.

19   Q.   What did you do?

12:07:58PM 20   A.   We sent letters and e-mails back and forth to Odette and

21   Jon Flournoy.

22   Q.   Did you just send a couple of e-mails or....

23   A.   No.  I think it ended up being 80 or 90 back and forth.

24   Q.   All right.  Were there telephone conversations between

12:08:12PM 25   the bookkeeping folks and your office and the bookkeeping

USCA5 3779

1   folks in Gyro-Trac's office?

2   A.   Yes.

3   Q.   And who were the parties of those conversations?

4   A.   Initially Patty Curran and Dawn Wright, I believe, were

12:08:25PM 5   the main two.

6   Q.   How did those conversations go?  Were they able to get to

7   the bottom of it?

8   A.   No, not much help at all from Dawn Wright.

9   Q.   And during the term of the dealership relationship

12:08:37PM 10  between ROWMEC and Gyro-Trac, was there continual requests for

11  information by ROWMEC?

12  A.   Yes.

13  Q.   And to your knowledge did ROWMEC ever get the information

14  it needed to figure out the bill?

12:08:51PM 15  A.   Not until after discovery.

16  Q.   All right.  And let me just ask you a question point

17  blank.  You heard in opening, Mr. O'Hagan, that you took a

18  bunch of machines and you sold them and you just pocketed the

19  money.

12:09:07PM 20  A.   Yes, sir.

21  Q.   Do you remember that?

22  A.   Uh-huh.

23  Q.   Is that what happened?

24  A.   No, sir.

12:09:13PM 25  Q.   What happened here?

USCA5 3780

310

1    A.   Again, we were trying to work out -- we had some

2    differences starting in the beginning.  We were trying to

3    build a business relationship.  It got to a point where we

4    didn't know what to do.  We had talked continually to their

12:09:30PM  5    accounting department and to Odette about the billing issues

6    and the pricing issues.  We just didn't know what else to do.

7    So, definitely we stopped paying hoping that would get their

8    attention.  That didn't actually work.  So, it's part of what

9    this lawsuit was filed for, to try to get all these problems

12:09:53PM 10    straightened out and continue on in business, but that didn't

11   work.  They just took away our dealership.

12   Q.   And at that time when you put the brakes on paying, like

13   you just described, what was the reason for that?

14   A.   Because the bill was getting so far out of hand.

12:10:07PM 15   Q.   At that point in time were you well-satisfied that when

16   you made that call the bill was well under $500,000?

17   A.   Yes.

18   Q.   All right.  Now, let's talk about this 500,000-dollar

19   line or help or maybe even gift as Mr. Gaudreault described it

12:10:27PM 20   in his deposition.  What was that?

21   A.   Mr. Gaudreault had offered that personally to me for

22   ROWMEC as a help to get the whole dealership thing started,

23   get it going.

24   Q.   All right.  Did you and he have any conversations about

12:10:42PM 25   the terms of that help?

USCA5 3781

311

1  *A.*   No.  There were never terms discussed.

2  *Q.*   Did he tell you how much you had to pay and when, whether

3  it was a percentage of the balance or anything like that?

4  *A.*   No.

12:10:52PM 5  *Q.*   All right.  And when the dealership was terminated, had

6  anybody from Gyro-Trac told you, we withdraw the

7  500,000-dollar line or whatever you want to call it?

8  *A.*   No.

9  *Q.*   All right.  And, so, when these billing issues came up

12:11:08PM 10  with Gyro-Trac, had anybody told you the 500,000-dollar line

11  or credit extension was no longer in effect?

12  *A.*   No.

13  *Q.*   And did they always talk to you as if it was always in

14  effect?

12:11:23PM 15  *A.*   Yes.  When we started any discussions about the bill, it

16  was to get it under the 500,000.

17  *Q.*   All right.  I also want to talk about some of the

18  allegations that have been made against ROWMEC in the

19  termination letter and one of them was, if you recall, failure

12:11:50PM 20  to properly train and supervise sales staff.  What's your

21  answer to that?

22  *A.*   We have been selling this equipment for close to 30

23  years.  When though we had a pretty good way to do it.  When

24  we had equipment available, we did do it.  We still maintain

12:12:03PM 25  some of our original customers.  So, I think we had a pretty

USCA5 3782

1  good idea about how to do it.  I'm not saying we weren't open

2  to some new ideas.  There's always things out there that you

3  haven't thought of.  But I thought we were doing a pretty good

4  job.

12:12:17PM 5  Q.   Have you ever not sold a machine that you had an

6  opportunity to sell?

