1  *true?*
2  *A.   No, sir.   That would be a lie.*
3       (Videotape playing stopped)
4            MR. BANDAS:   Your Honor, at this time we will call
5  John Flournoy by videotape deposition.
6            THE COURT:   All right.
7       (**JON FLOURNOY,** Plaintiff's witness, via videotape)
8       (Videotape playing)
9                      *JON FLOURNOY,*
10  *called as a witness herein, having been first duly sworn, was*
11  *examined and testified as follows:*
12                    **EXAMINATION**
13  *BY MR. SIGLER:*
14  *Q.   Would you state your name, please.*
15  *A.   Jon Flournoy.*
16  *Q.   Mr. Flournoy, I understand that you're an employee of*
17  *Gyro-Trac?*
18  *A.   Yes, sir.*
19  *Q.   Which Gyro-Trac entity are you employed by?*
20  *A.   USA.*
21  *Q.   Are you also here today to speak on behalf of the other*
22  *Gyro-Trac entity that's a party to this case, or are you just*
23  *here to speak on behalf of Gyro-Trac (USA)?*
24  *A.   USA.*
25  *Q.   You understand that that's your role here today; you are*

Exhibit H

USCA5 3554

1  *going to be speaking on behalf of Gyro-Trac (USA)?*

2  *A.   I do.*

3  *Q.   Does Gyro-Trac currently owe Rowmec any commissions under*

4  *that agreement?*

5  *A.   I don't know that for sure.*

6  *Q.   Do you know one way or the other?*

7  *A.   Not really.*

8  *Q.   Do you know what the status of the commission payments to*

9  *Rowmec is at this point in time?*

10 *A.   I have an idea, but that's an accounting idea.  I don't.*

11 *Q.   Would Odette know about that?*

12 *A.   I don't know.  I think our accountant would know about*

13 *that.*

14 *Q.   And that's Dawn Wilson?*

15 *A.   Wright, Dawn Wright.*

16 *Q.   Wright.  I apologize.*

17          *What would your idea be about the status of the*

18 *commission payments to Rowmec?*

19 *A.   I don't know.  I know there is some disputes between his*

20 *accounting and our accounting.*

21 *Q.   But you just don't know one way or the other what the*

22 *status of the commission payments of the company are; is that*

23 *correct?*

24 *A.   No, other than what I have heard, hearsay around, I don't*

25 *know.  Dawn Wright can answer that for you.*

USCA5 3555

1   Q.   What if you have technology, different technology applied

2   to cutter head or cutter teeth products that's not Rowmec

3   technology?  Then would the agreement still require

4   commissions to be paid to Rowmec?

5   A.   No.

6   Q.   Has Gyro-Trac in the past, in your experience, had

7   trouble with accounting?

8   A.   Yes.

9   Q.   And what types of troubles have they had in general?

10  A.   Confusion mostly.  There seems to be at any given time

11  until not too far in the distant future, there seems to be

12  just inconsistencies.  Records not seeming to make sense.

13  Q.   That's happened in your relationship with Rowmec,

14  Gyro-Trac's relationship with Rowmec?

15  A.   It's happened in that relationship.  It's happened on

16  both sides of that relationship.  I tried to make sense of

17  theirs, and that didn't make any sense either, so.

18  Q.   Has it happened in Gyro-Trac's relationship with others

19  customers --

20  A.   Yes.

21  Q.   -- or people that they deal with?

22  A.   Yes.

23  Q.   Do you know if Rowmec was always charged the lowest

24  available wholesale price to Gyro-Trac less an additional

25  percent?

USCA5 3556

1  A.    No, because I don't know what they get charged.

2  Q.    When you say down here at the bottom, these problems are

3  just a symptom of the real problem, do you mean the real

4  problem being the accounting department at Gyro-Trac?

5  A.    Uh-huh.

6  Q.    Is that a yes?

7  A.    Yes.

8  Q.    Let me show you what I've marked as Exhibit 3.  Is this a

9  letter you sent to John O'Hagan --

10  A.    Yes.

11  Q.    -- terminating the dealer arrangement?

12  A.    Yes.

13  Q.    Did you write this letter?

14  A.    I didn't actually write it, but I was a party to it and

15  agreed to it.

16  Q.    Who wrote it?

17  A.    The group.  We have a management team; so that would have

18  been Odette, Bruce, myself, Daniel.

19  Q.    Odette, Bruce, yourself?

20  A.    Daniel Gaudreault.

21  Q.    What's Bruce's last name?

22  A.    Coy.

23  Q.    With regard to the issue in the first paragraph, you talk

24  about the reason for the termination is Rowmec's total and

25  complete failure to perform its contractual obligations.  Do

USCA5 3557

1  you see that?

2  A.   Uh-huh.

3  Q.   Then the letter goes on to say, the list of contractual

4  obligations that have been breached by Rowmec include but are

5  not limited to, and you go on to list several.

6  A.   Paying for products, failure to service customers,

7  failure to pursue sales opportunities, failure to properly

8  train service staff.

9  Q.   I can read that.  And here's my question.

10  A.   Okay.

11  Q.   What other contractual obligations do you claim that

12  Rowmec has breached other than those that are listed

13  specifically in this letter?  You say included, but not

14  limited to.  I want to know if there is any others you can

15  think of sitting here as a represent of Gyro-Trac?

16  A.   That's a very subjective question.

17  Q.   Okay.  Well, just give me a subjective answer then.

18  A.   As a dealership they're failing.

19  Q.   Okay.

20  A.   As a dealership they are not going out on a daily basis

21  and promoting and selling and demonstrating and doing the job

22  to put the product out there.  I have tried repeatedly to

23  salvage this dealership and to get sales going in Texas, and

24  it doesn't work for whatever reasons no matter how hard I try.

25  I go and make sales in their territory and pay them for their

USCA5 3558

1  *sales with them.  I have done that a few times.  I go and try*

2  *to explain to them how this business works.  This is a very*

3  *different business.  This is not like selling track hoes and*

4  *bulldozers.  You have to sell the business along with the*

5  *machine.  You can't just sell the machine and say, here, go do*

6  *your work with this thing.  People will go broke with it,*

7  *which is what people are doing in Texas right now.*

8  *Q.   Okay.  So basically what you just said, plus what's in*

9  *the letter?*

10  *A.   Yes.*

11  *Q.   Give me any specific examples you know of, of failure to*

12  *service customers.*

13  *A.   I don't know that I can think of any specific.  I know*

14  *that our departments have complained, have received*

15  *complaints.  Our service department has received complaints*

16  *about the service or the quality of the service or the lack of*

17  *response to service or the timeliness of service.  But that's*

18  *all in my service department.  That's not something I have*

19  *personal access to.*

20  *Q.   So that's something you've heard, but you don't have any*

21  *names; is that right?*

22  *A.   No, Allen Davis has had a problem.  Stanley Stew have had*

23  *problems.  And there are probably others, but I don't know*

24  *which ones.  Those are a couple in Arkansas.*

25  *Q.   Okay.  Say those names again.*

USCA5 3559

1   A.    Stanley Stew, S-T-E-W.   Allen Davis, D-A-V-I-S.

2   Q.    Those are customers in Arkansas that you think have had

3   trouble with Rowmec?

4   A.    They are people they have personally told me they've had

5   problems.

6   Q.    What do you know about where it says in the letter, 'the

7   use of consigned Gyro-Trac equipment for Rowmec's benefit,' do

8   you know when and how that occurred?

9   A.    That's something that was told to me by Chris

10  Connectstead of Environmental Land Clearing.   He's up near

11  Dallas, Texas; Tyler, Texas.

12  Q.    He's a customer of some type?

13  A.    He is a customer.   There was a consternation around Chris

14  Connectstead.   He was buying a machine, one type of machine.

15  When he called us he was unhappy with whatever was going on

16  between he and Rowmec.   He made some very strong statements

17  about that.   The machine that he wanted, as it turned out --

18  and I told Mr. O'Hagan when this was happening, that he had

19  called and that we were selling him the machine that he

20  actually wanted.   And his comments to me were that he lost a

21  contract to Rowmec because they took the contract and did it

22  with their demonstration equipment, which is one he rightfully

23  thought that he should have had because he was buying the

24  equipment to do the contract with.

25  Q.    So Rowmec had actually contracted for the work

USCA5 3560

1  *themselves?*

2  *A.   That's what he told me, yes.*

3  *Q.   Are you familiar at all with the invoicing, personally*

4  *familiar with the invoicing in this case?*

5  *A.   No, I can't make heads or tails out of it.*

6  *Q.   Before the dealership agreement was terminated, did you*

7  *have any contact with any Rowmec customers or anyone from*

8  *Gyro-Trac have any contact with any Rowmec customers?*

9  *A.   Yes.*

10  *Q.   Did Gyro-Trac attempt to make sales directly to any*

11  *Rowmec customers before the agreement was terminated by*

12  *Gyro-Trac?*

13  *A.   I definitely did.*

14  *Q.   What customers did you try to deal with directly?*

15  *A.   Chris Connectstead.*

16  *Q.   Any others?*

17  *A.   I don't know what the chronology is, so I'd have to go*

18  *back and look at when each machine was sold.  I know that*

19  *during this relationship Allen Davis was one that came*

20  *directly to Gyro-Trac, and I know he came out here and I did*

21  *all the work with him.  Sold the machine, paid Rowmec their*

22  *commission on that machine.  I don't know the date of that.*

23  *That's been a year ago maybe.*

24  *Q.   So that was a direct contact?*

25  *A.   Yeah, they came out here for whatever reason.  And I went*

USCA5 3561

1  on to make the sale and paid Rowmec their commission on it.

2  Q.   Any others?

3  A.   Chris Connectstead was having the dispute with Rowmec for

4  whatever reasons.  I made that sale, paid Rowmec their

5  commission on that sale, and told them of that.  Somewhere in

6  there is Stanley Stew, and I think one of our sales guys made

7  that sale, and Rowmec was paid the commission on that.  Those

8  are the only ones I can think of off the top of my head.

9  Q.   How long did these problems with sales and service on the

10 part of Rowmec go on, from your point of view?

11 A.   At least a year.  The service less so.  The sales have

12 been an issue from almost day one.