7  A.   No.

8  Q.   All right.  Now I want to talk about some specific

9  customer issues.  We've heard testimony in this case that Alan

12:12:33PM 10  Davis is one of the folks that complained about you.  Who is

11  Alan Davis?

12  A.   Alan Davis was a customer that we didn't find, that

13  Gyro-Trac actually sold him the machine.  We didn't know

14  anything about Alan Davis until after he had already gotten

12:12:48PM 15  his machine.  Most of the contact we had with him is I went up

16  and did a 50-hour service on his Gyro-Trac after he purchased

17  it.  Of course, then, we had more occasion to speak to him

18  when his tractor started going down.

19  Q.   Was that before or after Gyro-Trac had already made the

12:13:05PM 20  sale?

21  A.   After.

22  Q.   Before Gyro-Trac made the sale to him, did you even know

23  Alan Davis?

24  A.   No, never heard of him before.

12:13:13PM 25  Q.   Had you ever had any communications with him?

USCA5 3783

1  *A.*   No.

2  *Q.*   After Gyro-Trac made the sale, did Alan Davis ever

3  complain to you about your service?

4  *A.*   No.

12:13:24PM  5         MR. KEENAN:  Objection, Your Honor, hearsay.

6         MR. BANDAS:  Your Honor, we're talking factually

7  what occurred and what's relevant to their reasons for

8  terminating and I think we have the right to rebut.

9         THE COURT:  Overruled.

12:13:39PM 10  BY MR. BANDAS:

11  *Q.*   Did Alan Davis ever make any complaints to you about your

12  service?

13  *A.*   No.  He did complain about the tractor going down as much

14  as it did.  He was one of the customers that we actually

12:13:51PM 15  had -- he bought a GT-25.  He started having problems with the

16  undercarriage.  First, we were told to let him borrow the

17  GT-18 until we could get his tractor fixed.  We took the GT-18

18  to Arkansas.  It went down for the same reasons.  So, then,

19  that's when we took one of the brand-new GT-25's and took that

12:14:12PM 20  to him to use until his original unit was fixed.

21  *Q.*   How much was he paying for that machine?

22  *A.*   I'm not dead sure of the price but it would have been

23  around 270,000.

24  *Q.*   Was he frustrated with having a 270,000-dollar machine

12:14:27PM 25  that was broken down?

USCA5 3784

1    A.    He was very upset.

2    Q.    Did you see him upset?

3    A.    Yes.

4    Q.    Did he ever tell you this is ROWMEC's fault?

12:14:34PM  5    A.    No.

6    Q.    All right.  Now, let's talk about Stanley Tew.  We've

7    heard testimony in this case that Stanley Tew is one of the

8    fellows that complained about you.  Do you remember that?

9    A.    Yes, sir.

12:14:48PM  10   Q.    Who is Stanley Tew?

11   A.    Stanley Tew was another customer that Gyro-Trac sold to

12   in Arkansas.

13   Q.    How did you meet Mr. Tew?

14   A.    After they made the sale, they called and asked would we

12:15:00PM  15   do the delivery on the tractor.

16   Q.    After who made the sale?

17   A.    After Gyro-Trac made the sale.

18   Q.    Did they tell you that they were making the sale

19   beforehand?

12:15:08PM  20   A.    No.

21   Q.    Was it in your exclusive territory?

22   A.    Yes.

23   Q.    Then what did they ask you to do, "they" being Gyro-Trac?

24   A.    They asked us to do the initial service on the tractor

12:15:17PM  25   and deliver it to Mr. Tew in Arkansas.

USCA5 3785

1    Q.   Did you agree to do that?

2    A.   Yes.

3    Q.   And before Gyro-Trac made the sale to Mr. Tew or made the

4    deal to make the sale to Mr. Tew, had you ever met Mr. Tew

12:15:30PM  5    before?

6    A.   No.

7    Q.   After that time period did Mr. Tew ever complain to you

8    about ROWMEC's service?

9    A.   Only, again, about the breakdowns, not about how we

12:15:39PM  10   handled them.

11   Q.   Okay.

12   A.   Definitely was not happy, as Alan Davis was not happy.

13   Q.   All right.  Mr. Johnny Johnson?

14   A.   Yes.

12:15:48PM  15   Q.   We've heard the defendant say that he's one of the

16   fellows that complained about you, also.

17   A.   Yes.

18   Q.   Did Mr. Johnson ever complain to you about ROWMEC's

19   service?

12:15:57PM  20   A.   No, other than the fact that we had come out there so

21   much.

22   Q.   All right.  Is this the same Mr. Johnson that we watched

23   on videotape deposition yesterday?

24   A.   Yes.

12:16:06PM  25   Q.   Who is Kris Knackstead?