13 Q.   When do you think service first became an issue?

14 A.   I don't know.  It's been a while.  Probably from about

15 the time when we had the recall.

16 Q.   Which is when?

17 A.   I don't know the date of the recall.  That was seven,

18 eight months ago.  To answer that question, I don't really

19 know exactly the dates.

20 Q.   Of the recall?

21 A.   We had a recall early on.  We put the first 15 or 20

22 machines out early in -- late in '04, early '05 and we had a

23 traction problem.

24 Q.   Is that the only recall that's happened in the last year?

25 A.   Yes.

USCA5 3562

1  Q.   Have those recall problems affected sales, not only with

2  Rowmec, but with Gyro-Trac and anyone else that sells their

3  products?

4  A.   Nobody else sold our products during that period.  It was

5  just Gyro-Trac.

6  Q.   Did it affect you-all's sales?

7  A.   Short-term it affected my sales.  Long-term, no.

8  Q.   Do you know the approximate period of time when it

9  affected the sales?

10  A.   If I could put a handle on the exact dates of recall, I

11  could tell you that.  During that time people were restraining

12  until -- during the time of the recall people who were

13  interested in buying our product were holding back until they

14  saw if we actually fixed the problem, which we did.  And then

15  they went ahead and people were buying the equipment.

16  Q.   Are there any ongoing problems with Gyro-Trac products

17  that you're aware of?

18  A.   Sure.

19  Q.   What type of problem?

20  A.   We have had a little bit of undercarriage problems.

21  Sprockets, for instance.  We used to have a problem with axles

22  that would break after a few hundred hours of operation, and

23  we'd be putting in more axles than we thought was right, so we

24  fixed that.  Various quality control issues.  I don't know if

25  I could enumerate them, but we've had a few like any other

USCA5 3563

1  *manufacturing company.*

2  *Q.   Would you expect those problems to affect Rowmec when*

3  *they were trying to sell your products?*

4  *A.   It may affect the service of them because as the dealer*

5  *they have to service them, yes.*

6  *Q.   Don't they affect your ability to sell the products*

7  *because if people are having problems with the products,*

8  *they're not going to say good things about the products,*

9  *right?*

10  *A.   That's all in how you see it.  Now, it's a yes or no*

11  *question, but I sold an awful lot of machines this year with*

12  *the same problems Rowmec faced.  And I have a lot of customers*

13  *with these machines happy and making money with them.*

14  *Q.   And have you lost any customers because of the problems?*

15  *A.   One or two.*

16  *Q.   What other -- you talked about some disagreements you had*

17  *with the president of the company about the contract we've*

18  *marked as Exhibit 1.  We talked about the technological issue*

19  *in depth.  What other disagreements did you have with the*

20  *president of the company insofar as the agreement with Rowmec*

21  *was concerned?*

22  *A.   One of the biggest ones I had a disagreement with him*

23  *about is when we were coming up on the time that Rowmec had to*

24  *produce 'X' number of sales to maintain the status as*

25  *exclusive dealer in these territories.  And they weren't*

USCA5 3564

1    *getting there.  And I actually made, helped make a couple of*

2    *sales that put them over the top to maintain that status.*

3    *Q.    What year was that?*

4    *A.    It might have been the last part of '04.  Somewhere in*

5    *'04.  There is a date in here that says they have to hit a*

6    *certain date in order to maintain the status.  It was prior to*

7    *that date and coming right up on that date.  We had like a*

8    *year of operation with this thing already and they weren't*

9    *hitting the target, and so I helped hit the target so they*

10   *could maintain their status.  Daniel and I disagreed about*

11   *that because he says, you know, they're supposed to be doing*

12   *the work, what the hell are you doing it for, basically.  And*

13   *I said, I'm trying to help these people out.  And he said I*

14   *don't think it's right, but okay.*

15   *Q.    Do you know if Daniel saw that as a way to get rid of*

16   *Rowmec?*

17   *A.    No, I don't know that.  You'd have to ask him that.*

18   *Q.    Do you know why Rowmec would be billed for warranty work?*

19   *A.    Dealers are normally billed for the product, the parts.*

20   *And when the parts are submitted, go through our warranty*

21   *process, and it's deemed a defect or not a defect, that's when*

22   *they get reimbursed for the parts.*

23   *Q.    So they send the part to you.  And if the part is good,*

24   *then you just send it back to them?*

25   *A.    No, if the part is defective, has a manufacturer defect*

USCA5 3565

1  in it in some fashion which caused it to fail, then we'll pay

2  for it.

3  Q.   Give them a credit?

4  A.   Give them a credit.  If the part was not defective and

5  was destroyed by either normal wear and tear or destroyed by

6  we determine some sort of damage by abuse or whatever, then we

7  won't pay for it, we won't give them a credit for it.  It's

8  manufacturer defect.

9  Q.   Why does Rowmec get charged for that?

10  A.   All dealers get charged for that up front, and then

11  they're reimbursed for it when they submit the parts back to

12  us.

13  Q.   What does the charge up front cover, what contingency?

14  A.   The pay for the part.

15  Q.   The used part that they're giving back to you for the

16  warranty work, or the new part that --

17  A.   They're buying the new part that they're doing the repair

18  with.

19  Q.   And they're supposed to get reimbursed that by the

20  customer?

21  A.   In this equipment business, if there is a warranty claim,

22  if a part fails, say a hydraulic pump fails, the dealer buys

23  the pump from Gyro-Trac, goes, puts the pump on, takes the old

24  one off, sends the pump back to Gyro-Trac.  Gyro-Trac's

25  warranty department looks at the pump, they say, yep, we see

USCA5 3566

1   *that it failed because Sunstrand didn't build the pump*

2   *properly.  The dealer is then reimbursed for the amount of*

3   *that pump.  If the pump comes to Gyro-Trac and say Gyro-Trac's*

4   *warranty department looks at it and says this thing was abused*

5   *or didn't have enough hydraulic oil in it or they're running*

6   *the wrong grade of hydraulic oil in it, whatever, that caused*

7   *it to fail, it's not a warranty item, we don't pay for it.*

8   *The dealer gets that from his customer.*

9   *Q.   And so what the dealer has already done is given the*

10  *customer a new product, and that's what the warranty charge is*

11  *going up against?*

12  *A.   Yeah.  Most dealers charge the customer for it and*

13  *reimburse the customer just like we do.  Same process, except*

14  *on the other end of the spectrum.*

15  *Q.   And on the 10-31-05 entry, why would Rowmec get charged*

16  *for a c.o.d. only entry?*

17  *A.   Well, they bought some part, obviously.  At some point --*

18  *Gyro-Trac gave these people a $500,000 line of credit to work*

19  *from.  The balance got up over $500,000 and they didn't pay*

20  *us.  They kept not paying us.  They'd sell stuff, and they*

21  *wouldn't pay us.  So our accounting department, I assume,*

22  *decided to put them on c.o.d. so at least we'd start getting*

23  *paid for what were giving them.  We can't keep giving them*

24  *free stuff.*

25  *Q.   And you're also represented by counsel here today?*

USCA5 3567

1  A.   I am.

2  Q.   And if I understand correctly, you no longer work for

3  Gyro-Trac?

4  A.   That's correct.

5  Q.   How are you employed?

6  A.   I'm self-employed.

7  Q.   When did you leave Gyro-Trac?

8  A.   May.  Right about the end of May this year.

9  Q.   And why did you leave Gyro-Trac?

10 A.   I left Gyro-Trac because they broke their word to me in a

11 financial situation primarily.

12 Q.   And any other reasons, just in general?

13 A.   Health.

14 Q.   Very good.  Are you currently involved in litigation with

15 Gyro-Trac?

16 A.   Yes, they're suing me.

17 Q.   What have you been sued for?

18 A.   They're suing me, making allegations that I'm damaging

19 their business by trying to solicit their customers and sell

20 them other manufacturers' products.

21     (Videotape playing stopped)

22         MR. KEENAN:  May we approach, Your Honor?

23         THE COURT:  All right.

24     (At side bar)

25         MR. KEENAN:  That was specifically limined out.  Any

USCA5 3568

1    discussion about litigation, a lawsuit was filed, period, the

2    end.

3              MR. BANDAS:  He's exactly right, Your Honor.  And I

4    thought this was cut out.  We have a mistake with the video

5    guy.  I apologize to counsel.  He is exactly right.

6              MR. KEENAN:  Should we take a break and let him do

7    that?

8              THE COURT:  It's time for a break anyway.

9              MR. BANDAS:  I apologize.

10      (Open court)

11              THE COURT:  All right.  Ladies and gentlemen, we are

12   going to take a 15-minute recess right now.  So, be back here

13   at a quarter till 4:00, please.  Thank you.

14      (Short recess)

15      (Jury present)

16              THE COURT:  Are we ready to proceed?

17              MR. BANDAS:  We are, Your Honor.

18      (Videotape playing)

19   *Q.   Let me show you what has been previously marked as*

20   *Exhibit 2 in some corporate representative deposition that we*

21   *took of Gyro-Trac yesterday.  Do you recognize that document?*

22   *A.   No.  But if I read it I might.  You'll have to bear with*

23   *me.  I'm a slow reader.*

24   *Q.   Sure.  Please take your time.*

25   *A.   That's the letter that I wrote at the end of the*

USCA5 3569

1   *arrangement with Rowmec.*

2   *Q.   This is your signature on the second page?*

3   *A.   It is.*

4   *Q.   And this letter is dated February 3, 2006?*

5   *A.   It is.*

6   *Q.   Now, Mr. Flournoy, if you would, I will talk about the*

7   *details of what's in this letter in a moment, but what I'd*

8   *like to know right now is how did this letter come about?*

9   *A.   Well, it came about through a long process.  Various*

10  *folks at Gyro-Trac were evaluating the Rowmec dealership*

11  *arrangement and it was not working out and I thought still*

12  *wasn't working out and eventually we all had a meeting and*

13  *presentation was made that we got to do something with this*

14  *because it's not working out.  They're not doing the job we*

15  *hired them to do and I finally agreed -- about a week before*

16  *this letter actually went out, I finally agreed it wasn't*

17  *going to work.*

18  *Q.   You said various folks had meetings and participated in*

19  *that decision making process?*

20  *A.   Yes.*

21  *Q.   Who were those folks?*

22  *A.   Mr. Gaudreault, Bruce Coy, Odette Mones, Victor LeBlanc.*

23  *Those are the ones I can think of off the top of my head.*

24  *Q.   Would you agree with me that's the document that*

25  *established the dealership?*

USCA5 3570

1   A.   As far as I know, yes, sir.

2   Q.   And that's dated approximately November of 2003?

3   A.   It's actually dated September 12, 2003.

4   Q.   September 12.  But I guess there's some signatures of

5   November '03?

6   A.   November 8, 2003.

7   Q.   Maybe I was right after all.  I think the effective date

8   was September 12, 2003; correct?