USCA5 3786

1   *A.*   Kris Knackstead was originally a customer of ours that we

2   had sold a used GT-10 to -- GT-10 machine to.

3   *Q.*   There's been an allegation in this case that

4   Mr. Knackstead said you competed with him on a contract.  Are

12:16:27PM 5   you familiar with that?

6   *A.*   Yes.

7   *Q.*   What really happened?

8   *A.*   In our business because the tractors are fairly unknown,

9   they're getting more known now, but a lot of people didn't

12:16:39PM 10   know what they were, sometimes we would get involved in an

11   extended demo.  In most cases a demo is a two- to four-hour

12   affair with the machine and the customer is watching.  But

13   because of the initial problems that the Gyro-Tracs had

14   originally when we first purchased them, especially in our

12:16:57PM 15   area, people knew what kind of problems they could have with

16   them; so, they wanted two- to four-day demos.  What we did to

17   try to keep people from calling for demos just to get, say,

18   their back five acres cleared, which does happen, you have to

19   be careful, with Jon Flournoy and Daniel's blessing, we would

12:17:17PM 20   charge a minimum fee on anything over a one-day demo.  Because

21   some of these demos, like Mr. Knackstead's, was a four-hour

22   trip from our shop to take these machines up there.  And not

23   Mr. Knackstead's case, and I'm not sure of the name of the

24   he's talking about, but the instance that's he's talking about

12:17:37PM 25   the man wanted a four-day demo.  So, we charged him a minimum

USCA5 3787

1    amount.  And what we would do with that money is if they

2    purchased the machine, that money would come straight off the

3    top of the price of the machine.  If they didn't purchase the

4    machine, it would help us with the consumables and the fuel

12:17:51PM  5    and the man hours to go up there and do an extended demo.

6    Just a set of cutter teeth on one of these machines is well

7    over a thousand dollars.  So, you use up a set of teeth on a

8    demo.  So, we were trying to at least not go as far in the

9    hole on the demos.

12:18:07PM 10    Q.   Was that done with Gyro-Trac's permission?

11    A.   Yes, definitely.

12    Q.   Have you done, ever, any demos that Jon Flournoy or

13    Gyro-Trac didn't know about?

14    A.   No.

12:18:18PM 15    Q.   Have you ever done any demos that they didn't approve?

16    A.   No.

17    Q.   So, if you were demoing a machine someplace, would that

18    have been with Gyro-Trac's specific approval for that specific

19    demo?

12:18:29PM 20    A.   Yes.

21    Q.   I want to talk a little bit about the termination.  And

22    the testimony in this case has been that that occurred in

23    February of 2006.  Before that letter of termination came, did

24    anybody at Gyro-Trac ever pick up the phone and call you and

12:18:57PM 25    say, "We're thinking about terminating this dealership"?

USCA5 3788

1  *A.*   No.

2  *Q.*   All right.  What conversations did you have with anybody

3  at Gyro-Trac about terminating the dealership?

4  *A.*   None at all.  The only conversations I had with Jon

12:19:12PM 5  Flournoy even in that respect were that if we didn't get

6  control of the bill they would put us on COD.

7  *Q.*   We heard testimony yesterday from Mr. Flournoy that he

8  had a meeting with you and talked about your attitude and said

9  he might have to terminate the dealership.  Did that ever

12:19:28PM 10  happen?

11  *A.*   No.  I'm not sure where that came from at all.  Did we

12  have disagreements on how the sales should be handled because

13  of the problems we were having with the tractors at the time?

14  Yes, definitely, we had disagreements about that.

12:19:42PM 15  *Q.*   All right.  I also want to talk about what sales ROWMEC

16  thinks it could have made had it kept this dealership.

17  *A.*   Yes, sir.

18  *Q.*   Now, generally speaking when ROWMEC sells a machine or a

19  product, what's it's generally profit margin?

12:20:02PM 20  *A.*   Profit dollar wise or profit margin?

21  *Q.*   Profit margin maybe as a percentage.

22  *A.*   It should have been 30 percent.

23  *Q.*   Where does that 30 percent number come from?

24  *A.*   From the contract.

12:20:13PM 25  *Q.*   Well, historically has ROWMEC earned more or less 30

USCA5 3789

1   percent profit on its products?

2   A.   Yes.

3   Q.   All right.  And for how long has that been true?

4   A.   As long as we've been selling equipment.

12:20:27PM 5   Q.   And did anybody from ROWMEC ever talk to anybody about

6   the 30-percent profit margin with someone at Gyro-Trac?