9   A.   Yes, sir.

10  Q.   Starting with that date and going forward, when was the

11  first time, to your memory, that folks at Gyro-Trac started

12  questioning whether or not Rowmec ought to continue as a

13  dealer?

14  A.   I don't know.  I can't give you a time because it's

15  just -- it's not in there.  I think at the time involved it

16  wasn't something that happened like an event, like somebody

17  punched you in the nose.

18  Q.   You may not have a clear recollection, but nevertheless

19  I'll ask you.  When is the first time that you have a clear

20  recollection of this conversation coming up seriously at

21  Gyro-Trac, and that being whether or not Gyro-Trac ought to

22  terminate its dealership with Rowmec?

23  A.   Clear recollection was in '05 and maybe a part -- the

24  last part of '04.  Actually it was getting pretty clear things

25  weren't working.  We'd been in the agreement a year and a half

USCA5 3571

1   *or more and it was evident that we weren't getting where we*

2   *wanted to go.*

3   *Q.    And going back to that end of '04, beginning of '5 time*

4   *period, what wasn't working about the relationship?*

5   *A.    Sales weren't happening on one side.  There seemed to be*

6   *a lot of animosity between the two companies on the other*

7   *side.  But it -- just from my perspective I was the sales*

8   *manager, I was to make these things work and make sales and*

9   *I'd go over and I'd spend time and I'd teach people how to do*

10  *this and do demos and whatever.  When I wasn't doing that*

11  *nothing seemed to be happening in between and for sure a lot*

12  *of hard feelings around the board so and there was a lot of*

13  *problems with equipment and so forth, so I don't know.*

14  *Q.    So there was a variety of things that affected Rowmec's*

15  *ability to make sales; correct?*

16  *A.    Yes.*

17  *Q.    One of them, I think, as you said, you had criticisms how*

18  *they were handling sales?*

19  *A.    Yes.*

20  *Q.    But there was also problems with the equipment, correct?*

21  *A.    Yes.*

22  *Q.    What were the problems with the equipment that you were*

23  *observing in '4 and '05?*

24  *A.    Well, they had a recall.  Gyro-Trac had a recall on the*

25  *undercarriage.  The undercarriage had some major problems*

USCA5 3572

1  *which would cause the machines to break down and wheels to*

2  *fall off and the customer couldn't use the machine for a*

3  *period time until I put them back together.  That was*

4  *happening within 25 hours of start up or 50 hours.  And*

5  *everything at Gyro-Trac and Rowmec scrambled and scrambled.*

6  *It was a very difficult time for everybody to keep those*

7  *machines close to running and keep the customers happy.*

8  *Q.   And the machines that we're talking about, do you have*

9  *some specific model?*

10  *A.   GT-18.*

11  *Q.   Gt-18.  Okay.  And what did that machine sell for*

12  *typically?*

13  *A.   185,000, I think, in those days.  Went from 65 to 185.  I*

14  *don't remember exactly when.*

15  *Q.   And at the end of the '04, beginning of '05 time period,*

16  *that's approximately when the GT-18 was in recall?*

17  *A.   Yeah.  I don't remember the exact dates.  You'd have to*

18  *ask somebody else.  But somewhere in that early '04, I*

19  *believe.*

20  *Q.   In your experience did the customers of these machines,*

21  *did they like paying $185,000 for a machine that ran 25 hours?*

22  *A.   I'm going to go back to the machine.  I'm trying to think*

23  *back.  That might have been the GT-25 we had the recall on.  I*

24  *think one we just -- GT-25 -- '04, '05, end of '04.  GT-25 I*

25  *think is what we had the recall on.*

USCA5 3573

1   Q.   How much does the GT --

2   A.   285.

3   Q.   285,000.  All right.  In your experience did customers

4   like paying $285,000 for a machine and having the wheels fall

5   off, for example?

6   A.   No.

7   Q.   Did they like paying $285,000 for a machine that had

8   serious undercarriage problems?

9   A.   No.

10  Q.   Did they like paying $285,000 for a machine that wouldn't

11  last 25 hours?

12  A.   No.

13  Q.   Did customers like to have machines running to make a

14  living?

15  A.   Sort of mandatory, yes.

16  Q.   Okay.  And the people that bought these machines, do you

17  think that the recalls and the extraordinary money they spent

18  on them to get machines that didn't work and were recalled, do

19  you think, in all fairness, might have affected Gyro-Trac's

20  reputation?

21  A.   It did.

22  Q.   Affected sales?

23  A.   It does.

24  Q.   In your experience as sales manager for Gyro-Trac when

25  you have recalls in defective machines that cost several

USCA5 3574

1   *hundred thousand dollars, does that generally inflate sales or*

2   *depress them?*

3   *A.   Can I answer this in my own fashion?*

4   *Q.   You're the witness.*

5   *A.   Good.*

6   *Q.   You answer.*

7   *A.   Because I want to make a couple of things clear here.  A,*

8   *Caterpillar has recalls.  Largest equipment manufacturers on*

9   *the plant.  Things happen.  Doesn't make customers*

10  *sometimes -- is it good, never.  How you go about fixing it*

11  *and taking care of the problem goes to the customer*

12  *satisfaction in the end.  We all have to live through the*

13  *problem.  Just like having a car wreck, you get through it.*

14  *Q.   Let me ask you this.  We're sitting here today November*

15  *17, 2006.  To your knowledge as we're sitting here today, has*

16  *Gyro-Trac fixed the problems, the design problems, with the*

17  *GT-25?*

18  *A.   As far as I know they fixed those problems, the major*

19  *problem on the recall.  As far as I know they did, yes.*

20  *Q.   GT-25.  Sitting here today, are they still having*

21  *problems?*

22  *A.   Some.*

23  *Q.   Are they still breaking down?*

24  *A.   Yes.*

25  *Q.   And you left the company in May?*

USCA5 3575

1    A.    This year.

2    Q.    Of this year.  When you left the company in May of this

3    year, were you still having customer complaints about the

4    machine?

5    A.    Yes.

6    Q.    Still having a lot of serious issues in the machine and

7    reliability of the machine?

8    A.    Yes.

9    Q.    Was it still seriously affecting people's ability to use

10    the machine to make a living?

11    A.    Yes.

12    Q.    All right.  Did Gyro-Trac ever deliver a GT-25 to Rowmec

13    to have on consignment?

14    A.    Yes.

15    Q.    When did that happen?

16    A.    I don't have a date.

17    Q.    When was the GT-25 first developed and available for

18    sale?

19    A.    Dates are not something I'm going to be able to recall.

20    I have a bit of a memory problem.  But sometimes toward the

21    end of '04 is when I only remember exactly I got the prototype

22    and shortly thereafter, within three or four months, we

23    started developing at least by the beginning of '05.

24    Q.    And do you know when the first time was that Rowmec got

25    one of those machines?

USCA5 3576

1  A.   No.

2  Q.   And what other machines was Gyro-Trac selling at the

3  time?

4  A.   They were selling a 13, selling heads on skied stairs on

5  the post-traction skied stairs.  I think they call it a GT-12,

6  GT-10 something.

7  Q.   When was the first time that Rowmec got a GT-13?

8  A.   I don't know the dates.

9  Q.   When was the first time that Rowmec got a GT-18?

10  A.   I don't know dates.  You'll have to ask somebody.  I

11  don't do dates well.

12  Q.   You'd certainly agree with me to have one of those on

13  consignment, pursuant to the settlement agreement, would have

14  been important for their ability to make sales?

15  A.   Oh, absolutely.  You have to demonstrate this equipment.

16  You can't go pick up the telephone and sell it.

17  Q.   Their ability to demonstrate and to have one on

18  consignment, that's critical, critical to their ability to

19  make sales?

20  A.   Having one in stock, whether on consignment or they

21  bought it is a question, but having one is critical, yes.

22  Q.   The point is, regardless of how it's there they have to

23  physically have one?

24  A.   Yes.

25  Q.   In their possession?

USCA5 3577

1   A.   Be available.

2   Q.   Absolutely.  You would agree with me if they didn't have

3   one that would be a very serious impediment to their ability

4   to market and make sales?

5   A.   Yes.

6   Q.   Now, we were talking about some of the sales problems.

7   In fact, at this point, go ahead and refer to Exhibit

8   Number 2.  What I want to do is I want to focus you on this

9   first paragraph here.  Says the purpose of this letter is to

10  formally determine between Right of Way Maintenance, Rowmec

11  and Gyro-Trac USA; correct?

12  A.   Uh-huh.

13  Q.   The reason for the termination is Rowmec total and

14  complete to perform contractual?

15  A.   Uh-huh.

16  Q.   Are those your words?

17  A.   They're our words, the team, the management team.  But I

18  agree with them.

19  Q.   You agree with them?

20  A.   Yes.

21  Q.   The list of contractual obligations by Rowmec include but

22  are not limited to, one, failure to pay for product; right?