7   A.   Yes.

8   Q.   Who had those conversations?

9   A.   Myself with Jon Flournoy, also with Daniel, and Odette.

12:20:43PM 10   Q.   And tell me what conversations you had.

11   A.   Just we wondered why we weren't getting our proper

12   markup.

13   Q.   And did you have conversations with them about an

14   expectation to have a 30-percent profit margin?

12:20:56PM 15   A.   Yes.

16   Q.   All right.  And what was their response to that?

17   A.   I can't remember right now.  I'm a little foggy.

18   Q.   Did you complain to them that you weren't making 30

19   percent?

12:21:14PM 20   A.   Yes, definitely.

21   Q.   All right.  Is that part of the conversations you had in

22   complaining about the bill?

23   A.   Yes.

24   Q.   All right.  Now, when you had sold before New Holland

12:21:26PM 25   tractors or Caterpillar tractors, what was ROWMEC's historical

USCA5 3790

1   profit margin?

2   A.   You were always aiming for 30 percent at least.

3   Q.   Is that standard in your industry?

4   A.   Pretty much.

12:21:37PM   5   Q.   Has that been historically true for ROWMEC on a

6   particular product?

7   A.   Yes.

8   Q.   All right.  Now, you understand that one of the claims

9   that ROWMEC is making in this lawsuit is that losing the

12:21:57PM   10   dealership impeded or cost ROWMEC the ability to make sales in

11   the future.  Do you understand that?

12   A.   Yes.

13   Q.   If you would, Mr. O'Hagan, can you tell us what are some

14   of the sales that you know about that you feel that ROWMEC

12:22:13PM   15   could have made in the future?

16   A.   One of the first would have been with Wright's Tree

17   Service.

18   Q.   Tell me more about that.

19   A.   He called me and told me that he was in the --

12:22:22PM   20        MR. KEENAN:  Objection, Your Honor.  It's hearsay.

21        MR. BANDAS:  Your Honor, this has to do with intent

22   which is relevant to economic loss.

23        MR. KEENAN:  What?

24        THE COURT:  Sustained.

12:22:36PM   25   BY MR. BANDAS:

USCA5 3791

1   Q.   Mr. O'Hagan, what sales do you believe you could have

2   made to Wright's Tree Service?

3   A.   We ave missed three sales not long after the dealership

4   was taken away.

12:22:46PM   5   Q.   All right.  And how do you know that?

6   A.   Because they actually went out and bought competitors'

7   machines.  I had spoken to Mr. Myers.

8        MR. KEENAN:  Objection, Your Honor.  It's hearsay

9   and speculation.

12:22:55PM   10        MR. BANDAS:  May we approach, Your Honor?

11        THE COURT:  No.  I'm going to sustain the objection

12   as to hearsay.

13   BY MR. BANDAS:

14   Q.   All right.  And what other machines do you think ROWMEC

12:23:07PM   15   could have sold going into the future?

16        MR. KEENAN:  Objection, Your Honor.  It calls for

17   speculation.

18        MR. BANDAS:  Your Honor --

19        THE COURT:  Establish a basis, Mr. Bandas.

12:23:22PM   20        MR. BANDAS:  That's what I was trying to do, Your

21   Honor.

22        THE COURT:  Other than hearsay.

23        MR. BANDAS:  Okay.

24   BY MR. BANDAS:

12:23:28PM   25   Q.   What would be your basis for projecting sales in the

USCA5 3792

1    future?

2    A.   What we've done in the past, basically on 20 years of

3    experience.  Am I allowed to answer?

4    Q.   Yeah.  Just go ahead and answer and tell us what your

12:23:46PM  5    basis is.

6    A.   What we had sold in the time period that we had access to

7    GT-25's and what we had talked to customers about in the

8    market, we felt strongly that we could do at least ten a year.

9    Q.   All right.  What business is ROWMEC engaged in now that

12:24:18PM 10    it's lost the dealership?

11    A.   We're trying to back up and rebuild our sales of the

12    units we were building before that.

13    Q.   Is ROWMEC still in the service business?

14    A.   Yes.

12:24:29PM 15    Q.   And please tell us what is the service business.

16    A.   We work on not only our machines that we've sold but

17    competitors' machines for our customers, which would be more

18    localized customers.

19    Q.   All right.  And just one question I forgot to ask you

12:24:44PM 20    yesterday.  Were you honorably discharged from the Marine

21    Corps?

22    A.   Yes, sir.

23              MR. BANDAS:  Pass the witness, Your Honor.

24              THE COURT:  All right.  Cross-examination?

12:24:53PM 25              MR. KEENAN:  Yes, Your Honor.  May I use the podium?

USCA5 3793