23  A.   Uh-huh.

24  Q.   Failure to service customers?

25  A.   Uh-huh.

USCA5 3578

1   *Q.   Failure to pursue sales opportunities?*

2   *A.   Uh-huh.*

3   *Q.   Failure to properly train service and sales staff?*

4   *A.   Uh-huh.*

5   *Q.   Use of consigned Gyro-Trac equipment for Rowmec's*

6 *benefit?*

7   *A.   Uh-huh.*

8   *Q.   And failure to meet minimum sales requirements?*

9   *A.   Uh-huh.*

10   *Q.   Is that right?*

11   *A.   Exactly.*

12   *Q.   Now, before we go on, is there anything else that you*

13 *thought was a reason for termination that's not on this list*

14 *that ought to be on the list, or does this cover --*

15   *A.   I think that was it.*

16   *Q.   What I want to do is kind of go through these items one*

17 *by one with you and get some of the specifics we haven't had*

18 *an opportunity to do yet with you in this case; okay?*

19   *A.   Okay.*

20   *Q.   Now, let's talk about the first item which is -- somebody*

21 *got a marker?*

22   *A.   Where you at?*

23   *Q.   The fifth line down, failure to pay for product.  That's*

24 *the first thing on the list.*

25   *A.   Yes.*

USCA5 3579

1   Q.    What does that refer to specifically?

2   A.    That refers to -- try to figure out how to you put this

3   concisely.  There was a situation where we -- where Gyro-Trac

4   gave Rowmec a floor plan which was a line of credit basically

5   for half a million dollars.  They would be able to buy product

6   and pay for it over some period of time.  I forget whether it

7   was 30 or 90 days after they would receive the equipment they

8   had to pay for.  The two things that are clear in my mind

9   about the failure to pay for product was a couple of sales

10  were made, one I helped with and another one that was made, we

11  already had either reached or exceeded the half a

12  million-dollar floor plan, and John had a sale and wanted the

13  machine, I believe a 125, I know there was a 13 in there too,

14  and he promised that he would pay from that, you know, he

15  would pay so he would keep inside of his -- inside of his

16  floor plan arrangement.  I went and I talked to the ownership

17  at Gyro-Trac into sending the machine and we still didn't get

18  paid.

19  Q.    Now, let me make sure I understand this.  There's two

20  things specifically.

21  A.    These are just in my mind.  There's a lot of things that

22  went into this.  But in my mind these are the things I can

23  remember clearly.

24  Q.    To talk to Gyro-Trac's corporate representative on the

25  topic?  You're the man.  You're the one that knows you're the

USCA5 3580

1  one that we?

2  A.   I'm telling you what I need.

3  Q.   I want to understand in detail with concrete examples

4  everything that you considered in putting this letter

5  together; okay?

6  A.   Uh-huh.

7  Q.   Right now we're focused on failure to pay for product.

8  A.   Right.

9  Q.   And there's two specific issues about that that you

10  recollect.   One were sales that you helped with?

11  A.   Uh-huh.

12  Q.   And the other exceeding the $500,000 credit line?

13  A.   Uh-huh.

14  Q.   Correct?

15  A.   Correct.

16  Q.   Is there anything else on that list that you need to add?

17  A.   There is, but I haven't got a memory to be able to tell

18  you all.   There were several things that led up to this

19  because we had a lot over a few months back and forth and I

20  went and worked out payment arrangements with Rowmec to try to

21  bring these payments into line.   I know you have because we

22  did this before a document that I did with Rowmec that they

23  agreed to pay for these machines and we were going to sell

24  machines and start paying down the debt load and that never

25  came to pass.   It just kept not happening.

USCA5 3581

1   Q.   Let me ask you this.  Would it be fair to say that at

2   least in your mind at the time Rowmec exceeding the $500,000

3   credit line that was an important reason or an important

4   justification in your mind for terminating the dealership?

5   A.   Yes.  There's two in that relationship.  Going over the

6   limit is something that we at Gyro-Trac would make decisions

7   and allow or disallow.  But what really got me was being

8   clearly promised and clearly put my neck on the line to make

9   one of these deals happen and we still didn't get paid.

10  Q.   At that point in time, did you have any awareness as to

11  whether or not there was any inaccuracies or problems with the

12  accounting that Gyro-Trac was using to come up with its

13  contention that it was owed 7 or $800,000?

14  A.   In short, in my estimation -- this is my opinion.

15  Accounting was a mess.  I don't know how anybody could tell

16  anything.

17  Q.   As you're sitting here today, have you ever gone back to

18  try to figure out legitimately whether that number was even

19  close to right?

20  A.   I've tried.

21  Q.   Have you been able to do it?

22  A.   No, sir.

23  Q.   As you're sitting here today, can you tell us whether or

24  not that number was off by 5 percent or 50 percent or 90

25  percent?

USCA5 3582

144

1   A.   I have no idea.

2   Q.   Would you agree --

3   A.   Let me rephrase that.  I know what equipment he had in

4   hand.  So I know the value of some of the equipment.  So that

5   adds up to maybe $300,000.  Maybe.  I don't know what he had

6   in hand.  But around 3 or $400,000 of equipment.  Other than

7   that I have no idea how all that works out.

8   Q.   Let me ask you this.  Irrespective of what the agreement

9   marked as Exhibit 3 says, are you telling the jury in this

10   case that Gyro-Trac was counting towards the $500,000 line

11   whatever equipment John had in his position?

12   A.   I believe so.

13   Q.   And that was about $300,000?

14   A.   Three or four.

15   Q.   So at least coming back to that time period and trying to

16   put ourselves in what Gyro-Trac's intent was, regardless of

17   what the contractual terms of Exhibit 3 say, Gyro-Trac was

18   looking at it as John has $300,000 worth of our equipment and

19   he owes us for it?

20   A.   Gyro-Trac was looking at $700,000 worth of equipment or

21   $700,000 worth of bills, but I don't know how all that came

22   about.

23   Q.   So how they came up with that $700,000, you just don't

24   know?

25   A.   I know that we sold them equipment.  We gave them

USCA5 3583

1   equipment they put in the field.  And there was a lot of

2   things going on royalty payments.  There was contention over

3   all sorts of things.

4   Q.   But nevertheless, at that point in time, you'd agree with

5   me that Gyro-Trac's accounting was, in your words, a mess?

6   A.   That I would agree with, yes.  I'm going to need more of

7   this.

8   Q.   Let me show you what's been marked as JF Number 2.  Tell

9   me if you recognize that document.

10  A.   Yeah, I recognize it.  I've been over and over and over

11  it again in those days.

12  Q.   And what is that document?

13  A.   This is an attempt on my part, through my secretary was

14  Christy, last name not coming to me at the moment, but at any

15  rate, to figure out what sales have been made taking Gyro-Trac

16  accountants figures and what was supposedly paid in Rowmec and

17  what wasn't supposed to be paid in royalties to Rowmec, trying

18  to figure out where they were in their payment plan.

19  Q.   What's the date of that document?

20  A.   I don't know actually.  Let's see.  It's on here

21  somewhere.  It's just a compilation of stuff.  I don't think

22  there's actually a date on the document.  There's dates when

23  things were happening.  But I don't remember when I actually

24  did this.

25  Q.   What's the most recent date that's documented in that

USCA5 3584

146

1  *document?*

2  *A.   Looks like it was the fifth month.  Dates on from 5/3 to*

3  *5/31.*

4  *Q.   What year?*

5  *A.   2004.*

6  *Q.   After that document was generated, what was the next*

7  *effort that Gyro-Trac made to sit down and really try to*

8  *figure out who owed who what, or did that ever even happen?*

9  *A.   I don't recall that ever happening at Gyro-Trac.  I*

10 *recall me trying to always get in the middle of it and try to*

11 *solve it, but I couldn't get a lot of cooperation and I never*

12 *could get to the bottom of some of these discrepancies.*

13 *Q.   If you don't mind, let's go over some things here.  And*

14 *again, this is Exhibit JF-2.*

15 *A.   Oh, it's on the screen.*

16 *Q.   I'm going to zoom in here.  Your best recollection is*

17 *that this document was generated sometime in the middle part*

18 *of '04?*

19 *A.   Had to be, yes.*

20 *Q.   And are these your notes and comments that you inputted*

21 *here?*

22 *A.   Yes, they are.*

23 *Q.   The first notation you make is problem.  We treat some*

24 *federal as exempt and some as not exempt.  What are you*

25 *talking about there, some federal what?*

USCA5 3585

1  A.   These are sales to the federal government agencies,

2  whatever they may be, forestry, National Guard, whatever.  We

3  sell GT-18s to one of them or GT-10s to one of them and

4  royalties were not paid to Rowmec.  Another and royalty was

5  paid on it.  And that's what some of this documentation was

6  out there.

7              That's one month that I did and that's the

8  discrepancies why these things were.  And this was internal

9  memo sent to our accountant at the time.

10  Q.   By the way, this memo that we're looking at, this is

11  specific to the Rowmec's account?

12  A.   This is just Rowmec.

13  Q.   And this is just one month?

14  A.   Oh, yeah.

15  Q.   And these are major problems you noted just one month

16  that, I assume, you picked by random or just simple --

17  A.   That was the month I was working with.  That was the

18  month that had just ended and I wanted to see what they were

19  doing.

20  Q.   So you picked that out of the hat and take a snapshot.

21  See what's happening?

22  A.   Uh-huh.

23  Q.   And you saw a mess?

24  A.   You can see my notes.  Yes, I saw a mess.

25  Q.   And there, again, we pay for some and not for other sales

USCA5 3586

1   *to the same institution.*

2   *A.   Yeah, that was good.*

3   *Q.   You would agree with me that was a major problem?*

4   *A.   Yes.*

5   *Q.   And you'd agree with me depending on how you account for*

6   *that, that could make a potential big difference on that*

7   *$700,000 bill?*

8   *A.   Yes, sir, I do.*

9   *Q.   Next one.  Many of these accounts were supposed to pay*

10  *but didn't.  Does that mean Rowmec was supposed to get paid*

11  *money but you did not?*

12  *A.   Yes, sir.*

13  *Q.   Big difference on that $700,000 account?*

14  *A.   Yes.*

15  *Q.   Other accounts were not supposed to be paid but did.  Any*

16  *specific examples?*

17  *A.   If I looked at it long enough I would find them there.*

18  *Can I have the thing back so I can see it?*

19  *Q.   Sure.*

20  *A.   Because I had some methodology at the top where it says:*

21  *Per Dawn, do we pay or not.  When we see that yes, yes column,*

22  *and the Volusia County Fire Department, yes, we pay, and State*

23  *of Florida Forestry, no, we don't pay.  Big Cypress Wildlife*

24  *Refuge, which is a federal wildlife refuge, yes, we pay.  And*

25  *then let's go up here.  See if I can find any other examples*

USCA5 3587

1  here.   Those are the ones that stood out.   Why are we saying

2  yes to Volusia County Fire Department and no to Florida

3  Forestry but they're not paying for Florida Forestry, which is

4  also a Florida state agency.

5  Q.   You understand that the settlement, Exhibit 3, only

6  exempts sales to the actual state itself?

7  A.   State of Florida.   I understood that, yes.

8  Q.   So for example, Volusia County should have been paid;

9  correct?

10  A.   It's not the State of Florida, it's the county.

11  Q.   Just want to make sure we're on the same page.   Let's go

12  back down here.

13          The next one.   If this is the way the rest of

14  our accounting looks, we are in trouble.   Did you look at the

15  other accounting?

16  A.   Huh-uh.   No.   I need to make this part clear.

17  Q.   Sure.

18  A.   I think I did this once before.   I had a title.   I sold

19  equipment.   Internal workings at Gyro-Trac was kept away from

20  me unless I really dug and take care of my end of the business

21  things were shared with me times.   But to be privy everything

22  that was going on, no.   That was always outside of my realm.

23  Q.   Even though that stuff was out of your realm and you

24  weren't informed, nevertheless the company looked to you to

25  make the decision about whether or not to terminate Rowmec;

USCA5 3588

1   right?

2   A.   Yes.

3   Q.   Then what are you telling me?  I want to make sure I

4   understand.  I'm not trying to put words in your mouth.  I'm

5   trying to figure out what happened.

6   A.   There is a long, drawn out process.  They kept getting

7   worse and worse and worse between the companies with the sales

8   and with service, all kinds of things.  It was a long, drawn

9   out process.  Bruce Coy was investigating.  Bruce Coy was

10  coming back saying this wasn't happening, that wasn't

11  happening.  The customer would call in saying this isn't

12  happening.  It was a long, drawn out process that the company

13  had to have several meetings about.  There was a management

14  team which Daniel was a part of, I was a part of, Bruce was

15  part of, Dawn Wright was part of, Victor LeBlanc was part of

16  it.  It was a long, drawn out process, and finally they made

17  and they the management team wanted to end the relationship

18  with Rowmec before I did.  It was toward the end of that run

19  that I finally agreed we're not getting anywhere and I

20  realized it's just a state we're not going to move.

21  Q.   How long did that process take?

22  A.   Easily a year.

23  Q.   So the notion of firing Rowmec, that notion evolved over

24  a year at Gyro-Trac; right?

25  A.   Yes.

USCA5 3589

1   Q.   In that year time period, to your recollection, did
2   anybody at Gyro-Trac ever call up John O'Hagan or anybody else
3   at Rowmec and say John, this is a specific problem we're
4   having with you and if you don't fix it we're going to
5   terminate this relationship?
6   A.   I did.
7   Q.   What's the first time you had a conversation like that
8   with John?
9   A.   Dates gone are not going to come.  The only way I could
10  even figure that out is somebody to find the flight records
11  when I flew into Houston.  But it was toward the end of this
12  will maybe within -- we had one, two.  I don't know.  I hate
13  to do this, but my memory is vague for a lot of reasons.  But
14  I had one or -- I was there once and then I was there again.
15  The final time that I was there it was like we were talking,
16  we've always been honest with each other and I said, you know,
17  John, if I had the attitude that you have I wouldn't sell a
18  single Gyro-Trac.  If I was worried about having a perfect
19  machine, perfect company, I couldn't even sell the product and
20  it's not going to work because you can't get past this problem
21  you've got.  So at that point, we sort of both agreed, okay,
22  I'm going to go back and agree to end this thing.
23  Q.   You're saying that John O'Hagan agreed to end this thing?
24  A.   I don't think he agreed to end it, but he knew that's
25  what I was going to do when I went back.

USCA5 3590

1  Q.   So with him, at least on that occasion, that you

2  recollected sort of an attitude problem with John?

3  A.   Yes.  I hate to say that, but it's a fact.

4  Q.   Sure.  Okay.  Other than that attitude problem and you

5  suggesting to John you may have to consider ending this

6  relationship, do you recollect any other times that you told

7  John that you might have to end the relationship?

8  A.   No.  I don't think I did actually.  Kept trying to work

9  it and we worked so hard on this.  He and I worked.

10 Q.   So you'd agree with me before John got this letter dated

11 February 2006, from his point of view there was only one time

12 that anybody from Gyro-Trac told him we're considering ending

13 this thing, and that's the example you just gave me?

14 A.   Yes.

15 Q.   How long before this February letter did that happen, the

16 best of your recollection, a month before, two months before?

17 A.   A couple of months, at least, because from there I went

18 to California and I went several places.

19 Q.   You went to Australia?

20 A.   Yeah.  So it was at least two or three months.

21 Q.   So in all fairness, the only time Gyro-Trac ever told

22 John O'Hagan before the boom was lowered on him by this

23 February 2006 letter is one time a couple of months beforehand

24 you met with him and you observed an attitude problem and

25 that's when you let him know the one and only time before the

USCA5 3591

1   *letter, you know, we may have to consider ending this?*

2   *A.    I understand the question my understanding and personal*

3   *involvement, yes.  I do not know what was going on between him*

4   *and Bruce, for instance, or anybody else.  But I can tell you*

5   *from my perspective that's when I was verbally making it known*

6   *I couldn't see a way we could move forward.*

7   *Q.    And are you aware of anybody else's conversations?*

8   *A.    There was a lot of people talking to that man.  I don't*

9   *know who, what, where.  Again, I'm never in the loop in this*

10  *company.  You need to understand that.*

11  *Q.    You were kept out of the loop?*

12  *A.    Yes.*

13  *Q.    Why was that?*

14  *A.    I'm going to make my opinion.  Be sure this is my*

15  *opinion.*

16  *Q.    We understand.*

17  *A.    I'm the front guy.  I'm the honest guy.  Things that are*

18  *going on that we don't want somebody interfering with, we*

19  *don't tell them.  So they kept me out of a lot of things.*

20  *Q.    What kind of things?*

21  *A.    If I knew that, I probably would be a threat, but I don't*

22  *know that because I wasn't in the loop.  That's why I wasn't*

23  *allowed in accounting.  I never went to the factory.  The last*

24  *three years with the company was some kind of insanity.*

25  *Q.    Was it your impression before you left the company, there*

USCA5 3592

1  was dishonesty going on in the accounting?

2  A.   It was my impression, yes, sir.

3  Q.   Do you believe that dishonesty was intentional?

4  A.   I believe that, yes.

5  Q.   Do you believe that some of that dishonesty, some of that

6  intentional dishonesty was directed at Rowmec?

7  A.   Honestly I can imagine that it might be, yes.

8  Q.   Do you believe that some of that intentional dishonesty

9  manifested itself in Gyro-Trac's account of what it thought

10  Rowmec owed it?

11  A.   Possible.

12  Q.   And at the time you sent this letter in February you knew

13  that?

14  A.   Knew what?

15  Q.   You suspected that there was intentional dishonesty in

16  those accounts being used to justify the letter of February;

17  right?

18  A.   It was either that or total incompetence.  And actually

19  to be clear, the person we had in that position was, in my

20  mind, totally incompetent.

21  Q.   And whether it was, to put the best light on it, complete

22  incompetence; to put another light on it, intentional fraud

23  and deception, at the time you wrote the letter in February of

24  2006 you were aware of that; correct?

25  A.   Yes.

USCA5 3593

1  *Q.    Did you voice those concerns to anybody at Gyro-Trac?*

2  *Did you ever say, guys, this is half-baked, this is*

3  *half-baked.  We don't have all the facts and we're sending*

4  *this letter.  What are you pointing at?  Okay.  This was your*

5  *way of letting the company know?*

6  *A.    Of course I did.*

7  *Q.    And your testimony is that between this letter and the --*

8  *these notes?*

9  *A.    Those are notes, yes.*

10  *Q.    And writing the letter of February 10, 2006, you made*

11  *other efforts to try and get people at the company to focus on*

12  *getting to the truth; right?*

13  *A.    Oh, yeah.  I tried -- I'm going to elaborate a little bit*

14  *here.  I tried at one time with Dawn Wright, who was the*

15  *accountant, to reconcile all of the invoicing and billing for*

16  *about a year's worth of invoicing and billing for Rowmec.  It*

17  *could not happen.  The information was so -- it was a mess.*

18  *We just couldn't find anything.  I've never seen accounting*

19  *like this and I spent several years in the hotel business.  I*

20  *know what good accounting looks like.  We know a bar of soap,*

21  *how many we use a day, so I know.  It was impossible.*

22  *Q.    When we look at Exhibit JF-2, that was your effort to*

23  *say, like the movie, Houston, we've got a problem?*

24  *A.    Yes, sir.*

25  *Q.    And that was in '04?*

USCA5 3594

1    A.    Yes, sir.

2    Q.    Between '04 and February of '06 I assume you continued to

3    voice your concerns to management?

4    A.    Off and on, yes, sir.

5    Q.    Houston, we've got a problem?

6    A.    Uh-huh.

7    Q.    Right?

8    A.    Mostly I was told to butt out.

9    Q.    You were told don't worry about it?

10   A.    No.  Don't go there, don't mess with it.  Not don't worry

11   about it.  That's not your job, don't do it.

12   Q.    Is this what has formed your opinion today in part, that

13   there is intentional accounting fraud that they didn't want

14   you to know about?

15   A.    I will not go anywhere saying there was intentional

16   fraud.  I don't know that.  I have no information to that.

17   Was there total incompetence, was the accounting a disaster,

18   absolutely, and can that cause problems, absolutely.  Was

19   there fraud, I don't know.

20   Q.    Would you agree with me that it would have been

21   reasonable for Gyro-Trac to get the true facts before it told

22   Rowmec you owe us $700,000 and if you don't pay us, we're

23   going to terminate your dealership?

24   A.    I would agree with that.

25   Q.    Did that happen?

USCA5 3595

1   A.   Not in my estimation, no.

2   Q.   Would you agree that it would have been unfair and

3   indefensible to put that on the list of reasons to terminate

4   Rowmec?

5   A.   No.  Only with the caveat because there were other things

6   along with not paying, including my personal reputation, my

7   personal job, my personal efforts to help them and my

8   personally being told I would get paid -- the company would

9   pay the company these things.  I even set up a program for

10  payment and that didn't happen, quote/unquote, because the

11  lawyers thought it wasn't a good idea.  So no, that all adds

12  into that still makes that a valid reason for termination in

13  my mind.

14  Q.   Failure to pay we're talking about?

15  A.   Failure to pay, yes, sir.

16  Q.   But nevertheless, you agree with me that it should have

17  been handled differently?

18  A.   Oh, absolutely.

19  Q.   And should have been more completed, right?

20  A.   Yes.

21  Q.   And it wasn't?

22  A.   Yes.

23  Q.   And you'd agree with me that with respect to that one

24  issue, failure to pay, you'd agree with me that John O'Hagan

25  and Rowmec didn't get a fair shake on that one issue?

USCA5 3596

1   A.   I'm thinking about whether I agree with you or not.   I

2   can't agree with you because there were promises that weren't

3   kept in the payment, so I don't agree with you.

4   Q.   What specific promise are you referring to?

5   A.   Again, machines that I fought to get him that he needed

6   sales, he needed cash flow and I said John, you're already

7   over the limit, you haven't paid.   You have to pay.   You made

8   a promise.   John has been honest.   He made a promise to pay.

9   I delivered the machine.   He didn't pay.

10   Q.   Was it Gyro-Trac's position that even if the accounting

11   was wrong, even if it was off by 50 percent, that doesn't

12   matter, John has to pay anyway, no matter how inaccurate the

13   account is?

14           MR. KEENAN:   Objection as to form.

15   A.   Yes.

16   Q.   Going back to that period of time, February of '06.   Have

17   we talked about all the facts that you're aware of and can

18   remember today that's relevant to this failure to pay issue?

19   A.   To the best of my recollection, yes.

20   Q.   Again, I want to finish up this Exhibit JF-2.   We're now

21   on the second page.   So we can put it in the right context, we

22   go from many of our customers experience the same kind of

23   billing problem.   Their accounts are rarely right and then we

24   adjust just them if they catch us.   Again, you're talking

25   about Rowmec?

USCA5 3597

1  A.   I'm talking about everybody at this point.

2  Q.   Next comment.  It has been brought to my attention we

3  have been paying for things we never received; and again,

4  because nobody is verifying.  More time has been committed to

5  investigating this and trying to correct it.

6               Again, another observation about Gyro-Trac

7  accounting?

8  A.   Yes, sir.  It works both ways.  When it's a mess, you

9  lose money as well as make money.

10 Q.   I have a copy of invoices where we charged two different

11 prices for the same part.  There seems to be no consistency in

12 how or what we charge.  Would you agree with that?

13 A.   Yes, sir.

14 Q.   Did that ever change?

15 A.   I believe it did.  In '05 it started changing because --

16 they did a whole parts manual and made everything consistent

17 and they started really getting onto professionalizing the

18 operation, if you put it in that general way.

19 Q.   The next, the customer is not totally stupid.  Are you

20 talking about Rowmec, in particular?

21 A.   Customer in general.

22 Q.   Did Gyro-Trac think any of its customers were partially

23 stupid?

24 A.   According to some of the things that were showing up as

25 billing, yeah, I think they were really nuts that they

USCA5 3598

1   *wouldn't notice these things.  But that's an assumption on my*

2   *part.  This is just my commentary, you know.  Customers get*

3   *billed.  They don't understand.  They're not stupid.  They're*

4   *going to start looking at them to try to figure out what the*

5   *hell is going on.*

6   *Q.   Again, along those lines, like you said, they notice*

7   *these things, customers notice eventually?*

8   *A.   I'm on the end of it when they notice.*

9   *Q.   We waste time making adjustments when we get caught?*

10  *A.   Yes.*

11  *Q.   These problems are just a symptom of the real problem?*

12  *A.   Uh-huh.*

13  *Q.   What's the real problem?*

14  *A.   Total incompetence in our accountant department.*

15  *Q.   Okay.  Other than what you and I have covered, is there*

16  *anything else that you recollect about this failure to pay*

17  *issue in the termination letter?*

18  *A.   No.*

19  *Q.   The next item is failure to service customers.*

20  *A.   Yes.*

21  *Q.   What specific customers were you referring to when this*

22  *letter was written?*

23  *A.   One specific that I remember was a guy named Chris*

24  *Connectstead and, I forget the town, but north Texas.  Had a*

25  *lot of complaints.*

USCA5 3599

1   Q.    Do you remember any other Rowmec customers complaining

2   about Rowmec other than Chris Connectstead?

3   A.    To me directly, no.

4   Q.    What about to somebody else directly observed?

5   A.    In the management meetings Bruce had brought up,

6   investigated, made phone calls to customers to find out their

7   satisfaction level, I guess is what he was doing with Rowmec.

8   And he made statements that all of the people he called were

9   unhappy.  Connectstead is the one that I know about.  But he

10  made statements.  And then Victor LeBlanc, who was the

11  manager, also indicated some, but I don't remember.  I think

12  only five or six of them in the first place.

13  Q.    So what was Bruce Coy's position with the company?

14  A.    He was director of marketing.

15  Q.    A sales guy?

16  A.    Sales guy.  Head sales guy.  Vice president of sales,

17  actually, or marketing.

18  Q.    And just so we're clear on what you heard and who said

19  what, you personally only knew of one customer that had

20  complained about Rowmec?

21  A.    Yes, Chris Connectstead.

22  Q.    So how many times had Gyro-Trac had to send its own

23  truck?  Was that a big deal?  Did you terminate a dealership

24  over that?

25  A.    We terminate a dealership whenever we have information

USCA5 3600

1  *that the dealer is not servicing the customers and not*

2  *responding to their needs.  Absolutely.  That's with any*

3  *equipment.  And I was only in Gyro-Trac.  I've never been in*

4  *the equipment business before.  I know a lot more now than I*

5  *did then.  But it is in their contracts if the customers are*

6  *not happy and satisfied then you have very serious cause to*

7  *terminate their agreement.*

8  *Q.   In your experience has any dealer ever been able to keep*

9  *a hundred percent of their customers, a hundred percent happy,*

10 *a hundred percent of the time?*

11 *A.   Oh, I don't think so.*

12 *Q.   So, you'd agree with me that an occasional customer*

13 *complained about service in no way justifies the termination*

14 *of the dealership?*

15 *A.   True.  Yes.*

16 *Q.   And as you're sitting here today, from what you can*

17 *recollect about this time period, you can recall at least one*

18 *occasion of Victor LeBlanc told you where he had to send a*

19 *service truck, right?*

20 *A.   Yes.*

21 *Q.   And can you recollect why that was?  Was it because*

22 *Gyro-Trac machines breaking down all over the country and not*

23 *enough service trucks?  Do you even know?*

24 *A.   Actually when you put it that way that is a problem.  I*

25 *mean, I don't know.  I think John had five or six customers,*

USCA5 3601

1  but things were breaking down so fast he couldn't keep up with

2  them.

3  Q.   Is it possible, Mr. Flournoy, that the breakdowns in

4  these machines were because of the fault of Rowmec so far

5  beyond what any dealer could reasonably keep up with?

6  A.   It's possible.

7  Q.   And as you're sitting here today, you can't tell us

8  whether that was the situation or not, can you?

9  A.   No, sir.

10 Q.   Now, what was the situation with Chris Connectstead?

11 A.   Well, he was experiencing a lot of breakdowns.  He was

12 out of -- when you break down with one of these machines,

13 you're out of business for however long it takes to come and

14 fix it.  But I don't remember the specifics anymore.  I had a

15 conversation with him, but I couldn't tell you what the

16 specifics are.

17 Q.   I guess what I'm asking what was so bad about Chris'

18 experience with John that justified terminating this

19 relationship with Rowmec?

20 A.   Chris told me he never -- he called and have a problem,

21 try to fix it or try to get service and told me he never got

22 service.

23 Q.   Was his Rowmec -- I mean Gyro-Trac machine broken down a

24 lot?

25 A.   Yes.

USCA5 3602

1  Q.    Do you blame John O'Hagan or his company for his machine

2  breaking down?

3  A.    No, I don't.

4  Q.    That doesn't have anything to do with Rowmec, does it?

5  A.    The machines breaking down don't have anything to do with

6  Rowmec, no.

7  Q.    From what you remember, was he any more unhappy with his

8  Gyro-Trac machine than he was Rowmec?

9  A.    I don't know.   I don't know.

10  Q.    How many times did Chris Connectstead call you and tell

11  you that he had a problem with Rowmec?

12  A.    Twice.

13  Q.    When did that occur relative to the termination letter?

14  A.    He hadn't had his equipment very in the first place, so

15  he'd just got the equipment a couple of months or three months

16  up close to the end of this arrangement, yes.

17  Q.    So that happened at the end?

18  A.    Uh-huh.

19  Q.    And he just spent what, 2, $300,000 on a machine?

20  A.    Uh-huh.

21  Q.    Breaking down a lot?

22  A.    Uh-huh.

23  Q.    You have to answer out loud.

24  A.    Oh, I'm sorry.   Yes.

25  Q.    He was an unhappy customer generally?

USCA5 3603

1    A.    Seemed to be, yes.

2    Q.    There was other machines breaking down in other parts of

3    the country?

4    A.    Yes.

5    Q.    Rowmec was trying to service those breakdowns, too?

6    A.    Yes.

7    Q.    Is it really surprising to you that Chris Connectstead

8    voiced complaints?

9    A.    Oh, no, it's not surprising.

10   Q.    Can you blame Rowmec for that?

11   A.    If the complaints were true, yes.

12   Q.    And what were the complaints?

13   A.    Lack of service, lack of getting out there and getting

14   the machine running when it was broken down.

15   Q.    To your knowledge, did John O'Hagan ever go service those

16   machines?

17   A.    I think he did several times.

18   Q.    And how long did it take between, if you know, between

19   John getting the phone call and being able to go out there and

20   service the machines?

21   A.    I don't know.

22   Q.    Did you ever call John and say, hey, Chris is complaining

23   about you.  Go out there and do something about it?

24   A.    I don't think I did.  If that's Victor LeBlanc's job and

25   he did.

USCA5 3604

1  Q.    How do you know Victor did?

2  A.    I don't know that Victor did.  I know that wasn't my job.

3  I was told I don't do this thing and he turned it over to

4  Victor.  Whether he did it or not, I have no clue.

5  Q.    Other than the things you've talked about here today,

6  information you got from Bruce Coy, some comments you heard

7  about Victor LeBlanc, your general recollection of what

8  happened with Chris Connectstead, are you aware of any other

9  customer complaints about Rowmec?

10 A.    Personally not that I can recall.

11 Q.    Based on those complaints and what we've talked about

12 here today, do you think that is enough to terminate a

13 dealership?

14 A.    I'd give it a lot of consideration before I decided one

15 way or the other.

16 Q.    Now, the next item on the list is failure to pursue sales

17 opportunities?

18 A.    Yes.

19 Q.    If you would, can you tell me where in Exhibit Number 3

20 there is a contractual obligation on Rowmec where they had to

21 pursue sales and they had to sell equipment?

22 A.    Do I have to read this contract or are you going to point

23 me somewhere?  I don't know.  I haven't seen this contract in

24 years, or in a while anyway.

25 Q.    In the day --

USCA5 3605

1   A.   But they have minimum sales requirements they had to

2   meet, for sure.

3   Q.   For what, for commission structures or to keep the

4   dealership?

5   A.   To keep the dealership.

6   Q.   Is that Gyro-Trac's position at the time?

7   A.   I can tell you what my position was.

8   Q.   Sure.

9   A.   That might be helpful.

10  Q.   Sure.

11  A.   The dealership arrangement has contractual requirements.

12  They meet minimum sales requirements.  I actually helped them

13  meet some of their minimum sales requirements myself

14  personally.  They're in East Texas and they had all the

15  adjoining states as their territory.  It's a huge territory.

16  There is a boat load of business in that part of the world.

17  There should have been many times more than five machines sold

18  in almost two years.  So from my point of view, in having gone

19  there and tried to bring them to speed, try to get them to go

20  and do the show-and-tow, which you have to do every day, not

21  once a week, not once a month, but every day on the road

22  looking for new people, that's how the business works, that

23  was not happening.  The sales were not happening.  Five sales

24  in a year and a half or two years is ridiculously out of line

25  with the market.

USCA5 3606

1   Q.   *There is a boat load of business to be had there?*

2   A.   *Yes.*

3   Q.   *And this dealership was terminated in February of this*

4   *year?*

5   A.   *Yes.*

6   Q.   *How has Gyro-Trac done in that same territory with that*

7   *boat load?*

8   A.   *I have no idea, and it would have required me to go do*

9   *it.*

10   Q.   *And you left the company in May?*

11   A.   *Uh-huh.*

12   Q.   *And this dealership was terminated in February?*

13   A.   *Uh-huh.*

14   Q.   *But even before the termination you were participating in*

15   *helping them make sales; correct?*

16   A.   *Uh-huh. Yes.*

17   Q.   *Well, let's say between February and May, how did*

18   *Gyro-Trac do with the boat load of business opportunities that*

19   *were available to sell machines in that territory?*

20   A.   *I don't know what was sold in that period. I'd have to*

21   *have a record. I don't know.*

22   Q.   *As you're sitting here today, can you recollect Gyro-Trac*

23   *selling one machine in that boat load of business territory?*

24   A.   *I didn't sell any. I didn't go over there and try. I*

25   *got put onto government business and got taken out of the*

USCA5 3607

1  *loop.*

2  *Q.   As we're sitting here today in November 2006, do you have*

3  *any idea how Gyro-Trac has done with this boat load of*

4  *business?*

5  *A.   None whatsoever.*

6  *Q.   Is there a specific sale that you think Rowmec could have*

7  *made that they didn't?*

8  *A.   No.*

9  *Q.   Before this termination letter was sent, could you*

10  *testify to the jury in this case under oath that there was a*

11  *single sales opportunity that Rowmec missed in its territory?*

12  *A.   The question is -- I'm going to have to ask a question*

13  *about the question because the question is not answerable in a*

14  *yes or no format.  Is that okay with you?*

15  *Q.   I'm happy to clarify my question.*

16  *A.   Clarify your question.*

17  *Q.   One of the justifications for terminating the dealership*

18  *was Rowmec is not selling what Gyro-Trac thought Rowmec should*

19  *sell in its territory?*

20  *A.   Yes.*

21  *Q.   Would you agree with that?*

22  *A.   I agree with that.*

23  *Q.   Now, you have sort of general business ideas that they*

24  *should have been selling, quote, a lot more because, quote,*

25  *there's a boat load of business to be had?*

USCA5 3608

1  A.   Yes.

2  Q.   Right.  Let's start with this.  What do you base that on?

3  A.   I base that on what other companies are doing and what I

4  did myself in the territories I was selling in.  I can 12 to

5  14 machines a year on average.

6  Q.   What territories were you in?

7  A.   Southeastern United States primarily.

8  Q.   Do you know whether that market is the same market as the

9  Texas market, for example?

10  A.   It's almost identical.  Mentalities are different of the

11  people, mentalities, but the market is.  Development that's

12  going on what these machines are in.  It's there.

13  Q.   And so you believe that if you can do it in the Southeast

14  United States, your assumption was that all the other markets

15  in the US are exactly the same?

16  A.   Absolute not.  That would be ludicrous.

17  Q.   But you believe Texas --

18  A.   Texas is -- East Texas and Louisiana, Mississippi are

19  definitely hot markets for this kind of equipment definitely.

20  Q.   And what's the competition like in East Texas?

21  A.   Mostly you've got Fecon, Raycon, Timer Axe, Hyper Axe.

22  There's a bunch of them.

23  Q.   Okay.  To be clear, you as a sales guy for Gyro-Trac, you

24  had certain expectations of what the market should do; right?

25  A.   Absolutely.

USCA5 3609

1  Q.    And you believe that Rowmec wasn't capturing the full

2  potential of the market; correct?

3  A.    Absolutely.

4  Q.    And as you're sitting here, though, you can't tell us one

5  specific example of a sale that they lost that they should

6  have made?

7  A.    You're splitting a hair, so I'm going to answer it as

8  you're splitting a hair.  Okay.  Can I respond anyway or what?

9  Q.    You are free to respond, but the editorializing about the

10 question we're going to make an objection.

11 A.    Oh, that's fine.  As long as I can answer.

12 Q.    The question is, even though you have these criticisms of

13 Rowmec, as you're sitting here today, you can't give us one

14 concrete, specific example of a sale that they missed?

15 A.    No.  Now I'm going to go to my answer.

16 Q.    Okay.

17 A.    This is a very specific reason I'm going to this answer.

18 Anybody that came to Rowmec and wanted to buy a machine got

19 the machine.  But that's not the business.  We're not

20 order-takers.  In order to do this business, you go on the

21 road and find customers and you beat down the doors and get

22 the work done.  They were not doing the work to find customers

23 to make real business.

24          And the second part of this answer that you're

25 not going to like is, the reason I thought when I came out of

USCA5 3610

1  the hospital and when this thing always coming back in '03,

2  this was a good idea, they could make a lot of money in that

3  market, because I knew that market and I thought this would be

4  a good way for everybody to win and for them to make money.

5  And it's there and they didn't do it.

6  Q.   And as you're sitting here today, you can't tell the jury

7  whether or not Gyro-Trac has practiced what you're preaching?

8  A.   I don't know what they're doing.

9  Q.   So whether or not this great boat load of opportunity in

10  the land of milk and honey in Texas, you don't know whether or

11  not Gyro-Trac has done a single thing with it?

12  A.   Can't tell you.

13  Q.   But nevertheless, this was a reason to fire Rowmec?

14  A.   Yes.

15  Q.   The next thing on the list is failure to properly train

16  service and sales staff.  That's the next reason Rowmec was

17  fired?

18  A.   Yes.

19  Q.   What specifically were the shortcomings in that regard?

20  A.   The service was something that Victor and everybody came

21  up with.  The sales portion of this was the sales person that

22  I had to work with was John, Jr., which is senior's son,

23  obviously.  He's a very smart young man.  My problem overall

24  was that he spent his time in the shop and not out on the

25  road.  He was always in the business with the shop, but wasn't

USCA5 3611

1   *a salesman.   And I -- many times we explained in the beginning*

2   *there had to be a salesman on the road and he had to be*

3   *specific to selling this product.   I think that's part of the*

4   *contract, actually.   And then I needed to be able to train*

5   *somebody and know they'd be on the road.   That didn't happen.*

6   *John is a very bright young man and he can do the sales, but*

7   *mostly he spend his time running the business and doing*

8   *whatever.   He stayed at the office.   I have to have a salesman*

9   *who is on the road with a vehicle with that machine that we*

10  *gave them to do the demonstrations with on the road*

11  *demonstrating that machine on a regular basis.*

12  *Q.   You agree with me, they don't have a machine, they can't*

13  *do the demos?*

14  *A.   I agree with you.   They had machines, though, so I don't*

15  *know what your point is.*

16  *Q.   Other than what you just told me, are there any other*

17  *specific concrete examples you can give me of failure to*

18  *properly train service staff?*

19  *A.   That's it.*

20  *Q.   John Junior.   That's it?*

21  *A.   No salesman.   That's it.*

22  *Q.   Next on the list is use of consigned Gyro-Trac equipment*

23  *for Rowmec's benefit.   What does that mean?*

24  *A.   Gyro-Trac gave Rowmec a GT-18 modification with new*

25  *planar tooth technology for their demonstration machine.   I*

USCA5 3612

1  was doing some demo work for them down there, and was told

2  specifically by a customer but he has was in South Texas, that

3  he had a contract for some amount of land to do.  And Rowmec

4  took the contract and did the contract, and basically, he

5  said, took the contract out from under him, or away from him,

6  however.

7  Q.    Interesting.  Who was that customer?

8  A.    His name is not in my head.  I don't know.  John would

9  know because he was John Junior's -- at least was there on

10  that, so John junior would know who that was.  He's in South

11  Texas and he had a sharp -- I'm trying to think.  I just can't

12  remember.

13  Q.    Well, what were the circumstances surrounding that?

14  A.    Well, we were demoing this equipment and he was unhappy

15  because we had told him he had this contract and

16  circumstances, as I recall.

17  Q.    What was the contract that the guy said he had?

18  A.    I don't recall the numbers or what.  Just had some land

19  he was going to clear and they got the contract and they came

20  and they came and cleared the land with Gyro-Trac machine.

21  Q.    Did this customer, whose named you can't remember, tell

22  you whether or not he had a written contract to clear the

23  land?

24  A.    He didn't tell me that.

25  Q.    Did he ever tell you for sure he was going to clear the

USCA5 3613

1   *land?*

2   *A.   It's been a long time.*

3   *Q.   Did you follow-up and ask him what are you talking about,*

4   *what contract, let me have some details here?*

5   *A.   No.*

6   *Q.   You never did that?*

7   *A.   No.*

8   *Q.   Did anybody else at Gyro-Trac ever do that?*

9   *A.   No.*

10  *Q.   Did you tell John O'Hagan this funny complaint?*

11  *A.   I did.*

12  *Q.   What did John tell you?*

13  *A.   He said it was a contract he had, or something to that*

14  *effect.   His contract.*

15  *Q.   Did you get involved kind of as a referee who was right*

16  *or who was wrong?*

17  *A.   No.   I let it drop.*

18  *Q.   As you're sitting here today, can you tell the jury who*

19  *was right or who was wrong in that dispute if there even was a*

20  *dispute?*

21  *A.   No.*

22  *Q.   Whether or not that customer was even telling the truth?*

23  *A.   No, I can't.*

24  *Q.   But nevertheless that was a reason to terminate this*

25  *dealership in your mind?*

USCA5 3614

1   A.   There was other evidence of this use of equipment in my

2   mind.

3   Q.   Great.  I want to hear it.  What was it?

4   A.   The machine went over there with 900 or a thousand hours

5   and came back with 800 hours on it.

6   Q.   What does that mean?

7   A.   800 more hours, so 1,800.  That means 800 odd hours that

8   machine was used.  Since we weren't together and showing and

9   we weren't demonstrating, how did it get 800 more hours on it,

10  and the machine came back.  When I saw the machine, I was

11  appalled when I saw the machine.  The head on that machine,

12  the teeth were worn clear down to the house.  The thing was

13  abused.

14  Q.   And what machine was that?

15  A.   The GT-18 modification we had given them for

16  demonstration purposes.

17  Q.   When did that happen?

18  A.   They got the machine a year and a half earlier.  It was

19  repossessed just before I left the company.  I saw it in the

20  yard.

21  Q.   And did you talk to John about it?  Did you ask him hey,

22  what happened here?

23  A.   No.  Like I said, I hadn't seen the machine.  They

24  repossessed it at Gyro-Trac very, very shortly before I left,

25  before I quit the company.

USCA5 3615

1   Q.   Did you see the machine before or after the dealership

2   was terminated?

3   A.   After.

4   Q.   Did you this 800-hour issue, I'll call it, that even come

5   to your attention before the termination letter was sent?

6   A.   Yes.

7   Q.   How did it come to your attention?

8   A.   I guess Victor probably brought it up in a meeting.   That

9   would be how it would normally come.

10   Q.   Call John and say what's the explanation for this?

11   A.   I didn't.   I don't know if anybody ever did.

12   Q.   Did anybody ever call up John and say, hey, we need an

13   explanation and we're going to fire you as a dealer over this?

14   A.   I didn't.   I don't know if anybody else did.

15   Q.   Do you believe that before you will fire a dealer it

16   might be reasonable to call them up and say, hey, what's the

17   story here?

18   A.   Yes.

19   Q.   But that never happened?

20   A.   I didn't do it.

21   Q.   To your knowledge, did anybody ever do it?

22   A.   I don't know.

23   Q.   So other than this uninvestigated situation, 800 hours on

24   the machine and this uninvestigated whose name you can't

25   recollect, maybe truthfully maybe not, that John took a

USCA5 3616

1  *contract away from him.  Are there any other examples you can*

2  *tell the jury about this case where Gyro-Trac used consigned*

3  *equipment for its benefit?*

4  *A.   You mean where Rowmec used.*

5  *Q.   I'm sorry, Rowmec.  Other than that.*

6  *A.   The hours and the customer is what convinced me.*

7  *Q.   So in your mind these unconfirmed, undiscussed,*

8  *uninvestigated submissions was enough to terminate a*

9  *dealership over?*

10  *A.   This particular, yes, sir.*

11  *Q.   And then the last is failure to meet minimum sales*

12  *requirements?*

13  *A.   Uh-huh.*

14  *Q.   We've already talked about that; right?*

15  *A.   Uh-huh.*

16  *Q.   Kind of a repetition of things already covered?*

17  *A.   It is.*

18  *Q.   What I've tried to do with you here today, Mr. Flournoy,*

19  *is go through and identify the specific examples, everything*

20  *that, at least, you were aware of at the time this termination*

21  *letter was sent that justified in Gyro-Trac's mind the*

22  *termination of the dealership, you understand that's the*

23  *conversation we've been having?*

24  *A.   Yes, sir.*

25  *Q.   Is there anything else that comes to mind that you think*

USCA5 3617

1  is important for the jury to hear in this case justifying the

2  termination of this dealership?

3  A.   No, sir, I don't think so.

4  Q.   Do you believe that Gyro-Trac was justified in

5  terminating the dealer relationship when you wrote the letter

6  that is Exhibit 2?

7  A.   Yes, sir.

8  Q.   Do you believe that Rowmec held up its end of the bargain

9  in terms of trying to be a good dealer for Gyro-Trac?

10  A.   Trying, yes.  Getting it done, no.

11  Q.   And ultimately in your business, that's what it's all

12  about, isn't it, getting it done?

13  A.   Yes, sir.

14  Q.   Is the floor plan arrangement I believe that you and

15  Mr. O'Hagan reached concerning getting the $700,000 balance

16  back under control; is that right?

17  A.   Yes.  Terminology is a little off.  This isn't a floor

18  plan.  A floor plan is the line of credit.  This is actually

19  an attempt to find the way to make sales and through the sales

20  be able to supply John O'Hagan's business with enough money to

21  keep it fluid and still get Gyro-Trac paid back so we get paid

22  down to -- somewhere the goal was to get around $200,000 or

23  thin line of credit, so room in the line of credit to buy

24  equipment.

25  Q.   At the injunction hearing both you and Mr. O'Hagan

USCA5 3618

1    testified that this agreement was reached and it was the

2    intent of both parties to operate under this agreement.  Would

3    you agree with that?

4    A.   Yes.

5    Q.   If you go to the section where it says payments to GT

6    outstanding.  Do you see that?

7    A.   Uh-huh.

8    Q.   Why don't you explain to the jury how this was supposed

9    to work just in --

10   A.   Let me see if I can figure that out.

11   Q.   Just take that, if you want it.  Whatever.

12   A.   Can I take that?  That would be easier than looking at

13   the screen.

14   Q.   Sure.

15   A.   I'm going to review this a minute because it's been a

16   while since I've seen this.  The way I worked this out is they

17   had -- say I'm working with Wright Tree, GT-25 sales, the

18   first one was sold, the second one was sold, that's why I put

19   sold out here.  So there was -- I didn't give -- because we

20   were trying to get the balance down, they agreed to this --

21   John agreed to this -- I only gave them -- let's see, pay

22   Gyro-Trac 27,000 and I think that left 15,000.  No, I have to

23   work out my numbers here.  We were in the hole on that deal.

24   That's right.  They were in the hole on that deal because they

25   sold that for something less than the 200,000.  Yeah, sold

USCA5 3619

1  *that for something less than the $275,000.  I got to work this*

2  *out a little bit.  The gist of this thing, just to be very*

3  *clear, is they had two or three sales.  Two sales sold.  They*

4  *agreed to give me this $100,000 you see on the second deal*

5  *which is the second Wright Tree deal that was to be paid*

6  *towards --*

7  *Q.   Outstanding balance?*

8  *A.   -- and they this I believe.  I think I remember they gave*

9  *us that.  And then every sale that was made from then on was*

10 *going to be split up according to a payment to Gyro-Trac,*

11 *which is where it says pay to Gyro-Trac, and then the balance*

12 *of that commission was paid to them.  In fact, the way I had*

13 *set it up was that the deal would be made and the moneys would*

14 *go to Gyro-Trac and Gyro-Trac would distribute the money to*

15 *itself and back to Rowmec.  The goal was within 10 machines I*

16 *had it to where they were down to $211,000.  That was the plan*

17 *I had worked out.  And I don't think we had a time frame on*

18 *it, but we might have.*

19 *Q.   Did Gyro-Trac get the payments that Rowmec agreed to pay*

20 *to them?*

21 *A.   I'm pretty sure they got the 100,000.  I don't know about*

22 *the rest.  I'm pretty sure they got the 100,000.*

23 *Q.   Do you know whether or not this arrangement was ever*

24 *successful?*

25 *A.   It became not successful.  At some point Rowmec stopped*

USCA5 3620

1  *paying or --*

2  *Q.   Was that part of the reason why you felt that it was*

3  *justified they be terminated?*

4  *A.   Absolutely.*

5  *Q.   Do you know an accountant by the name of Steve Quirion?*

6  *A.   Yes.*

7  *Q.   Do you consider him to be a competent accountant?*

8  *A.   No, I don't.*

9  *Q.   You don't.  Okay.  Do you know if Mr. Quirion has the*

10  *equivalent of a CPA license in Canada?*

11  *A.   No idea.*

12  *Q.   Would it be fair to say at this point in time you don't*

13  *have personal knowledge at all about the status of the balance*

14  *between Rowmec and Gyro-Trac?*

15  *A.   I have no knowledge.  I do not know what's going on.*

16       (Videotape deposition stopped)

17           MR. BANDAS:  At this time we would call Steve

18  Quirion by videotape deposition.

19     (**STEVE QUIRION,** Plaintiff's witness, via videotape)

20                    <u>**EXAMINATION**</u>

21     (Videotape playing)

22  BY MR. BANDAS:

23  *Q.   Good afternoon, would you please state your name for the*

24  *record.*

25  *A.   My name is Steve Quirion.*

USCA5 3621